Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CHRISTOPHER C. LUKE                                        PLAINTIFF

VS.                         CIVIL ACTION NO. 3:14cv240 DPJ-FKB

NESHOBA COUNTY, MISSISSIPPI, ET AL.              DEFENDANTS

_____

DEPOSITION OF ANGEL CROCKETT
_____

Taken at the instance of the Plaintiff at

Wade White, PLLC

501 West Main Street

Philadelphia, Mississippi

Wednesday, April 1st, 2015

Commencing at 3:35 p.m.


*******

Reported by:

Katherine Lusk, CCR 1731


EMM, INC. REPORTING   (601)506-8261
EMMREPORTING@GMAIL.COM

**EXHIBIT "D"**

Page 2

```
 1              APPEARANCES
 2
 3  COUNSEL FOR THE PLAINTIFF:
 4    ROBERT O. WALLER, ESQUIRE
      WALLER & WALLER
 5    220 South President Street
      Jackson, Mississippi 39201
 6    Post Office Box 4
      Jackson, Mississippi 39205-0004
 7    Phone: (601) 354-5252
      Fax: (601) 354-2681
 8    bobwaller@wallerandwaller.com
 9
10  COUNSEL FOR THE DEFENDANTS:
11    STEVEN J. GRIFFIN, ESQUIRE
      DANIEL COKER HORTON & BELL
12    4400 Old Canton Road, Suite 400
      Jackson, Mississippi 39211-5982
13    4400 Old Canton Road, Suite 400
      Jackson, Mississippi 39211-5982
14    Phone: (601) 969-7607
      Fax: (601) 969-1116
15    sgriffin@danielcoker.com
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2
 3  Style...................................1
 4  Appearances.............................2
 5  Index...................................3
 6  Examination by Mr. Waller...........4, 30
 7  Examination by Mr. Griffin.............26
 8  Certificate of the Court Reporter......31
 9  Certificate of the Deponent............32
10
11            EXHIBITS
12
13  1 - Health Care Services, Policy No. F-101............7
14  2 - Staff and Inmate Movement, Policy No. C-108.......7
15  3 - Policy and Procedure Directives...................7
16  4 - Incident Report/Statement.........................7
```

Page 4

```
 1              ANGEL CROCKETT,
 2  having been first duly sworn, was examined and testified
 3  as follows:
 4      MR. WALLER:  Okay.  This is the deposition of
 5  Angel Crockett taken pursuant to notice and Rules of
 6  Mississippi Civil Procedure.  Objections except as to
 7  form will be reserved for the trial of the matter.
 8              EXAMINATION
 9  BY MR. WALLER:
10      Q.  Ms. Crockett, I'm Bob Waller.  I represent
11  Christopher Luke, and I want to ask you some questions
12  under oath.
13      What is your name as it appears on your birth
14  certificate?
15      A.  Angel Crockett.
16      Q.  Okay.  What is your home address?
17      A.  821 Chestnut Street, Philadelphia, Mississippi
18  39350.
19      Q.  And how long have you lived there?
20      A.  All my life.
21      Q.  Okay.  Where were you born?  I guess -- I guess
22  there, huh?
23      A.  Uh-huh (affirmative).
24      Q.  Philadelphia?
25      A.  I was born in, actually, Union.
```

Page 5

```
 1      Q.  Okay.
 2      A.  Newton County.
 3      Q.  Date of birth?
 4      A.  12/9/77.
 5      Q.  High school education?
 6      A.  Philadelphia High School.
 7      Q.  Any additional education?
 8      A.  East Central Community College and Mississippi
 9  State University.
10      Q.  Did you get a degree?
11      A.  Uh-huh (affirmative).  Bachelor of Science in
12  teaching elementary education.
13      Q.  Your degree is in education?
14      A.  Uh-huh (affirmative).
15      Q.  Okay.  What's your work history?
16      A.  I've been employed with the Sheriff's Department
17  since April of 1997, and with Philadelphia Public
18  Schools since August of 2011.
19      Q.  You currently work for the school?
20      A.  I do.
21      Q.  And the Sheriff's Department?
22      A.  I do.
23      Q.  Are you married?
24      A.  I am.
25      Q.  What is your husband's name?
```

2 (Pages 2 to 5)

Page 6

1   A. Marcus Coleman.
2   Q. Do you have any children?
3   A. No.
4   Q. Most of your family lives in Neshoba --
5   A. Yes.
6   Q. -- County? Okay. Have you ever given a
7   deposition before?
8   A. No.
9   Q. What is your job title with the Sheriff's
10  Department?
11  A. Jailer.
12  Q. Okay. And what training have you received in
13  that job?
14  A. The minimum standards course.
15  Q. Certification?
16  A. Uh-huh (affirmative).
17     MR. GRIFFIN: Make sure you say yes or no.
18     THE WITNESS: Okay.
19  BY MR. WALLER:
20  Q. There are three documents in front of you. Have
21  you seen any of these documents before today?
22  A. I have.
23  Q. Okay. When did you see them?
24  A. I can't say exactly, but I have seen them. I'm
25  pretty sure it was a while back.

Page 7

1   Q. Okay. And they're labeled -- they're dated 1995,
2   4 of 1995, Staff and Inmate Movement, Policy and
3   Procedure Directives and Health Care Services. That's
4   the three documents, and I said them in reverse order.
5   A. Okay.
6   Q. Did you give a statement regarding Chris Luke
7   on -- that occurred May 28th, 2013?
8   A. Did I give a report or --
9   Q. A written statement?
10  A. I did.
11  Q. Okay. I have it here, and ask you to look at
12  that --
13  A. Okay.
14  Q. -- and see if that's your statement.
15  A. It is.
16  Q. I'm going to ask you to read it, too. Read it
17  out loud, please.
18  A. The entire thing?
19  Q. Yes, ma'am.
20  A. Okay. "An inmate in B block was beating on the
21  dayroom door. I zoomed the camera in on B block and
22  noticed the inmates were huddled around inmate Chris
23  Luke, who was sitting on the stool near the wall. I
24  asked what was going on. One of the inmates said that
25  Luke was sick, and he couldn't stand up. At this time,

Page 8

1   with the aid of others, Luke attempted to stand and fell
2   down. I called to booking and asked for Officer Hickman
3   to come to see what was going on. Officer Guess and
4   Officer Walker came up with Officer Hickman. The
5   officers went to B block. Inmate Luke was lying by the
6   dayroom -- by the dayroom day." That was supposed to be
7   door. "Officer Hickman came back to the control room to
8   get the blood pressure machine. Officer Guess and
9   Officer Walker stayed in the block. Officer Hickman
10  attempted to check inmate's blood pressure, and he
11  started to fight. The officers tried to get him to calm
12  down, but he continued to struggle and fight. After I
13  saw the officers was having major trouble with this
14  inmate, I called the jail administrator, Jimmy Reed, and
15  he might need to come and assist the officers. Jimmy
16  Reed, Tommy Waddell, Josh Burt, and Ken Spears came to
17  the back to help with the inmate. The officers was
18  finally able to cuff him. Officer Hickman and Officer
19  Walker carried him to booking. He was still bucking and
20  resisting. Luke was taken to the booking area. Later
21  that afternoon, before Luke was moved to isolation, he
22  was beating his head on Detox 2 door. He was running
23  from the back of the cell to the door saying, 'Help me.'
24  I asked him to stop. He said, 'I've got to get out of
25  here.' After doing that about four times, he stood at

Page 9

1   the door with his head laid on the door crying."
2   Q. When did that happen?
3      MR. GRIFFIN: What are you referring to, Bob?
4   BY MR. WALLER:
5   Q. When he said he was moved to isolation. When was
6   he moved to isolation?
7   A. He was moved to isolation later that afternoon.
8   Q. So when was -- when was he beating his head on
9   the door?
10  A. When he was in Detox 2.
11  Q. So Detox 2 was before he was moved to the
12  isolation because that's two different things, right?
13  A. Uh-huh (affirmative). It is.
14  Q. Did you tell anybody he was beating his head on
15  the door?
16  A. Well, if I -- well, I can't recall that detail,
17  but I was aware so...
18  Q. Did you do anything in response to that?
19  A. I attempted to get him to stop.
20  Q. That's not in your report, is it?
21  A. Well, because it's not in the report don't mean
22  it didn't happen. I mean, we --
23  Q. How did you -- what did you --
24  A. -- we try to do all we can to see after the
25  inmates. I mean, I wouldn't sit there and watch him

Page 10

1    beat his head on the door and not attempt to do
2    anything.
3        Q.  Did you ask him why he was doing that?
4        A.  Why he was beating his head on the door?
5        Q.  Yeah.
6        A.  No, I didn't ask him.  I asked him to stop.
7        Q.  He was saying, "Help me."  Did you help him?
8        A.  Yes, I did help him --
9        Q.  How did you help him?
10       A.  -- by trying to get him to calm down and stop.
11   I -- at that time, I didn't know any help that I could
12   give him.
13       Q.  What shift did you work that day?
14       A.  I worked the day shift, 7:00 to 5:00, if I
15   remember correctly.
16       Q.  Okay.  So this would have had to happen before
17   5:00 o'clock?
18       A.  Uh-huh (affirmative).  Yes, sir.
19       Q.  All right.  And you -- when did you write this
20   report?
21       A.  The date of the report is May the 28th, 2013.
22       Q.  The same day the incident occurred?
23       A.  Yeah, if that was the date of the incident.
24       Q.  Okay.  And had you seen the video at that point?
25       A.  I did not.

Page 11

1        Q.  Okay.  So how did you know it was Chris -- Chris
2    Luke that was -- that needed assistance?
3        A.  Because he's been in jail before, and I'm
4    familiar with who he is.
5        Q.  But you didn't know that until he came -- until
6    they went in -- went into the dayroom, right?
7        A.  I saw who it was that was on the camera.
8        Q.  How come you didn't tell anybody else that it was
9    Chris Luke in your -- when you told them there was an
10   inmate down in -- the statement that you -- that they
11   said they received from you is that there was an inmate
12   down in the dayroom.
13       A.  Why I didn't say it was Chris Luke, because it
14   didn't matter who the inmate was, there was an inmate
15   that needed help, so I didn't think that -- we don't
16   usually identify inmates with names.  Whenever an inmate
17   need help, and we call for help, then it doesn't matter
18   who the inmate is, then the officers respond
19   accordingly.
20       Q.  Okay.  What kind of help did he need?
21       A.  Well, according to -- he was supposedly sick --
22       Q.  Okay.  How --
23       A.  -- according to the other inmates.  I didn't know
24   if he was sick or not, because I couldn't physically
25   touch him to see if he was sick, but according to the

Page 12

1    inmates, he needed help.
2        Q.  How did you -- how could you hear the inmates?
3        A.  On the intercom.  I called into the cell block.
4    I couldn't physically see if he was sick or not from my
5    point of view.
6        Q.  All right.  So at that point, you didn't know
7    what had happened to him?
8        A.  No, sir.  So I called the booking and -- and
9    relayed the message to them, and they come up, and they
10   check it out, and they go from there.
11       Q.  Okay.  Did you -- did you learn afterwards that
12   he had been hit by another inmate?
13       A.  That was probably days after.
14       Q.  How did you --
15       A.  And that was according to someone else.  I did
16   not see him being hit by another inmate.  I didn't see
17   him hit by anyone.
18       Q.  Did you see a video of it?
19       A.  No, I -- well, I saw the video.
20       Q.  Yeah.
21       A.  Uh-huh (affirmative).
22       Q.  Why didn't you --
23       A.  But not at that time.
24       Q.  Why did you not see it when it occurred?
25       A.  Well, that cell -- the person that works in

Page 13

1    control tower, you answer the telephone, you open the
2    doors.  There's several things that go on in control
3    room, and, also, we had church ladies that were there,
4    and we have civilians that come inside of the jail, and
5    they are actually in the block with the inmates, and we
6    focus a lot on them.
7        Q.  Okay.  Did you have that screen up, the ministry
8    screen up, the girl cell block screen up?
9        A.  All screens were up.  It wasn't only one up, it
10   was all screens.  I mean, this was not like they were
11   having a brawl in the dayroom.  Nobody was hollering,
12   yelling or none of that.  This wasn't like it was a
13   brawl, something that would have just jumped out at me.
14   I was watching the cameras.
15       Q.  Well, you would -- you would agree, would you
16   not, that when these officers went into the dayroom,
17   they didn't know -- they didn't know what had happened,
18   right?  They didn't know what had happened to Chris
19   Luke?
20       A.  Would I agree that that --
21       Q.  Yeah.
22       A.  Well, I would -- the only thing that I would say
23   is they relied on the information that I gave them,
24   that --
25       Q.  But you --

4 (Pages 10 to 13)

Page 14

1   A. -- they needed to come --
2   Q. -- but you didn't --
3   A. -- to the block and check on someone.
4   Q. Yeah.
5   A. They didn't know --
6   Q. But you didn't know --
7   A. -- what they were going into.
8   Q. -- you didn't know either?
9   A. I did not. I had --
10  Q. So --
11  A. -- no way of knowing.
12  Q. -- it's your testimony that you -- you -- you had
13  all screens up when Chris Luke got hit?
14  A. All screens were up, and I did not see Chris Luke
15  --
16  Q. And you --
17  A. -- get hit.
18  Q. -- didn't have the girls' block on the whole
19  screen, covering the whole screen?
20  A. You have to understand, you have all the cameras,
21  and so I flash through, flash through. Time to time,
22  I'm flashing.
23  Q. So --
24  A. So, I mean, I have the girls' blocks up, and I
25  would flash back to see the guys.

Page 15

1   Q. So it's scanning through all the different
2   cameras?
3   A. Manually, you can scan through.
4   Q. It doesn't do it automatically?
5   A. No.
6   Q. Your testimony is you were manually scanning
7   through all the --
8   A. My --
9   Q. -- cameras?
10  A. -- testimony -- my testimony is I was watching
11  the cameras. That's my testimony, I was watching the
12  cameras.
13  Q. What was on the cameras that you were watching?
14  A. I can't recall exactly.
15  Q. What were you watching?
16  A. But the cameras, it watches all the zones. I
17  can't recall exactly.
18  Q. It watches --
19  A. I was watching the cameras.
20  Q. -- it watches all the --
21  A. I was watching A block --
22      MR. GRIFFIN: Make sure he finishes his question
23  before you answer.
24      THE WITNESS: Okay.
25

Page 16

1   BY MR. WALLER:
2   Q. It watches all the zones at the same time?
3   A. The zones are on the cameras.
4   Q. All the zones -- you can see all the cameras at
5   one time?
6   A. You can.
7   Q. How many is that?
8   A. I'm not for sure. I can't recall exactly how
9   many there are. There's several that's on the front
10  door; it's on the gate; it's on all the cell blocks. You
11  have A, B, C, D and E block, and it's on the booking
12  area; it's on the hallway. It's several cameras. I
13  can't be for sure the exact number, so I won't say a
14  number, because I'm not for sure.
15  Q. Well, you're not answering my question.
16  A. I think I'm answering the question to the best of
17  my knowledge.
18  Q. How many cameras are there?
19  A. I'm not for sure exactly how many cameras there
20  are.
21  Q. All right. So were you watching all the cameras
22  simultaneously?
23  A. There's a screen that you can watch all cameras.
24  Q. Is that your testimony --
25  A. That there's a screen --

Page 17

1   Q. -- that you were watching all the cameras
2   simultaneously?
3   A. My testimony is that I was watching the cameras,
4   that I was monitoring the control room. That's my
5   testimony.
6   Q. Which -- which display did you have on your
7   monitor?
8   A. I'm not sure. I can't recall. Sir, we're
9   talking about May the 28th of 2013. I don't think I
10  could go back and ask you what you were doing at a
11  specific time and that you would remember.
12  Q. So your answer is you don't know what you were
13  looking at?
14  A. I know I was watching the cameras. I was
15  watching -- my answer is I was watching the jail
16  cameras.
17  Q. But you don't know which camera -- which screen
18  was on your monitor, do you?
19  A. My answer is I was watching the jail cameras.
20  Q. But you don't know which --
21  A. The jail cameras.
22  Q. -- whether you were watching the girls' block, or
23  A block, or B block, or C block?
24  A. All jail cameras.
25  Q. Simultaneously?

5 (Pages 14 to 17)

Page 18

1  A. All jail cameras.
2  Q. You were watching all jail cameras
3  simultaneously?
4  A. Yes, sir. I was watching --
5  Q. I'd like to get an answer out of you. I'm not
6  going to sit here and argue with you.
7  A. I'm not arguing, either. I didn't think it was
8  an argument.
9  Q. I'd like an answer. What camera were you
10 watching?
11 A. I gave you my answer. That's the only answer I
12 have for you, I was watching jail monitors. That's it.
13 That's the only answer I have for you. We can go back
14 and forth all day with the same thing. I'm not upset.
15 I'm not fussing. I'm just saying that is my answer.
16 You won't get another answer from me, because that is my
17 answer. I'm not upset and not arguing, I'm just
18 answering your question the best I can. That's it.
19 Q. But your testimony is you weren't watching the
20 church service?
21 A. That is not my testimony. I said that I was
22 watching jail cameras.
23 Q. You were watching --
24 A. Jail --
25 Q. -- them all --

Page 19

1  A. -- church --
2  Q. -- simultaneously?
3  A. -- church was occurring in the jail, so that
4  means that I was watching the church.
5  Q. And you said earlier that it was important that
6  you see what was going on in there.
7  A. I said that that was one of my priorities. I
8  didn't say that that was the only thing that I was
9  watching. You're turning my words around.
10 Q. Well, you said earlier --
11 A. No, sir.
12 Q. -- you couldn't remember what you were watching.
13 A. I was watching all jail cameras. That's my final
14 answer.
15 Q. You said initially --
16 A. All jail cameras.
17 Q. -- you said initially, the church service was
18 going on and that's what you were watching --
19 A. I said we pay extra --
20 Q. -- because it has visitors.
21 A. -- we pay extra attention to the jail -- I said I
22 was watching all jail cameras. You're not going to get
23 me to say whatever that you are trying to get me to say.
24 Q. I'm trying to --
25 A. I was watching all jail --

Page 20

1  Q. -- get you to say that that's all you were
2  watching, and that was the full screen.
3  A. Well, sir, you won't get me to say that because
4  that is not true.
5  Q. That's not true?
6  A. I was watching all jail cameras.
7  Q. You don't remember -- you don't remember what you
8  specifically --
9  A. I remember monitoring the jail, monitoring the
10 jail cameras. That's it.
11 Q. Why did it take 10 minutes for you to respond to
12 what was going on in that -- in that room?
13 A. I don't know how long it took to respond. I
14 didn't see anything happen out of the ordinary, so I
15 don't recall how long it took. I didn't see anything
16 happen out of the ordinary in the dayroom, you know, so
17 I don't know how long it took.
18 Q. Why was Brandy Nicole Dutton standing at your
19 counter for the entire time that all this was going on?
20 A. I have no idea, sir. I was in the control room.
21 That's the booking area. I have no idea who was -- who
22 ran the --
23 Q. Was she standing there?
24 A. There was a lady in booking, but I have no idea
25 who she was and what her business was down there.

Page 21

1  Q. Did you know Christopher Luke prior to this
2  event?
3  A. From jail, I did, and his sister went to the same
4  high school I went to. Not on a personal level, just
5  from knowing --
6  Q. You know of him?
7  A. -- like you know other people in town.
8  Q. Yeah. Right. Right. Now, when -- when the
9  inmates in the dayroom are beating on the door, can you
10 hear that where you are?
11 A. You can.
12 Q. Okay. But in order to hear them in that room,
13 you have to turn on an audio speaker. Is that right?
14 A. Correct.
15 Q. So you heard them beating on the door, and you
16 turned on the audio, and what was said?
17 A. I can't recall exactly what was said, but I was
18 informed that he was sick. I don't remember the exact
19 words.
20 Q. Why was Mr. Luke not taken to the hospital for
21 treatment on May 28, 2013?
22 A. I can't answer that. I don't know if he went to
23 the hospital or not. I can't answer that.
24 Q. Did Dr. Soriano see him at any point while he was
25 there?

6 (Pages 18 to 21)

Page 22

1  A. Not to my knowledge.
2  Q. Did the nurse see him at any point when she was
3  there?
4  A. Not to my knowledge. I don't remember seeing Dr.
5  Soriano or the nurse there that day, so I can't answer
6  that.
7  Q. Were any pictures taken of Mr. Luke while he was
8  in your presence?
9  A. Not to my knowledge.
10  Q. Could you -- when you looked -- when you observed
11  the dayroom, what was Mr. Luke doing? You said he was
12  sitting on a stool, I think you said your statement
13  said.
14  A. Uh-huh (affirmative).
15  Q. Is that right?
16  A. I did.
17  Q. All right. Then it says, "At this time" -- on
18  the first page of reading from your statement -- "with
19  the aid of others, Luke attempted to stand and fell
20  down." Is that something you witnessed on the camera,
21  or is that something -- how -- where did you -- how did
22  you come to that knowledge?
23  A. Okay. Where are you reading at?
24  Q. I'm reading the first page. "One of the in" --
25  it starts, "One of the inmates said that Luke was sick

Page 23

1  and couldn't stand up. At this time, with the aid of
2  the others, Luke attempted to stand and fell down."
3  A. And that was on camera.
4  Q. You witnessed that?
5  A. I did, on the camera.
6  Q. When you -- when you called Hickman and asked for
7  Hickman to come to see what was going on, did you tell
8  Hickman that Chris Luke was sick, or do you know?
9  A. I can't recall.
10  Q. Did you tell anybody that Officer -- that Chris
11  Luke was sick, Guess or Walker?
12  A. I can't recall.
13  Q. Did you watch what happened in the dayroom when
14  they went in there, because you kind of -- you kind of
15  say like -- next, you say on Page 2, top of the page,
16  you said, "Luke was laying by the dayroom door." Is
17  this -- are you watching what's going on and writing it
18  down, or is that what you wrote down later?
19  A. Are you saying was I writing it down as this was
20  happening?
21  Q. Well, it almost -- it's what it sounds like, you
22  were looking at the camera and writing this down.
23  You're very specific about where -- where Luke was
24  laying and what -- what happened.
25  A. No, sir. I wasn't writing that while this was

Page 24

1  going on.
2  Q. Okay.
3  A. I don't think anybody wrote a report --
4  Q. You wrote a report --
5  A. -- while it was happening.
6  Q. -- before the day was over, though, right?
7  A. I can't recall, but I know the facts that I wrote
8  were the facts as I saw them.
9  Q. It's dated 5/28/13. That's the day that this
10  happened, so we can assume that you wrote it the same
11  day all this happened?
12  A. I wouldn't assume that. I don't assume anything.
13  If I can't recall, then I will say I can't recall.
14  Q. Your answer is you didn't know when you signed it
15  and when you wrote the report?
16  A. I do know that I wrote it on 5/28. That's the
17  date that's on the report.
18  Q. Who called Josh Burt?
19  A. I called Jimmy Reed. I have no idea who called
20  Officer Burt.
21  Q. Okay.
22  A. I called the jail administrator.
23  Q. And your testimony is you worked 7:00 to 5:00
24  this day, this particular day?
25  A. Yeah, according to the schedule. I really can't

Page 25

1  remember. Sometimes we work over, so I can't -- that's
2  according to the schedule. I really don't remember the
3  exact hours.
4  Q. Have you talked to anybody today about this
5  deposition and what was said -- what would have been
6  said earlier?
7  A. I have not.
8  Q. Okay.
9    MR. WALLER: I'd like her statement and these
10  three documents to be admitted testimony to her -- as
11  exhibits to her testimony.
12    (EXHIBITS 1 THROUGH 4 MARKED)
13  BY MR. WALLER:
14  Q. Let me ask you this: In May of '13, were you
15  teaching school?
16  A. In May, I was.
17  Q. May 28th, was school out by then?
18  A. Yes.
19  Q. Were you working the same shift you're working
20  now part-time?
21  A. Yeah, I went part-time in '11 when I started
22  teaching so...
23  Q. When school is out, do you stay part-time, stay
24  on the same schedule?
25  A. Well, if you're talking about on the same --

7 (Pages 22 to 25)

Page 26

1  Q. May 28th of '13, school would have been out?
2  A. Yes.
3  Q. So you're still part-time at that point?
4  A. Uh-huh (affirmative). Well, yeah.
5  Q. Do your hours go up in the summer when school is
6  out when you're not teaching?
7  A. Usually.
8  Q. Okay. You take on more hours?
9  A. Uh-huh (affirmative).
10 Q. It's still considered part-time?
11 A. It's still considered -- yes.
12    MR. WALLER: I tender the witness.
13         EXAMINATION
14 BY MR. GRIFFIN:
15 Q. Ms. Crockett, I have just a couple of follow-up
16 questions.
17 A. Okay.
18 Q. Maybe more than a couple.
19 A. Yes, sir.
20 Q. Were you physically present when this incident
21 involving Mr. Luke occurred? In other words, were you
22 in the dayroom or in the booking area when these
23 officers were restraining and removing him through the
24 facility?
25 A. No, I was in the control room.

Page 27

1  Q. During the entire incident involving Mr. Luke?
2  A. Uh-huh (affirmative).
3  Q. That's yes?
4  A. Yes.
5  Q. Okay. You were asked about the cameras that you
6  watch, and those are cameras -- are they cameras that
7  look into each of the housing zones?
8  A. Yes.
9  Q. As well as other parts of the facility?
10 A. As well as the entrance gate, both entrance
11 gates, the jail entrance, the deputy's office, the
12 booking area.
13 Q. Well, let me ask you this: Would you have ever
14 gone ten minutes without looking at one of the cameras
15 in the zones?
16 A. No.
17 Q. Okay. When you said you're monitoring all the
18 jail cameras earlier, I mean, how -- how frequently are
19 you looking at each zone using those cameras, just on --
20 just in general terms?
21 A. All the time. Even answering the phone, you -- I
22 mean, the monitor is there. It's not like you have to
23 reach over and go -- I mean, the monitor is there. You
24 can see it. If you're in the control room, you could
25 see it at all times.

Page 28

1  Q. Okay. So you're constantly scanning each of the
2  cameras on the zones?
3  A. Uh-huh (affirmative). Yes, sir.
4  Q. If you had been staring right at the camera for
5  B block where this incident occurred and had seen
6  Mr. William Smith punch Mr. Luke, is there anything you
7  could have done to stop that?
8  A. No, sir. The only thing I could have done was
9  what I did once the inmates informed me that he was sick
10 was call to booking for help.
11 Q. How often when you're looking into the zones
12 using the cameras, do you see inmates lying on the
13 floor?
14 A. All the time.
15 Q. Why is that?
16 A. Well, because once they're out in the dayroom,
17 then they're out in the dayroom, and a lot of them like
18 to sleep, so they lay in the dayroom, lay in the floor.
19 Q. So if you -- if you would have looked at the
20 camera for B block and seen Mr. Luke lying on the floor,
21 would that have caused you any immediate concern?
22 A. No.
23 Q. Did you see any unusual activity in the zone
24 before the inmates were banging on the door?
25 A. No.

Page 29

1  Q. If you see inmates huddled around one table,
2  would that cause you any concern?
3  A. No, because they often play cards. Some of them
4  write letters for each other, and they huddle a lot, you
5  know, writing letters, playing cards, looking in books,
6  magazines so...
7  Q. Okay. And did you have any indication that
8  something was wrong with Mr. Luke prior to these inmates
9  in B block banging on the door to get your attention?
10 A. No.
11 Q. Okay. And did you have any prior indication that
12 the assault where Mr. Smith hit Mr. Luke was going to
13 occur?
14 A. No.
15 Q. Were you aware of any reports by Mr. Luke that he
16 felt threatened by Mr. Smith?
17 A. No, because at booking time, if you have an
18 enemy, then usually that person is identified, and we
19 have a board that we put up the inmate's name, and we
20 keep those inmates separated.
21 Q. Are you aware of any conflict between Chris Luke
22 and William Smith from the time he got to the jail and
23 the time this incident occurred?
24 A. No.
25    MR. GRIFFIN: All right. I have no further

8 (Pages 26 to 29)

Page 30

1  questions.
2      MR. WALLER:  I have redirect.
3          FURTHER EXAMINATION
4  BY MR. WALLER:
5     Q. If you're watching the cameras, and you see
6  something suspicious, is there a way for you to back
7  that camera up --
8     **A. No.**
9     Q. -- to re-watch it?
10    **A. No, sir.  It's live.  I mean, what you see is**
11 **what you get.**
12    Q. So the tape, you don't have any control over the
13 tape --
14    **A. No, sir.**
15    Q. -- where you could rewind it and see what
16 happened --
17    **A. No, sir.**
18    Q. -- or see -- you thought you saw something, but
19 you wanted to go back, and you can't rewind it?
20    **A. No, sir.**
21      MR. WALLER:  That's all I have.
22         (DEPOSITION CONCLUDED AT 4:07 P.M.)
23          *************
24
25

Page 31

1
           CERTIFICATE OF THE COURT REPORTER
2
3    I, Katherine Lusk, Court Reporter and Notary Public,
4  and for the State of Mississippi, hereby certify that
5  the foregoing contains a true and correct transcript in
6  the aforementioned matter at the time and place
7  heretofore stated, as taken by stenotype and later
8  reduced to typewritten form under my supervision by
9  means of computer-aided transcription.
10   I further certify that I placed the witness under
11 oath to truthfully answer all questions in this matter
12 under the authority vested in me by the State of
13 Mississippi.
14   I further certify that I am not in the employ of or
15 related to any counsel or party in this matter and have
16 no interest, monetary or otherwise, in the final outcome
17 of this matter.
18    Witness my signature and seal this the _____ day of
19 _____, 2015.
20
21  /s/Katherine Lusk_____
    Katherine Lusk, CCR # 1731
22
    My Commission Expires:
23  November 6, 2015
24
25

Page 32

1           CERTIFICATE OF THE DEPONENT
2  DEPONENT:  Angel Crockett
   DATE:  April 1st, 2015
3  CASE STYLE:  Christopher C. Luke vs. Neshoba County,
   Mississippi, et al.
4
       I, the above-named deponent in the deposition
5  taken in the herein styled and numbered cause, certify
   that I have examined the deposition taken on the date
6  above as to the correctness thereof, and that after
   reading said pages, I find them to contain a full and
7  true transcript of the testimony as given by me.
       Subject to those corrections listed below, if
8  any, I find the transcript to be the correct testimony I
   gave at the aforestated time and place.
9
   Page    Line           Comments
10 ____    ____    _____
11 ____    ____    _____
12 ____    ____    _____
13 ____    ____    _____
14 ____    ____    _____
15 ____    ____    _____
16 ____    ____    _____
17
       This the ____ day of _____, 2015.
18
19        _____
              Angel Crockett
   State of Mississippi
20 County of _____
21
       Subscribed and sworn to before me, this the _____
22 day of _____, 2015.
23 My Commission Expires:
24 _____   _____
              Notary Public
25