Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CHRISTOPHER C. LUKE                                          PLAINTIFF

VS.                       CIVIL ACTION NO. 3:14cv240 DPJ-FKB

NESHOBA COUNTY, MISSISSIPPI, ET AL.                DEFENDANTS

_____

DEPOSITION OF HARVEY HICKMAN
_____

Taken at the instance of the Plaintiff at

Wade White, PLLC

501 West Main Street

Philadelphia, Mississippi

Wednesday, April 1st, 2015

Commencing at 10:33 a.m.

\*\*\*\*\*\*\*\*

Reported by:

Katherine Lusk, CCR 1731

EMM, INC. REPORTING   (601)506-8261
EMMREPORTING@GMAIL.COM

EXHIBIT "E"

Page 2

```
 1          APPEARANCES
 2
 3  COUNSEL FOR THE PLAINTIFF:
 4   ROBERT O. WALLER, ESQUIRE
     WALLER & WALLER
 5   220 South President Street
     Jackson, Mississippi 39201
 6   Post Office Box 4
     Jackson, Mississippi 39205-0004
 7   Phone: (601) 354-5252
     Fax: (601) 354-2681
 8   bobwaller@wallerandwaller.com
 9
10  COUNSEL FOR THE DEFENDANTS:
11   STEVEN J. GRIFFIN, ESQUIRE
     DANIEL COKER HORTON & BELL
12   4400 Old Canton Road, Suite 400
     Jackson, Mississippi 39211-5982
13   4400 Old Canton Road, Suite 400
     Jackson, Mississippi 39211-5982
14   Phone: (601) 969-7607
     Fax: (601) 969-1116
15   sgriffin@danielcoker.com
```

Page 3

```
 1            INDEX
 2
 3  Style................................1
 4  Appearances..........................2
 5  Index................................3
 6  Examination by Mr. Waller............4
 7  Certificate of the Court Reporter...22
 8  Certificate of the Deponent.........23
 9
10
11           EXHIBITS
12
13  1 - Incident Report/Statement.........8
14  2 - Staff and Inmate Movement, Policy No. C-108......18
15  3 - Policy and Procedure Directives..................16
```

Page 4

```
 1        HARVEY HICKMAN,
 2  having first been duly sworn, was examined and testified
 3  as follows:
 4        MR. WALLER: Okay. This is a deposition of Hardy
 5  Hickman taking pursuant to notice and pursuant to the
 6  Rules of Civil Procedure. Objections except as to form
 7  shall be reserved until the trial of the matter.
 8            EXAMINATION
 9  BY MR. WALLER:
10   Q. Please state your name as it is listed on your
11  birth certificate, Mr. Hickman.
12   A. Harvey Jay Hickman.
13   Q. Jay?
14   A. Yes, sir.
15   Q. And your home address?
16   A. 204 Martin Luther King Drive, Union, Mississippi
17  39365.
18   Q. How long have you lived there?
19   A. About 20 years.
20   Q. Okay. Where were you born?
21   A. Union.
22   Q. Date of birth?
23   A. 1/20/57.
24   Q. Fifty-seven model, huh?
25   A. Yes, sir.
```

Page 5

```
 1   Q. High school?
 2   A. Union High School.
 3   Q. Any other education?
 4   A. No, sir.
 5   Q. Work history?
 6   A. Worked at US Motors for like 27, 28 years, and
 7  they went to Mexico and just moved from there.
 8   Q. You didn't want to move to Mexico?
 9   A. I didn't want to see that plant leave. That was
10  a good living.
11   Q. A good job, wasn't it?
12   A. Yes, sir.
13   Q. So where do you work now?
14   A. I work at the Neshoba County Detention Center.
15   Q. How long have you worked there?
16   A. Seven years.
17   Q. And what is your -- you're still there?
18   A. Yes, sir.
19   Q. Okay. Are you married?
20   A. Yes, sir.
21   Q. And what's your wife's name?
22   A. Eva Hickman.
23   Q. Children?
24   A. Three girls.
25   Q. Names and ages?
```

Page 6

1   A. Kimly Hickman, Amesha Hickman, and Koyesha
2   Hickman. They were all born the same month, August, and
3   their birthday is --
4   Q. Just give me their ages.
5   A. Thirty-two, 23, and 19.
6   Q. Okay.
7   A. I think I'm right. I get them confused.
8   Q. Do they live in Neshoba County or Union County?
9   A. My oldest live in Montgomery, Alabama and the
10  other two live in Union.
11  Q. Okay. Have you ever given a deposition before?
12  A. No, sir.
13  Q. Okay. What is your title, if I may ask?
14  A. Right now, I'm a supervisor.
15  Q. Okay. Were you supervisor on May the 28th
16  of '13?
17  A. Yes, sir.
18  Q. And are you the -- are you the -- what does that
19  mean when they say supervisor? Are you over a certain
20  area of the jail or all the jail?
21  A. The day shift. Yes, pretty much.
22  Q. The day shift?
23  A. Day shift, yes, sir.
24  Q. So you're the -- you're the senior person in the
25  jail on the day shift?

Page 7

1   A. Right now, I am.
2   Q. Were you back in '13?
3   A. No, sir. Mr. Guess was.
4   Q. So what was your title back in '13?
5   A. I was a supervisor, but I wasn't over --
6   Q. You weren't the senior supervisor?
7   A. No, sir.
8   Q. If Mr. Guess was not there, then you would be --
9   you were the senior person?
10  A. Yes, sir.
11  Q. Was he there when this altercation occurred with
12  Mr. Luke, Mr. Guess?
13  A. Yes, sir. He was there.
14  Q. He was there, too?
15  A. Yes, sir.
16  Q. You work 7:00 to 3:00, 8:00 to 4:00, 9:00 to 5:00
17  or what?
18  A. Depends on how the schedule runs.
19  Q. Do you work 8 hours a day or 12 hours a day?
20  A. Sometimes 8, sometimes 12. It all depends how --
21  Q. Well, just they call it the day shift --
22  A. Yes, sir.
23  Q. -- whatever the hours are that you're scheduled
24  to work. Are you a defendant in any other litigation
25  right now?

Page 8

1   A. No, sir.
2   Q. This is the only time you've ever been sued?
3   A. Yes, sir.
4   Q. Okay. We're concerned with May the 28th of '13
5   or May the 25th --
6       MR. GRIFFIN: May 28th. Yeah.
7   BY MR. WALLER:
8   Q. Is that your report, Officer Hickman?
9   A. Yes.
10  Q. And that's an eight. It looked like a five there
11  for a minute. All right. "Names of persons involved,
12  Hickman, Walker, and Guess. Crocket called on the
13  radio" [sic] -- read that -- just read that for me, if
14  you will.
15  A. Officer Crocket called on the radio said there
16  was an inmate down in B Block, and I, Officer Guess, and
17  Officer Walker went up to B Block to see what was going
18  on. And when we got there, we found a inmate wallowing
19  in the floor crying, Inmate Chris Luke. And we didn't
20  know what was wrong, so I -- I went to get the blood
21  pressure machine to check his blood pressure to see what
22  was -- if he was having any kind of heart or anything
23  like that. And as I got it and come in to check him, he
24  refused to be checked, and he started -- Officer Walker
25  got him up and said, "Let's take him to detox, so we can

Page 9

1   evaluate him and see what's going on," and he started
2   fighting. And he started fighting Officer Walker, and
3   they had to take him down. And he just -- I think he
4   bit Officer Guess. And we were trying to cuff him, hold
5   him down so we take him down to detox, and he just
6   fought and fought. And they end up spraying him trying
7   to get him, you know, contained and cuff him, but
8   somehow one of the handcuffs got crossed up, and he just
9   kept fighting. Then eventually Office Walker said,
10  "Let's just pick him up and take him down there." We
11  picked him up and took him to Detox 2.
12      And he had an odor -- when you spray a person,
13  you've got to clean them up, get the -- get it off of
14  them. Office Walker said, "Let's go and clean him up."
15  So he went in the shower. As we was getting him in the
16  shower, he started fighting again. He swung and hit
17  Officer Walker with the hand with the cuffs on it, and I
18  subdued him. Then we just took him back to detox,
19  because he just didn't want to cooperate.
20  Q. So he was not handcuffed at that point?
21  A. He had one on him --
22  Q. Yeah.
23  A. -- you know, that was --
24  Q. Yeah. On one wrist --
25  A. Yes, sir.

Page 10

1    Q. -- both cuffs on one arm?
2    **A. Uh-huh (affirmative), at that time.**
3    Q. Had y'all -- y'all had him handcuffed prior to
4  that, though. Right?
5    **A. We had to put another set on him.**
6    Q. Yeah.
7    **A. Yes, sir.**
8    Q. Yeah. And that was on him in front or in the
9  back?
10   **A. I believe it was in his back, because we had to**
11 **pick him up and carry him down to the booking area.**
12   Q. Okay. And the three of y'all that subdued him
13 was you and Walker and Guess?
14   **A. Well, Mr. Walker, the one that carried him.**
15   Q. But the three of y'all came into the day room
16 together?
17   **A. Yes, sir. We came.**
18   Q. Did Officer Crockett know Chris Luke by name?
19   **A. I assumed she knew, I mean --**
20   Q. But she didn't say that Chris Walker --
21   **A. She said -- yes, sir.**
22   Q. On the radio, she just said an inmate was down.
23 She didn't say "Chris"?
24   **A. Uh-uh (negative).**
25   Q. You didn't know, when you entered the day room,

Page 11

1  what the situation was --
2    **A. No, sir.**
3    Q. -- or how long the situation had been going on?
4  Did Officer Crocket tell you that, how long the inmate
5  had been down?
6    **A. No. She just hollered on the radio, and we**
7  **responded.**
8    Q. I think it was about 20 minutes from the time
9  Chris Luke was assaulted by William Smith and the time
10 y'all arrived. Do you disagree with that?
11      MR. GRIFFIN: Object to the form.
12 BY MR. WALLER:
13   Q. Do you know how -- have you looked at the video?
14   **A. I don't know what time -- how much time it was.**
15   Q. I think the video indicated about 20 minutes.
16      MR. GRIFFIN: I think it was actually around 11
17 minutes if you look at the time stamp on the video.
18 BY MR. WALLER:
19   Q. Do you know why it would have been a 10-minute
20 delay from the time he was assaulted until the time
21 y'all were called? Whatever the time delay was. I'm
22 not -- I'm not agreeing it's 10 minutes.
23   **A. No, sir.**
24   Q. Is it Angel Crockett's responsibility to monitor
25 that day room, Block B or Zone B?

Page 12

1    **A. Well, it's several zones on that monitor. And I**
2  **think at the time, the lady minister was in A Block, and**
3  **I imagine she was -- that's all I can remember that they**
4  **were having ministry up in A Block for women.**
5    Q. And Officer Crockett was in that meeting?
6    **A. No, sir. She was probably monitoring them over**
7  **there.**
8    Q. Well, what does that got to do with her not
9  calling you immediately and describing what happened in
10 better detail?
11   **A. I can't answer that.**
12   Q. Did you pass her station when y'all went to the
13 Zone B?
14   **A. Yeah. We went --**
15   Q. Did you go through the control room?
16   **A. We passed by the control room. Yes, sir.**
17   Q. Was she -- was she seated at the cameras at that
18 time?
19   **A. I didn't look in there.**
20   Q. You don't recall?
21   **A. No, sir.**
22   Q. Does she have other duties besides monitoring the
23 cameras?
24   **A. Phones -- you've got the phones ringing.**
25   Q. Any other -- and who subs for her when she's

Page 13

1  not -- when she has to go to the bathroom or something?
2  One of y'all?
3    **A. We have to come up and relieve her.**
4    Q. She calls you and asks?
5    **A. (Affirmative nodding).**
6    Q. So she's supposed to be there all -- you know,
7  the entire time? Somebody's supposed to be watching
8  those cameras. Right?
9    **A. Uh-huh (affirmative).**
10   Q. Did you know Chris Luke prior to that day?
11   **A. He had been to jail a few times, but not knowing**
12 **him personally.**
13   Q. You didn't know anything about him or know his
14 name or -- did you know his name?
15   **A. I know it was Chris Luke. Yes, sir. We have**
16 **booked him in several times.**
17   Q. Yeah. You knew at least knew his name?
18   **A. Uh-huh (affirmative).**
19   Q. Did you know William Smith?
20   **A. We booked him in. He had been up there several**
21 **times.**
22   Q. Had he been in any other altercation that you're
23 aware of --
24   **A. Not that I'm aware of.**
25   Q. -- prior to Chris Luke's altercation?

Page 14

1  A. Not as I'm aware of.
2  Q. When did you find out that he had -- he had
3  assaulted Chris Luke?
4  A. I guess when everything had settled and --
5  Q. You watched the video?
6  A. The video. Yes, sir.
7  Q. But Angel Crockett never told you exactly what
8  happened, did she?
9  A. No, sir. We never talked about it.
10 Q. Okay. Now, the doctor has determined that Chris
11 has lost his hearing in his left ear as a result of
12 nerve damage as a result of a blow to this area of his
13 head (indicating). Do you have any idea how that may
14 have happened?
15 A. No, not at all.
16 Q. Was Chris Luke unconscious at any point during
17 this event?
18 A. No, sir. He was fighting the whole time.
19 Q. When you got him in the detox room, he was -- he
20 went to sleep eventually there, didn't he?
21 A. I don't recall him going to sleep. We was trying
22 to get that off his arm. He probably went to sleep in
23 isolation, but in detox, that's where --
24 Q. Okay. So detox and isolation are two different
25 --

Page 15

1  A. Yes, sir.
2  Q. When did he go to isolation?
3  A. After we got the cuffs off, and we -- I think the
4  other shift moved into isolation.
5  Q. That was after you left?
6  A. The evening shift.
7  Q. And was in isolation the next day, Wednesday.
8  Did you work that next day?
9  A. I believe I did.
10 Q. Did you monitor Chris's status at that time?
11 A. I think we fed him breakfast.
12 Q. Was he responsive?
13 A. He was.
14 Q. Do you know -- did Dr. Soriano come by that day,
15 or do you know?
16 A. I don't know.
17 Q. Do you know if the nurse was there? She
18 testified that she was off that Wednesday, the 29th.
19 She didn't come to work on Wednesday the 29th. She came
20 on the 30th, the next day, the Thursday. Did anybody
21 give Chris any aspirin or anything or any Tylenol or
22 anything Wednesday that you're aware of?
23 A. I'm not aware of it. I don't know.
24 Q. Do you know if he ate his -- you said he ate
25 breakfast. Do you know if he ate lunch?

Page 16

1  A. No, sir. I don't know.
2  Q. So you can only confirm that he ate breakfast?
3  A. Uh-huh (affirmative).
4  Q. Have you -- what training have you had in jail
5  administration?
6  A. Went to six-week training.
7  Q. In Meridian?
8  A. It was up above Starkville.
9  Q. Mayhew?
10 A. Mayhew.
11 Q. When did you go to that?
12 A. Probably two years prior to this.
13 Q. Okay. So 2011 maybe?
14 A. Somewhere around there. Yeah.
15 Q. Now, have you -- have you seen a copy of the jail
16 policy and procedures by the County, this document here?
17 A. Uh-huh (affirmative). All of us have to see it.
18 Q. Have y'all had any training on that -- on those
19 policies and procedures?
20 A. On macing and how to conduct inmates and stuff.
21 Q. How to manage inmates? You're talking -- I'm
22 talking about with the County now. I'm not -- what you
23 got at Mayhew. What specific training have you received
24 in Neshoba County?
25 A. We had the deputies -- we had a training with the

Page 17

1  deputies before -- before we can mace somebody, we have
2  to be maced ourself, and we have --
3  Q. When did that happen?
4  A. That's -- that's right after the -- that's about
5  two years after I started. You know, we have to go
6  through a little training.
7  Q. Michael -- you know, Michael McDougal is -- was
8  an inmate that died there back at the end of last year.
9  Part of his -- he was maced. What does your training
10 teach you to do as far as -- or don't do when you're
11 using mace on an inmate?
12 A. He was maced? I had no recollection of him being
13 maced.
14 Q. I'm not just speaking -- that was just a side
15 comment. I'm not asking about Michael McDougal. I'm
16 asking you about your training.
17 A. If they're real forceful attacking, trying to put
18 us in danger, we mace them.
19 Q. As self-defense?
20 A. Yeah.
21 Q. And what is the -- after you mace, what is the
22 procedure?
23 A. We go and shower them down, get it off of them.
24 Q. Okay. Have you read this document prior to
25 today? Have you seen this document prior to today? I'm

Page 18

1  referring to the Neshoba County Law Enforcement Center
2  of Policy and Procedure Directive.  Have you seen this
3  document prior to today?
4     **A.  It's been a while.**
5     Q.  You don't recall when you saw it before today?
6     **A.  No, sir.  I just can't say.**
7     Q.  Okay.  I'm going to hand you another document,
8  and it's titled "Staff and Inmate Movement, Neshoba
9  County Law Enforcement Center Policy and Procedure
10 Directive."  Have you seen that document prior to
11 today -- before today?
12    **A.  I can't say.  I can't recall.**
13    Q.  Okay.  Let's finish reading your report here.
14    **A.  After we took him into Detox 2 -- we put Chris**
15 **Luke in Detox 2, and Officer Walker said, "Let's take**
16 **him and clean him up.  Get him in the shower."  And we**
17 **did, and he fought Officer Walker.  He hit him with the**
18 **handcuffs on.  I just got him and held him, and we took**
19 **him back into Detox 2.  And then that's when they**
20 **proceed trying to get the other cuff of him.**
21    Q.  At any time, was Chris Luke kicked by any -- any
22 officer either intentionally or unintentionally?
23    **A.  I never seen it.**
24    Q.  Now, this page is not signed -- my copy is not
25 signed.  Did you not sign the second page?

Page 19

1     **A.  I signed the first page.**
2     Q.  Okay.  Now, it's dated the 30th, but the date up
3  top on the first page says, "Date of report 5/28/13."
4  Does that mean the date of the incident was 5/28, and
5  the date of the report was 5/30?
6     **A.  That's the date I turned it in to Mr. Reid.**
7     Q.  You made the report out on the 30th or the 28th?
8  Which is it?
9     **A.  The 28th.  That's the day he signed it.  That's**
10 **the day we put it on his desk.**
11    Q.  Well, your date is the 30th, as well.  My
12 question to you is:  Did you make a report out on the
13 30th for what happened on the 28th, or did you make it
14 out on the 28th?
15    **A.  Made it out on the 28th, turned it in on the**
16 **30th.**
17    Q.  But you signed it on 30th.  Is that right?
18    **A.  I signed it the day I made it.**
19    Q.  It's dated the 30th.
20    **A.  That's my bad -- my fault.**
21    Q.  Okay.  Did y'all not ask the inmates in the day
22 room -- I call it the day room.  I don't know what y'all
23 call it, Zone B, B Block -- what happened when you came
24 in the room?
25    **A.  Yes, but they don't talk.  I asked what was wrong**

Page 20

1  **with him, and they all just stood around.  So we just**
2  **made him get out of the way, and that's when we went and**
3  **got the blood pressure machine.**
4     Q.  So you had no clue what happened to Chris Luke?
5     **A.  No, sir.**
6     Q.  Nor did Officer Walker?
7     **A.  None of us.**
8     Q.  Nor the supervisor here --
9        MR. WALLER:  Tell me your name again?
10       MR. GUESS:  Billy Guess.
11 BY MR. WALLER:
12    Q.  He didn't know either.  Right?
13    **A.  No, sir.**
14    Q.  Had you -- had you had an altercation with Chris
15 Luke any of the other times that he was incarcerated?
16    **A.  No, sir.**
17    Q.  So this was unusual for him to be this combative?
18    **A.  Yeah.**
19    Q.  It was out of character for him?
20    **A.  I would think so.**
21    Q.  So there was obviously something wrong with him.
22 You just didn't know what it was?
23    **A.  Yeah.**
24    Q.  Had you known what had happened, would you have
25 handled it differently?

Page 21

1        MR. GRIFFIN:  Object to the form.  Calls for
2  speculation.
3  BY MR. WALLER:
4     Q.  If you had known that William Smith had hit Chris
5  Luke, would you have done anything differently than what
6  you did?
7        MR. GRIFFIN:  Object to the form.
8     **A.  We just got him and took him down for observation**
9  **is what were trying to do to see what --**
10 BY MR. WALLER:
11    Q.  I think I asked you this.  You don't know how
12 Chris lost his hearing in his left ear?
13    **A.  No, sir.**
14    Q.  You don't have -- okay.
15       MR. WALLER:  Tender the witness.
16       MR. GRIFFIN:  No questions.
17       MR. WALLER:  Okay.  I'm going to mark his
18 statement and these two exhibits.  Mark these 2 and 3.
19          (EXHIBITS 1, 2 AND 3 MARKED.)
20          (DEPOSITION CONCLUDED AT 10:59 A.M.)
21             ************

Page 22

CERTIFICATE OF THE COURT REPORTER

I, Katherine Lusk, Court Reporter and Notary Public, and for the State of Mississippi, hereby certify that the foregoing contains a true and correct transcript in the aforementioned matter at the time and place heretofore stated, as taken by stenotype and later reduced to typewritten form under my supervision by means of computer-aided transcription.

I further certify that I placed the witness under oath to truthfully answer all questions in this matter under the authority vested in me by the State of Mississippi.

I further certify that I am not in the employ of or related to any counsel or party in this matter and have no interest, monetary or otherwise, in the final outcome of this matter.

Witness my signature and seal this the _____ day of _____, 2015.

/s/Katherine Lusk_____
Katherine Lusk, CCR # 1731

My Commission Expires:
November 6, 2015

---

CERTIFICATE OF THE DEPONENT
DEPONENT: Harvey Hickman
DATE: April 1st, 2015
CASE STYLE: Christopher C. Luke vs. Neshoba County, Mississippi, et al.

I, the above-named deponent in the deposition taken in the herein styled and numbered cause, certify that I have examined the deposition taken on the date above as to the correctness thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me.

Subject to those corrections listed below, if any, I find the transcript to be the correct testimony I gave at the aforestated time and place.

Page    Line         Comments
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____

This the ____ day of _____, 2015.
                    _____
                    Harvey Hickman
State of Mississippi
County of _____

Subscribed and sworn to before me, this the _____ day of _____, 2015.

My Commission Expires:
_____    _____
             Notary Public