Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CHRISTOPHER C. LUKE                                    PLAINTIFF

VS.                        CIVIL ACTION NO. 3:14cv240 DPJ-FKB

NESHOBA COUNTY, MISSISSIPPI, ET AL.              DEFENDANTS

_____

DEPOSITION OF NICHOLAS WALKER
_____

Taken at the instance of the Plaintiff at

Wade White, PLLC

501 West Main Street

Philadelphia, Mississippi

Wednesday, April 1st, 2015

Commencing at 9:05 a.m.

********

Reported by:

Katherine Lusk, CCR 1731

EMM, INC. REPORTING  (601)506-8261
EMMREPORTING@GMAIL.COM

EXHIBIT "F"

Page 2

APPEARANCES

COUNSEL FOR THE PLAINTIFF:
ROBERT O. WALLER, ESQUIRE
WALLER & WALLER
220 South President Street
Jackson, Mississippi 39201
Post Office Box 4
Jackson, Mississippi 39205-0004
Phone: (601) 354-5252
Fax: (601) 354-2681
bobwaller@wallerandwaller.com

COUNSEL FOR THE DEFENDANTS:
STEVEN J. GRIFFIN, ESQUIRE
DANIEL COKER HORTON & BELL
4400 Old Canton Road, Suite 400
Jackson, Mississippi 39211-5982
4400 Old Canton Road, Suite 400
Jackson, Mississippi 39211-5982
Phone: (601) 969-7607
Fax: (601) 969-1116
sgriffin@danielcoker.com

Page 3

INDEX

Style..................................................1
Appearances..........................................2
Index..................................................3
Examination by Mr. Waller............................4
Examination by Mr. Griffin...........................41
Certificate of the Court Reporter....................48
Certificate of the Deponent..........................49

EXHIBITS

1 - Incident Report/Statement.......................44
2 - Staff and Inmate Movement, Policy No. C-108......39
3 - Policy and Procedure Directives..................39

Page 4

1  NICHOLAS WALKER,
2  having been first duly sworn, was examined and testified
3  as follows:
4      MR. WALLER: Okay. We here to take the
5  deposition of Nicholas A. Walker in the matter of Chris
6  Luke versus Neshoba County, et al. The deposition is
7  being taken pursuant to notice and pursuant to the Rules
8  of Civil Procedure. Objections except as to form will
9  be reserved for trial.
10     Do you have anything you want to add?
11     MR. GRIFFIN: No, that's fine.
12            EXAMINATION
13 BY MR. WALLER:
14  Q. Okay. Mr. Walker, please state you full name.
15  A. My name is Nicholas Alexander Walker.
16  Q. Okay. And what is your home address?
17  A. 426 Columbus Avenue, Philadelphia, Mississippi.
18  Q. How long have you lived there?
19  A. We started -- really, I'm going to say about two
20 years, sir.
21  Q. Where were you born?
22  A. Memphis, Tennessee.
23  Q. Okay. How long have you been in Neshoba County?
24  A. A little over 12 years.
25  Q. All right. What is your date of birth?

Page 5

1  A. 5/03/1983.
2  Q. Education?
3  A. Yes, sir. I graduated. Yes, sir. 2003.
4  Q. High school?
5  A. Yes, sir. Oh, I'm sorry. Overton High school.
6  Q. In Memphis?
7  A. Yes, sir.
8  Q. Okay. Where all have you worked?
9  A. When I first started here, Golden Moon security.
10 I left there because I moved to North Carolina, but I
11 came back. I started at the Gamestop and Hardee's, so I
12 was working two jobs.
13  Q. When did you start working for the sheriff's
14 department?
15  A. I don't know offhand, sir.
16  Q. You can't remember?
17  A. No, sir.
18  Q. Okay. How long had you worked for them?
19  A. About a year and a half. I transferred to the
20 fire department and came back and worked for, I think,
21 about three more years. So all together, four and a
22 half, maybe five.
23  Q. What kind of training did you have as a deputy?
24  A. As a correctional officer, I had training at
25 Walnut Grove Youth Correctional Facility, six-week

Page 6

1  course.
2  Q. That was as a deputy you took that course?
3  A. No, sir. As a correctional officer, sir.
4  Q. At Walnut Grove?
5  A. Yes, sir.
6  Q. What training have you had as a deputy?
7  A. Never was a deputy. Correctional officer, sir.
8  Q. What training have you had as a correctional
9  officer?
10 A. From Neshoba County?
11 Q. Yes, sir.
12 A. Yes, sir. I went to Meridian, six-week class.
13 Q. Six-week class?
14 A. Yes, sir.
15 Q. When was that?
16 A. Roughly about a year ago.
17 Q. What was the subject matter of the class?
18 A. It covers various types of information such as
19 talking to inmates, realizing situations before it
20 happens, booking, body language, being familiar with
21 tattoos, things of that matter, sir.
22 Q. Okay. That was general correctional training?
23 A. Yes, sir.
24 Q. Did you -- what kind of specific training did you
25 receive from Neshoba County?

Page 7

1  A. Besides hands-on, that class there, sir.
2  Q. So you -- how were you made aware of the policies
3  and procedures of Neshoba County?
4  A. Passed down through verbal, sir.
5  Q. So you didn't have any specific training on the
6  policies and procedures of the jail itself?
7  A. Yes, sir. Through the supervisor, sir.
8  Q. Through the supervisor?
9  A. Yes, sir.
10 Q. Was it on-the-job training?
11 A. Yes, sir.
12 Q. But you didn't have any classes that you went to,
13 right, where they --
14 A. Well, it teaches us about policies and procedures
15 in the six-week class, but every county is different. I
16 did --
17 Q. I understand that. What specific classes did you
18 receive from Neshoba County?
19 A. In that six-week class, it was a lot. I really
20 just can't point out, but the main thing --
21 Q. Did you receive --
22 A. Go head.
23 Q. Go ahead.
24 A. Sorry. Go ahead.
25 Q. Did you receive any kind of certificate or

Page 8

1  diploma?
2  A. Yes, sir. They have a copy of it at the jail,
3  sir.
4  Q. So that was training for what?
5  A. The job --
6  Q. The certificate was for what?
7  A. For completing the six-week course over various
8  type of titles such as, like I said, booking, handling
9  of inmates, dealing with sick inmates --
10 Q. That was a six weeks course at Meridian. Right?
11 A. Yes, sir.
12 Q. That didn't deal specifically with Neshoba
13 County's policies and procedures, did it?
14    MR. GRIFFIN: Object to the form.
15 BY MR. WALLER:
16 Q. You can answer that, if you can.
17 A. I can't answer it, sir.
18 Q. The certificate that you received, did you
19 receive that in Meridian or in Neshoba County?
20 A. It was for Neshoba County.
21 Q. But you received it from your training in
22 Meridian?
23 A. Yes, sir.
24 Q. So besides your training in Meridian, you didn't
25 receive any other specific training other than

Page 9

1  on-the-job training at Neshoba County. Right? Or any
2  other certificates?
3  A. Correct.
4  Q. Okay. What shift did you work primarily, or were
5  you assigned a specific shift?
6  A. No, sir. Sometimes we moved around. Supervisors
7  were assigned a specific shift. As part time, whatever
8  they had the scheduled on, that's what you have to work.
9  Sometimes you'd have to pull maybe a 12-hour shift.
10 You'd work Monday -- I mean, morning and evening.
11 Sometimes you'd come in, and the next day you'd work
12 graveyard shift until the morning.
13 Q. Was it always a 12-hour shift?
14 A. It would fluctuate, sir. It depends on who
15 called off or what type of manpower we had.
16 Q. Did you have -- were you paid overtime?
17 A. Yes, sir.
18 Q. And you were a supervisor?
19 A. No, sir.
20 Q. You were not a supervisor?
21 A. Part time, sir. Part time, sir.
22 Q. Part-time supervisor?
23 A. No, sir.
24 Q. Just part-time jailer?
25 A. Yes, sir.

EMM, INC. REPORTING (601)506-8261
EMMREPORTING@GMAIL.COM

Page 10

1  Q. Did you work somewhere else at the same time?
2  A. Yes, sir.
3  Q. Where?
4  A. Fire department, sir.
5  Q. Okay. So you've been employed at the fire
6  department all this time?
7  A. Yes, sir.
8  Q. Full time at the fire department; part time at
9  the sheriff's department?
10 A. Yes, sir.
11 Q. And you're currently at the fire department?
12 A. Yes, sir.
13 Q. Are you currently at the sheriff's department?
14 A. No, sir.
15 Q. Okay. When did you leave the sheriff's
16 department?
17 A. About five months ago, sir.
18 Q. So this is the fourth month, so December,
19 November --
20 A. About November.
21 Q. -- somewhere in that time frame?
22 A. Yes, sir.
23 Q. Why did you leave? Were you asked to leave?
24 A. No, sir.
25 Q. You left on your own?

Page 11

1  A. Yes, sir.
2  Q. Why did you leave?
3  A. Got tired of fighting, sir.
4  Q. Tired of fighting? You mean physically fighting
5  the inmates or fighting what?
6  A. When you're a good officer, you have a target on
7  your back. And as these inmates go to big jails, if
8  they can knock off an officer and bring it to another
9  jail, they have this popularity stripe on them. I know
10 it sounds crazy, but that's what they do.
11 Q. I'm not following you.
12 A. Okay.
13 Q. They were trying to make you leave and go to
14 another jail?
15 A. No, sir. Before they go to prison, if they can
16 get a case, if they jump a jailer and beat them up, then
17 their reputation is higher. That means they don't have
18 to fight as they come inside the prison. Me being a
19 small sized guy and a good officer, I looked like
20 lunchmeat to them.
21 Q. How much do you weigh?
22 A. 205 now, sir.
23 Q. How tall are you?
24 A. Six even.
25 Q. Six feet?

Page 12

1  A. Yes, sir.
2  Q. And you consider six feet, 205 small?
3  A. Yes, sir. Compared to some of the guys you've
4  got inside the prison in jail.
5  Q. Okay. Did you know Chris -- let me finish your
6  background. Are you married now?
7  A. Yes, sir.
8  Q. What is your wife's name?
9  A. Jasmine Walker.
10 Q. Gavin?
11 A. Jasmine.
12 Q. Spell it for me.
13 A. J-A-S-M-I-N-E.
14 Q. Okay. Jasmine?
15 A. Yes, sir.
16 Q. Where does she work?
17 A. She doesn't, sir.
18 Q. Children?
19 A. Two.
20 Q. How old?
21 A. One is two years old, and one is seven.
22 Q. Okay. All right. Do you have family in Neshoba
23 County besides -- on your side of the family?
24 A. Negative. No, sir.
25 Q. Does your wife have family?

Page 13

1  A. Yes, sir.
2  Q. What are their names? What are her parents'
3  names?
4  A. Christopher Bowler and Myrtle Miller.
5  Q. So your wife is from Philadelphia?
6  A. Yes, sir.
7  Q. Okay. You have given a deposition before?
8  A. No, sir.
9  Q. Have you ever testified in court?
10 A. No, sir.
11 Q. Were you on duty when Chris Luke was booked on
12 May the 25th, 2013?
13 A. I can't remember, sir.
14 Q. Okay. Were you on duty on the 28th when he
15 had -- well, you obviously were. You would agree that
16 the altercation occurred May the 28th, 2013?
17 A. Was I there when it happened?
18 Q. Yes, sir.
19 A. Yes, sir.
20 Q. Okay. Now, have you seen the video?
21 A. Yes, sir.
22 Q. Okay. And did you see where William Walker
23 struck Chris Luke in the video?
24 A. Correction, William Smith.
25 Q. I mean William, excuse me. William Smith.

4 (Pages 10 to 13)

Page 14

1  A. Yes, sir.
2  Q. Do you know why William -- why he did that?
3  A. No, sir.
4  Q. Now, the video does not have the audio with it.
5  Right?
6  A. Yes, sir.
7  Q. No sound?
8  A. No, sir.
9  Q. And the person watching the video does not have
10 any sound, is that right, in the control room?
11 A. Yes, sir.
12 Q. So it's video only; no audio on the cameras?
13 A. Yes, sir.
14 Q. Now, how do the inmates contact -- if there's a
15 problem, how do they communicate with the control room?
16 A. The control room is all the way around maybe five
17 or six feet from all of the zones.  Someone could just
18 actually yell or beat on the door and get your
19 attention.
20 Q. But is there an intercom system?
21 A. Yes, sir.
22 Q. Does the intercom system work?
23 A. Far as I know of, yes, sir.
24 Q. Was it working on this particular day?
25 A. I can't remember.

Page 15

1  Q. All right.  Do you remember from the video that
2  it -- from the time Chris was hit by Mr. Smith, it was
3  20 or so minutes.  Do you recall that?
4     MR. GRIFFIN:  Object to the form.
5  BY MR. WALLER:
6  Q. Do you recall how much time passed before y'all
7  entered the room?
8  A. Negative.  No, sir.
9  Q. All right.  Had you had any problem with Chris
10 Luke prior to this day?
11 A. No, sir.
12 Q. Had you had any contact with Chris Luke prior to
13 this -- prior to May the 28th?  Did you know Chris Luke
14 before that day?
15 A. Yes.
16 Q. Had you had any problems with him?
17 A. He's usually straight-up forward when he come in,
18 and he's usually high.  But just because he's high
19 doesn't mean he's a bad person.  He would even tell me,
20 and I would ask him, "Do you want something to eat?"
21 Sometimes he would just want to eat and sleep.
22 Q. Okay.  Well, was he high when he came in on the
23 25th?
24 A. He's always.  I ain't never seen him come inside
25 this jail not on -- not intoxicated or on some type of

Page 16

1  substance that's impairing him.
2  Q. Okay.  But you can't say for sure, because you
3  weren't there on the 25th when he came in?
4  A. Yes, sir.  That's correct.
5  Q. Okay.  But the times you've seen him, that's
6  your -- has been your experience?
7  A. Yes, sir.
8  Q. Okay.  So you don't know if he was high when he
9  was arrested on the 25th?
10 A. Correct.
11 Q. You don't know if he was high when y'all had your
12 altercation on the 28th?
13 A. Correct.
14 Q. Okay.  Did you have any reason to assume that he
15 was under the influence of any kind of drugs or alcohol
16 on the 28th?
17 A. Through my experience, I have never seen him
18 sober.  I have never seen him in his right mind.
19 Q. Well, then he would have to have had something in
20 the jail, because he had been there three days.  If he
21 was under the influence, he would have had to receive
22 some kind of drug in the jail.  Are you saying that
23 that's possible?
24 A. Negative.  Any type of drug, especially the drug
25 that he's on, can stay in your system maybe a week, week

Page 17

1  and a half, sir.
2  Q. What do you base that opinion on?
3  A. Experience.
4  Q. Okay.  But you haven't had any training or
5  anything on the effects of drugs?
6  A. Yes, sir, I have.
7  Q. All right.  Do you know what kind of drug he's
8  on?
9  A. He told me crystal meth.
10 Q. When did he tell you that?
11 A. Every time he comes in.  He let's you know.
12 "Nick, I've been smoking crystal meth."
13 Q. But he didn't tell you this time that, did he?
14 A. No, because I didn't book him in.
15 Q. Okay.  Now, when you entered the day room --
16 A. Yes, sir.
17 Q. -- why did you enter the day room?
18 A. I was in booking and got a call saying we have an
19 inmate down.  By this time, we was busy.  But me and
20 Officer Hickman, we came inside B block.  When came
21 inside B block, this young man was by the door.  Luke
22 was conscious.  He was whining.  I thought, well, maybe
23 he was just wanted to go back in his room.  So I asked
24 him, "what's going on, Luke?"  He wouldn't tell me.
25 Things didn't feel right, so I asked the other inmates,

5 (Pages 14 to 17)

Page 18

1  "What happened?" They started telling me that he just
2  fell out. Now, the guys that were telling me this are
3  compulsive liars. I mean, they just lie all the time.
4  So I said, "No, this ain't right. This don't feel
5  right." I said, "Luke, come on, let's go down to the
6  nurse's office. Let's talk about it. Let's see what's
7  going on with you." He didn't want to go, but we've
8  already got a call this inmate was down. So, therefore,
9  we weren't going to leave him there. I said, "Come on,
10  young man. Let's go Luke." By this time --
11    Q. Hold that thought a minute.
12    A. Yes, sir.
13    Q. Who called you in booking and said that there was
14  a problem in there?
15    A. It was over the radio. It was by a officer -- a
16  fellow officer, Angel Crockett.
17    Q. Was she in the control room?
18    A. Yes, sir.
19    Q. Okay. Did she advise you of who -- what inmate
20  was down?
21    A. I made a report. I'm go to have to go with
22  what's I wrote in my report.
23    Q. Part of your statement?
24    A. Yes, sir.
25    Q. Let me hand it to you. Well, let me just ask you

Page 19

1  without looking at your statement. I'll give it to you
2  in a second. It says you received a call from Officer
3  Crockett stating there was an inmate down in B zone.
4  When you entered -- it says, "We realized it was Inmate
5  Christopher Luke." How did you realize that it was
6  Christopher Luke?
7    A. Because I know Christopher Luke, and he was
8  laying down at the floor. Nobody else was laying down.
9  So an inmate's down. We came in -- it might seem
10  strange. But at times, when you're in a jail like that,
11  when you're outnumbered one to six, sometimes you go in
12  and say, "Hey, look y'all. What's going on?" It puts
13  the whole zone -- you ask the whole zone to let them
14  know, hey, I'm seeing every last one of y'all who's out.
15  So if I go out and come back in and some of y'all is
16  back in y'all's cells, that's when I'm coming out.
17    Q. What is -- what's your policy in a situation like
18  that? What are you taught to do?
19    A. What I did. Make sure a scene's safe. Usually,
20  when an officer hits the door, all the inmates are
21  supposed to hit the wall. But, brother, these are
22  violent offenders. Sometimes they didn't want to sit on
23  the wall. So who am I to come in with just -- by myself
24  or another officer and fight six or seven inmates. No.
25  We're trying to make sure we came in alive, and we're

Page 20

1  going to leave alive. Y'all don't want to get on the
2  wall? Fine. We stay out that door.
3    Q. All right. The video, as I recall, showed you
4  wrestling Chris to the ground --
5    A. Uh-huh (affirmative).
6    Q. -- in a headlock. Why was that necessary?
7      MR. GRIFFIN: Object to the form.
8    A. No, there was no headlock, sir.
9  BY MR. WALLER:
10    Q. You didn't put your arm around his head and neck
11  like this and take him to the ground?
12    A. No, sir.
13    Q. All right. Tell me what you did.
14    A. When -- the third or fourth time that I advised
15  Luke to come to nurse's office, he said, "Okay. Fine.
16  I'll come." I was like, "All right. Come on." I
17  picked him up. I noticed he was kind of wobbly. So the
18  story they gave me that he fell out may have been true,
19  but I know Chris here will tell me what happened. He's
20  not going to tell me in front of them because that means
21  he's snitching. So regardless if he come back, if
22  anything happens, it's going to happen again. So I knew
23  the inmate code, so I waited. I got to the door. I
24  called for B block open. He just snapped, turned around
25  with his right elbow, hit me in the face.

Page 21

1    Q. Are you saying Chris hit you in the face with his
2  elbow?
3    A. Yes, sir.
4    Q. Is that on the video?
5    A. No, sir.
6    Q. All right. So all we see on the video is you and
7  him going to the floor.
8    A. You will see my head tilt to the right or to the
9  left. You won't see him hitting me. When he hit me, I
10  stuck this arm behind his other elbow and picked him up
11  toting him. We went at it. Now, he's a threat. He
12  struck me. I'm an officer. If he had any respect for
13  an officer, you don't put your hands on the officer.
14  But since you struck me, I'm going to have to retain
15  him -- well, detain him -- restrain him, I mean, sorry.
16  Now, if this young man didn't mean no harm, he would
17  have stopped fighting then, but he kept fighting. He
18  wind up biting one of my fellow officers. Now, he's a
19  threat to me and another officer, and things escalated.
20    Q. Is the video complete, because the video doesn't
21  depict what you just said at all? Is something missing
22  from the video?
23      MR. GRIFFIN: Object to the form.
24  BY MR. WALLER:
25    Q. Is there some part of your statement that's not

Page 22

1  on the video?  I mean, I didn't see -- I didn't see any
2  of this; a blood pressure cuff being applied to Chris,
3  and him rolling around on the floor.  All I remember
4  seeing is him -- Chris standing there, and you -- y'all
5  falling to the ground out of the sight of the camera,
6  and the rest is not known -- you know, you don't say
7  that he hit you in this statement, do you?  Let me hand
8  it to you.  Is that in -- it says he became combative.
9  "Crying and rolling around side to side.  Hickman
10 brought a blood pressure cuff.  He refused." [sic]  Why
11 would you do that in the day room?  Why would you do
12 that with all the inmates standing around?  I don't
13 remember seeing the blood pressure cuff in the video.
14    A.  It's in the video.  You may want to look at it
15 again.  But in my statement, I had put, "Chris Luke saw
16 how close he was to me and elbowed me from behind."
17    Q.  He elbowed you from behind?
18    A.  Well, what I meant, at this one time, I was
19 standing behind him.  See, this door has a reflect --
20 you can see in the door.  You can see yourself pretty
21 good.  It's like a mirror.  Not tinted, but you can see
22 what's going on behind you.
23    Q.  All right.  Next paragraph says, "I sprayed mace
24 on a towel."  Where was that?  Was that in the day room?
25    A.  It was probably a shirt or something, sir.

Page 23

1    Q.  I'm still on Page 1.
2    A.  Well, I had to go to Page 2 to figure out what
3  you was talking about to clear up this misunderstanding.
4  You said that I was being combative.  Yeah, there it is.
5    Q.  Where did the mace come in?  Was that before you
6  left the day room?
7    A.  Yes.
8    Q.  It looks like you have -- you wrote a report.
9  You sprayed mace on a towel?
10   A.  Uh-huh (affirmative).
11   Q.  Is that in your policies and procedures?  Are you
12 trained to do that?  Why were you needing to spray
13 mace -- well, let me back up.  When did this occur, in
14 the day room or in the holding cell?
15   A.  Day room, sir.
16   Q.  Before you left the day room?
17   A.  Well, I don't remember.  I don't remember, but I
18 can tell you --
19   Q.  It says, "To help bring him around --
20   A.  -- I was told --
21   Q.  -- to see he was unconscious."  So you used the
22 mace to arouse him.  Right?  Is that what you're saying?
23   A.  No, I'm not saying that.
24   Q.  "Had to spray him for control due to the fact
25 that him biting an officer.  He was handcuffed." [sic]

Page 24

1    A.  Those are the steps that was took.  At this time
2  when this young man bit this officer, his hands was
3  free.  We tried to put handcuffs on him.  He fought us.
4  One set of handcuffs got locked on one wrist.  He bit an
5  officer and tried to bite him again, so I sprayed him
6  just one time.  I could have sprayed him two or three
7  times.  I could have used the whole can if I had to.
8    Q.  This is all in the day room?
9    A.  Yes, sir.
10   Q.  But none of that's on video, is it?
11   A.  It's hard to see.
12       MR. GRIFFIN:  Object to form.
13 BY MR. WALLER:
14   Q.  Sir?
15   A.  He told me to keep my mouth shut.
16       MR. GRIFFIN:  No, I just objecting.  But the
17 video says -- shows what it shows, and it shows the mace
18 being applied.  You can see that in the video.
19 BY MR. WALLER:
20   Q.  But he was handcuffed at that time?
21   A.  No, sir.
22   Q.  He was not handcuffed?
23   A.  No, sir.
24   Q.  Then why did you feel necessary to use mace on
25 him?

Page 25

1    A.  He bit an officer, and he already elbowed me.
2    Q.  Who -- what officer?
3    A.  My supervisor, Billy Guess.
4    Q.  So it was three of you?  Who-all was in the room?
5  You said Hickman and you and Guess.  Who else?
6    A.  It was me and Hickman at first.  Now, Chris may
7  not look like he's strong, but he's stout.  It took two
8  of us at first.  He was overpowering us.  I was trying
9  to tell Chris, "Stop fighting.  We're not your enemy.
10 We're not the one that caused this."  Back of my mind, I
11 knew his pride was hurt.  Something was happening.  So
12 he had to show he has some type of manly about him.
13   Q.  If you had to do it again, would you do it
14 different?
15   A.  Seeing that I did my -- doing my job, trying get
16 me sued, I don't know.  Maybe I just would have
17 chickened out and said, "No, two inmates.  Let's call
18 deputies.  Hey, let's leave them there."  Maybe this is
19 a trick, because they do this.  One will there sick.
20 You go in there, and the other two will jump from
21 behind.  This person get up and beat the dog snot out of
22 you.
23   Q.  All right.  I'm talking about Chris Luke.  Now,
24 you didn't know that he had been hit when you went in
25 that room?

7 (Pages 22 to 25)

Page 26

1  A. Negative.
2  Q. He didn't know that he'd been hit. Right?
3  A. From what I saw on that camera -- that DVD, uh-uh
4  (negative).
5  Q. He was blind-sided?
6  A. Yes.
7  Q. So he didn't know who hit him. He was -- so when
8  y'all came in there, he was in a defensive posture, was
9  he not?
10 A. Negative. Because he was somewhat talking to me.
11 When I say somewhat, he was talking slow and slurred. I
12 asked him, "What happened to you"? True enough, he said
13 he don't know. I was thinking maybe he did, but I
14 shouldn't have asked what happened in front of other
15 inmates. When I found that he wasn't going to give me
16 any type of information, I said, "Come on. You still
17 have to come down to the nurse's office."
18 Q. Let me go back to your report here. It says --
19 at what point was he handcuffed? This report -- this
20 report is not clear. When was he handcuffed?
21 A. I apologize about the report not being clear, but
22 he was handcuffed. He was finally handcuffed in B zone.
23 We had to use two handcuffs. Why? Because he was
24 resiting. He was fighting.
25 Q. Two handcuffs?

Page 27

1  A. Yes, sir.
2  Q. How do you put two handcuffs on somebody?
3  A. Thank you for asking. The first handcuff went on
4  the right wrist. As he was fighting, during the
5  struggle, the other part of the handcuff latched on the
6  same wrist. So, therefore, we had to hold him down and
7  get some more. By this time, he had ample enough time
8  to stop what he was doing, to get up and walk with us,
9  but he chose not to. So we had to get some more help.
10 If I ain't mistaken, we had four guys on one. That just
11 shows you how stout he was -- I'm sorry -- strong he is.
12 This is after he just got through getting hit.
13 Q. Have you had training on how to put handcuffs on
14 combative inmates?
15 A. Yes, sir.
16 Q. Where did you receive that training?
17 A. Both trainings from Walnut Grove and from
18 Meridian.
19 Q. What did they teach you to do? How do they teach
20 you to do it?
21 A. Putting handcuffs on inmates doesn't go the same
22 way as out in the streets. We don't have a gun. We
23 don't have a taser. All we have is our own word and the
24 guts to do it.
25 Q. But it was three of y'all, right? Three of y'all

Page 28

1  and one of him?
2  A. Yes, sir.
3  Q. And wouldn't you put him face down on the floor
4  and hold his hands back and handcuff him? Is that what
5  y'all tried to do?
6  A. Thank you. Yes, that's what we tried to do.
7  Q. But it said -- your statement says, "As we were
8  leaving, he became combative." So was he not handcuffed
9  at that point?
10 A. Thank you. No, sir. When I picked him up, I
11 grabbed him by the arms, "Come on, Luke." That shows
12 you right there that I trusted him. He didn't never
13 gave me no problem. So that's why when he elbowed me,
14 it took me some -- like a shock. Okay? Like, "Chris,
15 what are you doing?" But then I said, "Well, you know
16 what? This is not about me. It's something about
17 something else happening, so I'm not going to take it
18 personal." You can see it on camera. I picked him up
19 nice and gently, turned him around, and laid him down.
20 I could have dropped him right there, but I didn't.
21 Q. All right. When did you have the handcuffs on?
22 When did you complete that procedure?
23 A. I can't honestly say that, because I had the
24 legs -- I held his legs down. You'd have to talk to a
25 Supervisor Jimmy Reid. Somebody handcuffed him. I

Page 29

1  didn't handcuff him.
2  Q. All right. So where was he when he was
3  handcuffed?
4  A. When he was fully handcuffed in B zone, we had a
5  time in getting the handcuffs on him due to the fact of
6  him fighting and also he crapped himself. He knew he
7  crapped himself. How he knew? He could have put his
8  hands behind his back, but he kept putting his hands
9  near is anal hole where crap was at, which I got all
10 over my shirt. That's another form of resisting --
11 Q. Yeah.
12 A. -- and not going.
13 Q. Okay. But, now, were y'all still in the day
14 room, or had y'all moved out of the day room when you
15 got the handcuffs on?
16 A. In the day room, sir. And I would like to add,
17 we're telling Chris, "Please stop, because we can't lock
18 the other handcuffs we've got on you." The more he
19 squirm, the more the lock tighten up on his wrist. He
20 didn't care. "I don't want to go. I'm staying here."
21    "It's too late for all that now. We need to see
22 about you. You need to come on and comply with our
23 rules."
24 Q. B zone, is that the day room? Is that what
25 you're calling the day room?

EMM, INC. REPORTING   (601)506-8261
EMMREPORTING@GMAIL.COM

## Page 30

1   A. Well, it's mixed together. It's where they
2   sleep, but they have like a lobby where they come
3   outside their cells. Well, the B zone, yes, sir, you
4   can call it, the whole thing.
5   Q. The day room is the B Zone?
6   A. Yes, sir.
7   Q. All right. So when he -- part of the video shows
8   him in a -- looks a drunk tank. When did he get to that
9   room, and what do you call that?
10  A. That is Detox 2, that's where -- actually, women
11  go inside that cells. Both that cell --
12  Q. That's supposed to be for women, but he was in
13  it?
14  A. No female inmate was inside that cell. The
15  reason why we didn't put him in Detox 1, we had other
16  occupants in side there. They would create another
17  problem. That means them people not safe no more.
18  Q. All right. Did you know that Chris is completely
19  deaf in his left ear? Are you aware of that?
20  A. Negative.
21  Q. And he's part -- he's lost some of his hearing in
22  his right ear, and they say -- the doctors said it was
23  due to him being -- receiving a blow behind his ear. Do
24  you know or have an idea of when that might have
25  happened?

## Page 31

1   A. No, sir.
2   Q. Now, when you said you waited on your
3   supervisor -- I think that's in your report -- to tell
4   you what to do next, at what point was that in all of
5   this? Was he in the detox room at that point?
6       MR. GRIFFIN: Object the form. Do you understand
7   question?
8       THE WITNESS: Negative.
9   BY MR. WALLER:
10  Q. Your report says you waited for further
11  instructions from Jimmy Reed, but you decided to stop.
12  So you --
13      MR. GRIFFIN: Bob, do you have your -- can he
14  look at that report again?
15      MR. WALLER: Last page.
16  A. Yeah. That was after he bit me, and he already
17  struck me with them handcuffs. And at the time, we was
18  trying our best to talk to Luke. "Luke, we're not
19  fighting you. We need to cut these handcuffs off of
20  you, so your wrist will feel better. Quit hitting with
21  them handcuffs." He struck me, and he bit me. By that
22  time, I had two officers inside there. He turned around
23  towards Hickman. I popped him in his arm, tried to
24  deaden his arm.
25

## Page 32

1   BY MR. WALLER:
2   Q. You popped him with what?
3   A. My hand, sir. I'm sorry. I struck Chris Luke
4   with my hand on his arm.
5   Q. Okay. Was he tased at any time?
6   A. Negative, sir.
7   Q. When he was in the detox --
8   A. Yes, sir.
9   Q. -- he was on the floor. Right?
10  A. Sitting up.
11  Q. Okay. Did anybody kick him at that point?
12  A. No, sir.
13  Q. Did anybody punch him?
14  A. No, sir. Regardless of what he was doing, I was
15  still trying my best to help Chris.
16  Q. His handcuffs were behind him. Right?
17  A. Negative. He wasn't even handcuffed at this
18  time. Once that handcuff was off, sir, the other one
19  was still on his wrist, and he used that to hit me with
20  after we tried to get him to shower.
21  Q. He had two cuffs on one hand?
22  A. Yes, sir.
23  Q. So he tried to hit you with it?
24  A. No, not try. Uh-uh (negative). I object. He
25  hit me.

## Page 33

1   Q. But it wasn't slinging loose? It wasn't one
2   slinging loose?
3   A. No, sir.
4   Q. It was just two cuffs on one wrist?
5   A. Yes, sir.
6   Q. So you don't have any idea how he was injured --
7   how he was injured on his left side of his head?
8   A. No, sir. Regardless, Luke still -- I still cared
9   for him. No, sir.
10  Q. So it's your opinion that at no time excessive
11  force was used in Chris Luke's situation by you or any
12  other officer?
13  A. I'm proud because he -- he pushed the limit, and
14  we didn't even go overboard, so no.
15  Q. But he did -- he did receive some permanent
16  injuries as a result of all this. Right?
17      MR. GRIFFIN: Object to the form.
18  A. Not that --
19  BY MR. WALLER:
20  Q. If he's deaf in his left ear as a result of these
21  altercations --
22  A. Not by us.
23  Q. Sir?
24      MR. GRIFFIN: I'm going to object to the form.
25      MR. WALLER: You can answer.

Page 34

1  MR. GRIFFIN: Do you understand the question he's
2  asking you?
3     THE WITNESS: He's asking me --
4  MR. GRIFFIN: Can you repeat the question,
5  please?
6  BY MR. WALLER:
7  Q. So it's your statement that you don't know how he
8  lost the hearing in his left ear?
9  A. Correct.
10 Q. Why were you not informed before going into the
11 day room what the situation was?
12 A. At times, stuff happens so fast you don't catch
13 everything, and we use this tool that we learn how to
14 talk to certain inmates. You have certain inmates that
15 will tell you what's going on regardless of who's
16 inside.
17 Q. What didn't Angel Crockett tell you what was
18 going on? Did you ask her?
19 A. Not at that present time.
20 Q. Did she know?
21 A. You'll have to ask her, sir.
22 Q. Well, isn't she responsible for watching and
23 monitoring that day room?
24 A. I can't answer that.
25 Q. Who is? Nobody? The inmate are just free to do

Page 35

1  whatever they want to in the day room?
2  A. I can't say that either.
3  Q. You can't answer that?
4  A. That's a trick question sir. I'm not going to
5  throw any of my fellow officers under the bus. I'm not
6  going to do it.
7  Q. When did you find out that Chris Luke had been
8  assaulted by William Smith?
9  A. After I was told that the supervisor watched the
10 video, and William Smith is the one that hit him. I was
11 thoroughly upset because all of that was basically for
12 nothing.
13 Q. Had you known that before going into the day
14 room, you would have handled situation a little
15 different. Right?
16 A. Yes.
17    MR. GRIFFIN: I'm going to object to the form.
18    THE WITNESS: Okay.
19    MR. GRIFFIN: Calls for speculation.
20    THE WITNESS: Okay.
21 BY MR. WALLER:
22 Q. Your answer was "yes." Right?
23 A. Negative.
24 Q. Your answer is no?
25 A. I'm not answering that. Sorry, brother.

Page 36

1  Q. Did you use mace in the detox room?
2  A. Uh-uh (negative). No, sir.
3  Q. Did anybody?
4  A. No, sir. I even went and got a towel to clean
5  his face off before he even take a shower. I tried to
6  talk to him again and let him tell me what's going on.
7  Q. Did you go and apologize -- try to apologize to
8  Chris later on after he got out of jail?
9  A. His dad saw me.
10 Q. You talked to his dad, Danny?
11 A. Yeah.
12 Q. What did you tell his dad?
13 A. Nothing much. That I hate that things happened
14 that way, and -- I mean, I couldn't be a hypocrite
15 because I'm the one -- one of the guys that had to try
16 to detain him, but, basically, I told his dad, "Look,
17 your son is not hisself because he's on drugs, and you
18 know that and I know that."
19 Q. He wasn't hisself because he had been knocked
20 unconscious by William Smith this particular day.
21 Right?
22 A. If he hadn't broke the law, he would never have
23 been in that place to start with.
24 Q. Well, he wasn't never charged with anything, was
25 he?

Page 37

1     MR. GRIFFIN: Object to the form.
2  BY MR. WALLER:
3  Q. What law did he break?
4  A. He's a frequent flyer.
5  Q. Were you on duty the next day? Do you know
6  anything about Chris's follow-up treatment with the
7  nurse or anything like that?
8  A. No, sir.
9  Q. Was the jail nurse called to examine Mr. Luke
10 this particular day?
11 A. She did come. I didn't see it, because I had
12 left.
13 Q. When did you leave that day?
14 A. I would say roughly around 3:30 because our shift
15 changed.
16 Q. Shortly after this happened then. Okay. Did
17 anybody take any pictures of Mr. Luke or his injuries?
18 A. That's a trick question, but I accepted a plea.
19 The young man didn't show any injuries but on the side
20 he got hit at. So at this point in time, not that I
21 know of. I know our supervisor spoke to him, Jimmy
22 Reid, so you'll have to ask Jimmy Reed.
23 Q. But you're not aware of any pictures or
24 photographs being taken of Chris Luke?
25 A. That day?

Page 38

1    Q. At any time? Any time during his incarceration
2    in this particular time?
3    A. Incarcerated like him being at the jail?
4    Q. Yes, sir.
5    A. Negative.
6    Q. Is this the only incident report you filled out?
7    A. Don't want to lie to you. That's the only one I
8    can think of, sir.
9    Q. Did you write it -- did you write it more than
10   one time? Did you write this page and turn that in and
11   then come back and write this page?
12   A. No, all together.
13   Q. All right. This is dated the 30th, which would
14   have been two days later. Right?
15   A. Yes, sir.
16   Q. Is it your policy and procedure to do that two
17   days after the event occurs, or do you know?
18   A. Yes, I know, sir.
19   Q. What's the answer?
20   A. I had to wait until I calmed down, sir. I mean,
21   regardless of me trying to do my job the best that I
22   can, emotions -- you know, I let it get to me until the
23   last point when I said, "You know what? I can't --
24   James, you're going to have to talk to him. I can't
25   deal with this."

Page 39

1    Q. What is the procedure on writing reports? Are
2    you supposed to do it the same day or two days later?
3    A. I want to say between that day and -- you have --
4    I'm trying to find the right words. You have a grace
5    period. I mean, if it happened Monday, you can't be
6    writing the report on Thursday and Friday and Saturday.
7    I'm sorry. So you're not supposed to be writing
8    reports.
9    Q. I'm going to hand you a document and ask you if
10   you can identify that.
11   A. No, sir.
12   Q. Okay. You've never seen this document before?
13   A. No, sir.
14   Q. What I just handed you is Neshoba County Law
15   Enforcement Center Policy and Procedure Directives.
16       MR. WALLER: Off the record.
17          (OFF THE RECORD)
18   BY MR. WALLER:
19   Q. I'm going to hand you another document --
20   A. Yes, sir.
21   Q. -- and ask you if you've seen that document.
22   It's called Staff and Inmate Movement.
23   A. What's going on here is, when I was hired, some
24   of this stuff was being changed over, and I was going to
25   be taught on duty how things go until everything was put

Page 40

1    on paper. So I might not have seen this stuff. I was
2    told how the Neshoba County Jail was going to transfer
3    and deal with inmates. So this here, me not have seeing
4    this, does not correspond of me not knowing how to deal,
5    how to --
6    Q. Okay --
7    A. -- handle a situation.
8    Q. Well, I'm just asking you about this document.
9    Thumb through it. I want you to make sure there's not
10   something in there that you're forgetting you've seen.
11   But it's your testimony that you've not seen that
12   document or any of the pages in the document?
13   A. The headlines of this pages, yes. I mean, that's
14   what they teach us, but what that's saying is probably
15   different, because policies change and procedures change
16   due to someone getting hurt or an inmate getting hurt.
17   Q. What's the date on that document?
18   A. 1995, sir. I was in school at the time.
19   Q. But as far as you know, that's the current policy
20   and procedure?
21   A. Negative. Before I left, they came up with a new
22   policy and procedure, but this was after the Luke
23   situation, because we all got one. It was a spiral
24   binder, and we were supposed to read it and sign a sheet
25   of paper stating that we're going to go by it. So if

Page 41

1    things such at that happened, we'd either lose our job
2    or get suspended without pay or whatever.
3    Q. The inmate that died here back last year -- end
4    of last year, Michael -- what's his last name?
5    A. McDougal.
6    Q. Were you on duty at that time?
7    A. Negative.
8    Q. Had you quit before that?
9    A. Yes, sir. Yes, sir. I knew the young man. I'd
10   like to add he was also always high.
11   Q. You haven't seen his autopsy or anything like
12   that, have you? You don't know what his cause of death
13   was, do you?
14   A. No, sir.
15       MR. WALLER: That's all the questions I have.
16       MR. GRIFFIN: Okay. I have a couple of follow-up
17   questions for you.
18          EXAMINATION
19   BY MR. GRIFFIN:
20   Q. You mentioned that you had training at Walnut
21   Grove Youth Correctional Facility prior to joining the
22   Neshoba County Sheriff's Department or working at the
23   jail. What kind of training did you have with Walnut
24   Grove?
25   A. A lot of various topics such as cell searches;

11 (Pages 38 to 41)

Page 42

1  pat downs; deescalating problems; at times being
2  somewhat like a counselor to inmates, because at times,
3  you can talk a person down rather than having to use
4  brute force; restraining inmates; mace certification;
5  dealing with sick inmates; taking blood pressures, you
6  know, things like that.
7      Q. Were you certified on using mace prior to this
8  situation on Mr. Luke?
9      A. Yes, sir.
10     Q. When you worked for Walnut Grove, what company
11 was that that you worked for?
12     A. Cornell.
13     Q. What was your position with that company?
14     A. Correctional officer.
15     Q. How long did you serve in that position at Walnut
16 Grove?
17     A. About a year and a half.
18     Q. And was it after that that you went to work for
19 the Neshoba County Jail?
20     A. Well, I moved to -- well, times were hard. And
21 at the time, I was -- I was homeless. I was living out
22 of my car. I started work at the casino, and I was
23 going to North Carolina for a track scholarship. At the
24 time, my wife got pregnant, so I had to come back down.
25 I couldn't get rehired at the Golden Moon because they

Page 43

1  laid a lot of people off, so I started working at the
2  jail. Since I had background from Walnut Grove, they
3  hired me.
4      Q. So your background is as a correctional officer?
5      A. Yes, sir.
6      Q. And it was when you came on with Neshoba County
7  they sent you to the school in Meridian for six weeks
8  for training?
9      A. Yes, sir.
10     Q. And what -- and the training at Meridian, was
11 that similar training regarding how to be a correctional
12 officer, dealing with inmates, and that sort of thing?
13     A. Yes, sir.
14     Q. Did the training you received in Meridian cover
15 things like use force?
16     A. It was better. It was more up to date.
17     Q. Was use of force covered in your training at
18 Meridian?
19     A. Yes, sir.
20     Q. And deescalating situation with inmates?
21     A. Yes, sir.
22     Q. You were asked about who was supervising the day
23 room. How many units are there down there at the jail?
24     A. Five.
25     Q. Okay. And is there surveillance cameras in each

Page 44

1  of those units?
2      A. Yes, sir.
3      Q. Is there anybody that's assigned to look at those
4  surveillance cameras?
5      A. As like to watch the camera as stuff goes on?
6      Q. Correct.
7      A. Yes, sir.
8      Q. Would that have been Angela Crockett on this day?
9      A. Yes, sir.
10     Q. And would B zone or B block, however you call it,
11 where this incident occurred with Mr. Luke, that was one
12 of the cameras that she would have been watching that
13 day?
14     A. Yes, sir.
15     Q. And so there was somebody that at least had eyes
16 or had the capability of having eyes on that zone on
17 that date?
18     A. Yes, sir.
19     Q. And you referred to this statement that you did
20 on May 30th, a couple of days after the incident
21 occurred. I think it's been made as Exhibit 1 to your
22 deposition. Have you had a chance to look over this
23 statement preparing for your deposition?
24     A. Yes, sir.
25     Q. Is there anything in this statement that is not

Page 45

1  true or that you want to change?
2      A. No, sir.
3      Q. I don't know if this was covered earlier, but you
4  said in your statement that you moved Mr. Luke or you
5  helped move him to the shower area there after he was
6  taken into detox. Why was he moved to the shower?
7      A. Because regardless of what he was doing, I still
8  cared about his safety and his health. He had mace in
9  his eyes. I gave an order to a trustee inmate to,
10 "Please, get this young man some fresh clothes, and if
11 you don't have any socks and drawers in his property,
12 find some for me." They had some extras ones. They put
13 it in the bathroom. By this time, I was in Detox 2. I
14 had a towel -- a cold wet towel damping his face with
15 it. I said, "Luke, we've got to get you a shower.
16 You've done messed on yourself. You've got messed all
17 over you." And I asked him, "Please, you've got that
18 handcuff on your wrist. Keep it to your side. Okay?
19 Better yet, I'm going to hold this arm. I'm going to
20 stand you up." He said, "Okay, Nick." By this time,
21 I'm talking to him. He is back. We go in the bathroom.
22 I said, "Luke, I'm going to turn on the shower."
23     Q. Did he walk to the shower?
24     A. Yes.
25     Q. Okay. Sorry. Go ahead.

12 (Pages 42 to 45)

EMM, INC. REPORTING  (601)506-8261
EMMREPORTING@GMAIL.COM

Page 46

1  A. As I turned -- Mr. Hickman followed behind me.
2  As I turned to turn on the shower, I said, "All right,
3  Luke, it's time to take a shower. Go on ahead and
4  undress." He take that dadgum wrist and he swung it. I
5  go to block my face. He hit my right wrist, and he cut
6  me. I jumped back -- it's like a little -- it's a bed
7  that the nurses use in there. I leaned on that. As
8  came to me, Mr. Hickman grabbed him and told him,
9  "You're not going to do that. Luke, we're not your
10 enemy. I said,"If you don't want to take a shower,
11 fine. We're not going to fight you. Go on to detox."
12    Q. At that point, did y'all take him back to detox?
13    A. Yes, we did.
14    Q. Okay. That's the point where you had to try to
15 get the other handcuff off his wrist?
16    A. Yes. He showed me that he -- you know, he can
17 use it for a weapon. So now he has a weapon on his
18 wrist.
19    Q. Okay.
20       MR. GRIFFIN: All right. That's all the
21 questions I have.
22       MR. WALLER: I want these documents made an
23 exhibit to his testimony. That's the only set I have,
24 so I guess we're going to need to keep them until I
25 finish the depositions.

Page 47

1       MR. GRIFFIN: We can make a copy here, too.
2  That's fine.
3       MR. WALLER: Well, it's 100 pages. She can take
4  one copy and make it work, or we can give her the disc.
5  I can forward her the disc.
6       MR. GRIFFIN: We would like to read and sign.
7  She's going to do a transcript, and she'll send it to
8  me. I'll get it to you, and you can look over it and
9  make sure that -- she does a good job. I just want to
10 make sure that there's not any typos or she
11 misunderstood what you said or that kind thing. All
12 right. You're done.
13           (EXHIBITS 1, 2 AND 3 MARKED.)
14           (DEPOSITION CONCLUDED AT 10:05 A.M.)
15              ************

Page 48

CERTIFICATE OF THE COURT REPORTER

  I, Katherine Lusk, Court Reporter and Notary Public, and for the State of Mississippi, hereby certify that the foregoing contains a true and correct transcript in the aforementioned matter at the time and place heretofore stated, as taken by stenotype and later reduced to typewritten form under my supervision by means of computer-aided transcription.
  I further certify that I placed the witness under oath to truthfully answer all questions in this matter under the authority vested in me by the State of Mississippi.
  I further certify that I am not in the employ of or related to any counsel or party in this matter and have no interest, monetary or otherwise, in the final outcome of this matter.
  Witness my signature and seal this the _____ day of _____, 2015.

/s/Katherine Lusk_____
Katherine Lusk, CCR # 1731

My Commission Expires:
November 6, 2015

Page 49

CERTIFICATE OF THE DEPONENT
DEPONENT: Nichols Walker
DATE: April 1st, 2015
CASE STYLE: Christopher C. Luke vs. Neshoba County, Mississippi, et al.

     I, the above-named deponent in the deposition taken in the herein styled and numbered cause, certify that I have examined the deposition taken on the date above as to the correctness thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me.
     Subject to those corrections listed below, if any, I find the transcript to be the correct testimony I gave at the aforestated time and place.
Page    Line           Comments
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____

   This the ____ day of _____, 2015.
                _____
                   Nicholas Walker
State of Mississippi
County of _____

   Subscribed and sworn to before me, this the _____ day of _____, 2015.

My Commission Expires:
_____   _____
             Notary Public

13 (Pages 46 to 49)