IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CHRISTOPHER C. LUKE PLAINTIFF

VS. CIVIL ACTION NO. 3:14cv240 DPJ-FKB

NESHOBA COUNTY, MISSISSIPPI, ET AL. DEFENDANTS

---

DEPOSITION OF BILLY GUESS

---

Taken at the instance of the Plaintiff at

Wade White, PLLC

501 West Main Street

Philadelphia, Mississippi

Wednesday, April 1st, 2015

Commencing at 2:16 p.m.

********

Reported by:

Katherine Lusk, CCR 1731

EXHIBIT "G"

APPEARANCES

COUNSEL FOR THE PLAINTIFF:
ROBERT O. WALLER, ESQUIRE
WALLER & WALLER
220 South President Street
Jackson, Mississippi 39201
Post Office Box 4
Jackson, Mississippi 39205-0004
Phone: (601) 354-5252
Fax: (601) 354-2681
bobwaller@wallerandwaller.com

COUNSEL FOR THE DEFENDANTS:
STEVEN J. GRIFFIN, ESQUIRE
DANIEL COKER HORTON & BELL
4400 Old Canton Road, Suite 400
Jackson, Mississippi 39211-5982
4400 Old Canton Road, Suite 400
Jackson, Mississippi 39211-5982
Phone: (601) 969-7607
Fax: (601) 969-1116
sgriffin@danielcoker.com

INDEX

Style................................................1
Appearances..........................................2
Index................................................3
Examination by Mr. Waller........................4, 37
Examination by Mr. Griffin...........................31
Certificate of the Court Reporter...................39
Certificate of the Deponent.........................40

EXHIBITS

1 - Health Care Services, Policy No. F-101...........37
2 - Staff and Inmate Movement, Policy No. C-108......37
3 - Policy and Procedure Directives..................37
4 - Incident Report/Statement........................12

BILLY GUESS,

having been first duly sworn, was examined and testified as follows:

MR. WALLER: This deposition of Billy Guess is being taken pursuant to notice and pursuant to the Rules of Mississippi Civil Procedure. Objections except as to form shall be reserved for the trial of the matter.

EXAMINATION

BY MR. WALLER:

Q. Mr. Guess, would you state your name as it appears on your birth certificate?

**A. Billy Ray Guess.**

Q. And your home address, please, sir?

**A. 11011 Road 361. Road 361. Sir?**

Q. Go ahead. Philadelphia?

**A. Let's see. It's 11 --**

Q. She's writing it down, so I'm not writing it. Go ahead.

**A. Oh, okay. I thought that looked funny. Where did I get to?**

Q. 110 -- go ahead. Just start over.

**A. Road 361, Union, Mississippi 39365.**

Q. How long have you lived at that address?

**A. About 15 -- a good while.**

Q. All right. Where were you born?

**A. Holmes County.**

Q. Date of birth?

**A. 12/21/54.**

Q. Education?

**A. 12th and four years of college.**

Q. Where did you go to high school?

**A. I went to Durant.**

Q. College?

**A. Wesley College.**

Q. Where?

**A. Wesley in Florence.**

Q. Wesley, okay. Where do you work now?

**A. I don't.**

Q. When did -- when did you retire?

**A. I -- I got sick in July, went to the doctor the 24th of July, had a five bypass the 26th. Come home for three days, had a blood clot and went back and stayed another 32 days in the hospital, the cardiac care unit. Since then, I've had four stents and four heart attacks and a blood clot.**

Q. What is your wife's name?

**A. Betty.**

Q. Pardon me?

**A. Betty.**

Q. Betty, okay. And children's names and ages?

Page 6

A. Brian and Dana.
Q. How old is Brian?
A. Brian is 38 or 39.
Q. Okay. And Dana?
A. Right in there.
Q. That's close enough.
A. And Dana's about 33. I may be wrong on that.
Q. Well, that's close enough. Does most of your family live in Neshoba County?
A. They do.
Q. Have you ever given a deposition before?
A. No.
Q. Okay. Have you ever been a party to a lawsuit?
A. No.
Q. Are you on any medication today that would affect your ability to respond to the questions correctly?
A. No.
Q. Okay. The event that occurred May 28th, 2013, with Christopher Luke, what do you remember about those events?
A. I remember we got a call from control and said that there was somebody beating on the door telling her somebody was down, so we ran up there. I think Harvey and Walker got in there before I did. When I got in, I asked what happened, you know, and I told them to check

Page 7

his blood pressure. Harvey went back and got the machine, but he wouldn't let us. And then we decided, well, we'll just take him down, and so Walker picked him up under his arm like this (indicating), and was holding him, and, you know, trying to get him out. Well, he had him under his arm, and when he started out the door, he elbowed him and took his feet and pushed back. And when he did, he started falling backwards and Hardy caught him, and they landed in the floor, all of them. Then he was just swinging, and we started to put handcuffs on him, and that's when he got that handcuff on him there. And somehow or another, he had it up under -- got it under him, and when he did, he had both of them on there. We kept telling him to kind of be still and asking him, "What's wrong with you? What's wrong?" He never would say -- tell us. He just kept poking and fighting and kicking, so we said, well, we'll just have to take him down, but at that time, Jimmy got up there. And when I -- I was still there, and he bit me, and I just -- but I fell backwards. Then I got up and just shook it off and went back to helping hold him. And then once Jimmy got there, the officer, I never turned around to look to see who was there, give them a pair of handcuffs, and we got him handcuffed, and then Harvey and Walker toted him out and took him and put him in

Page 8

Detox 2. And then Hickman came and asked me -- I was booking somebody in. I left and -- detox is here (indicating), and booking was over here (indicating), and I went and sat down and booked a lady in. And they done kept going to the window and checking on him, but he walked. If you look, you can see him walking in there, because he come up to the window and then --
MR. GRIFFIN: Who are you talking about?
THE WITNESS: The inmate.
BY MR. WALLER:
Q. Chris?
A. Chris. And once Hickman went, he come and asked me, he said, "He, you know, acts like he's doing good. Wait, let me -- would it be all right if I give him a shower?" And I said, "Yeah, if he wants to take a shower and get that stuff off of him." And so they got him some clothes. The inmate put them in the shower room, the trustees, and they went in and got him and took him in, and I heard a commotion when I was booking, and I got up and looked. And they said, "He don't want to take a shower." I guess they were, you know, trying to talk him into it, but he was fighting them back.
I said, "If he don't want a shower, if he wants to keep that stuff on him, put him back in detox, you know, don't force him, you know, to take a shower." And

Page 9

they wasn't using that kind of force that you think. I'm not saying fighting him, but they were pushing him, but he hit Walker twice. And they -- I told them, "Just put him back in the cell and leave him alone for a few minutes," because we wanted to get them handcuffs off of him that's on there, so they put him back in. Then when they got to the door, they turned him loose, and he ran across and throwed hisself in the floor. And whenever they shut the door, I asked them, I said, "What, did he change his mind?" And he said, "Yeah." And I said, "Well, we'll get him later," you know, and I went back to booking the lady.
And then Jimmy came in, and he told me, he said, "We really need to get them handcuffs off -- off of him." And I told him about him not wanting to take a shower.
He said, "That's fine. We'll just get the handcuffs off and maybe he'll get to feeling better and will do it." And so they went and got the bolt cutters, but he wouldn't be still for them to do it, so they brought him back and laid him on top of the counter, and then Jimmy came.
THE WITNESS: Did you come when they cut the cuffs off? I don't remember you being there.
A. But Jimmy came, and I tried to cut the handcuff,

EMM, INC. REPORTING (601)506-8261
EMMREPORTING@GMAIL.COM

Page 10

you know, and it wouldn't cut, because what it did, it would twist on his arm, so we stopped, and I said, "We're going to have to cut the center out, but somebody's got to hold him." But he got a rag, and we poked it in around his arm, you know, to keep him from getting hurt, and then I cut that bolt. Jimmy held his arms, and he pulled back a little bit, but we finally got them cut in half, and when we got them cut in half, then you could slide it up and took them off with a key.

See, the reason why it was so tough is because the cuffs, we didn't want to break his wrist, you know. We wouldn't -- that's something I don't believe in is mistreating anybody. You know what I'm saying? And I tried to treat them all like I was -- you know, even though they're criminals, I try to treat them like I'd want to be treated if I was in there. You respect them, and they respect you, but some of them won't let you respect them, don't want your respect and don't want to respect you, you know. So, in other words, once he -- we got him down there and everything and got them off, if I'm not mistaken, I was still there after 3:00 o'clock. I was supposed to have left at 3:00, but I was still there doing paperwork and stuff, because I was the day -- I was the senior supervisor. I think second shift was there when we had moved him over into isolation, so if a lady come in --

Page 11

BY MR. WALLER:

Q. You had to have that room?

A. -- I'd have a place, so I had -- because we just had that one lady, but she bonded right out. And -- but then when they got him back in the shower first, so that's when he was -- they were trying to cut his cuffs off the first time, and he raised up, and he even bit Walker a couple of times. Plus, he had used his clothes, and he was slinging it on us. He slung it on his pants, on Harvey's khakis and on Walker's shirt and across my arm.

MR. GRIFFIN: And when you say it, what is it?

THE WITNESS: Feces. He slung it all on us. And Walker come out and changed his shirt. Walker did hit him a couple of times in the arm when he threw it on him. And other than that, that's all that, you know, happened with us.

BY MR. WALLER:

Q. Did you write a statement out?

MR. WALLER: I haven't -- I don't have a copy of his statement, I don't think.

MR. GRIFFIN: I believe it was produced with everything else, but we have one. We've got a copy right here.

THE WITNESS: This is my copy.

Page 12

BY MR. WALLER:

Q. Well, let me see.

A. I was in a hurry when I wrote that, so there's a place where it says would, and it's supposed to be wouldn't, and I left the N and apostrophe T out.

MR. GRIFFIN: Off the record.

(OFF THE RECORD.)

BY MR. WALLER:

Q. All right. Mr. Billy, let's go over your statement here, if we could. Would you read that first page there?

A. This is on 5/28/13, around 2:45 p.m. "Officer Crockett called for someone to come to the B block, an inmate was down, and we needed to check on him. Officers Hickman, Walker and myself, Officer Guess, went to check on him. It was inmate Chris Luke down on the floor. He was crying and rolling around on the floor, and we weren't" -- "and we" -- it's supposed to be went -- "going to check his blood pressure, but he refused for us to check it, and we put a piece -- a piece of paper and a little spray to see if he would talk to us to tell what had happened to him. He would -- that's when Walker picked him up and started to take him out of the door, and when they got to the door, inmate Chris Luke started beating and kicking the door. He tried to

Page 13

elbow Officer Walker. We then took him down, and he went to fighting. He tried to put handcuffs on him, but he wouldn't stop trying to fight us. We, Officer Walker, Hickman and myself and also Neshoba 20, Jimmy Reed, came and helped. Officer Hickman and Walker took him to Detox 2 by carrying him, but he was still fighting. Once we got to booking, Officer Walker and Hickman tried to give him a shower, and they took off the other handcuffs that we put on him, and he -- he had on both hands, but the other was on him, his other arm." In other words, what I'm trying to say there is he had that one on his arm, "and when we got him handcuffed up there and went back, they took them off when they put him in detox. Then that's when they was going to go get something to cut the handcuffs off of him, but when they got back, they couldn't -- couldn't do it because he wouldn't -- it hurt his hands -- I mean, his arm when they tried to cut it, it twists on him. So he said he couldn't do it, and he went and got Jimmy. And when Jimmy got there, we -- like I said, we took a cloth and pushed it under the cuffs and around the cuffs so that it wouldn't pinch him, you know. And then he -- Jimmy took his hand and his fingers and held up the cuffs, and I cut the center out, and then he took the key and took them off of him, but he still wanted to fight, but

Page 14

**Officer Hickman and Neshoba 20 tried talking to him." Is that what that is?**

MR. GRIFFIN: "Tried to hold him."

**A. "Hold him, tried to hold him still." That's what it was right there, and I done said it. All right. "We called PD to come and check him. PD came and said he was just coming down off something. We put him in -- in isolation to keep a watch on him. 5/30/2013, nurse checked on him and said call PD and come check him because he's -- he thinks he needs to see a doctor and run tests. EMS came and checked him and took him to the ER at Neshoba General," and I forgot to add that in there where he bit Officer Walker in two places and bit Officer Guess on the wrist.**

BY MR. WALLER:

Q. Did he break the skin on anybody?

**A. Just a nick on my arm, but the thing was, it hurt me for days.**

Q. Why do you think he was fighting y'all --

MR. GRIFFIN: Object to the form.

BY MR. WALLER:

Q. -- if you know?

**A. Well, what are you trying to ask me?**

Q. Why was he -- why was he resisting?

MR. GRIFFIN: Object to the form.

Page 15

**A. I don't know. At that point in time, we just thought he was sick, and we was trying to get him help.**

BY MR. WALLER:

Q. The main reason I'm here is because Chris has lost all of his hearing in his left ear, and I think you've heard me say that the doctor determined that he took a blow to the left side of his head that caused that loss of hearing. Now, can you -- do you have an idea of how that happened?

**A. No, sir. I know he took the blow on the other side by watching the film.**

Q. Right. We know that Smith hit him on the other side, but that's on the wrong --

**A. If you look at the film, when he hit him on that side, he fell on the other side. He hit the floor, you know, sort of like pretty hard. And the inmates didn't -- the reason she didn't get that -- get us called, you know, it's a normal thing to look through the camera and see somebody laying in the floor, and you don't think nothing about it. We listen -- you know, when you scan that room by room, which we do periodically, and pull it close, you see inmates laying around. And if you scanned it and just saw him laying there, you wouldn't have never thought anything was going on. And then when the inmates finally decided to**

Page 16

**let us know, they beat on the door, see, and when she called, we went. We didn't know what was wrong with him.**

Q. Did y'all ask any of the inmates?

**A. We asked them, and they said I don't know, he just fell out. We didn't find out until after he was down and gone when we found out that he hit him. And I never -- I never saw the tape until the other day.**

Q. He has scars on his chest and on his neck and on his back. Did all of those occur when he fell after Smith was hit --

**A. I couldn't tell you.**

MR. GRIFFIN: I'm going to object to the form. You can answer, if you know.

**A. Well, the only thing I can say is with him pushing and turning, and the cuff on his hand, him pulling his hand across his chest with cuffs under him, it's possible he got scratched, but it was not done on purpose.**

MR. GRIFFIN: He's not asking you to guess how it happened. He's just asking if you know how it happened.

**A. No, I don't.**

BY MR. WALLER:

Q. Now, if he had a medical condition, why didn't y'all seek medical treatment for him?

Page 17

**A. That's what we was doing. Our first priority is to check his blood pressure, and then we call and tell them what it is, because that's the first thing they're going to ask, what's his blood pressure, is it high or low or whatever.**

Q. Did y'all ever check his blood pressure?

**A. We couldn't -- we never could.**

Q. You never got it checked?

**A. He wouldn't -- he wouldn't let us put it on his arm.**

Q. You never checked it?

**A. Well, I didn't, because he knocked that thing down and the batteries went everywhere, and I don't even know where they put it. I know we left it there in the floor. I saw --**

Q. As far as you know, his blood pressure never was checked?

**A. I -- I don't know if the nurse checked it or not.**

Q. Well, she didn't come that day.

**A. No, I don't know if she checked it the next day.**

Q. She didn't come the next day. You said she wasn't there Wednesday.

**A. Until the 30th? I couldn't tell you, but that's the first thing we normally do on call, but Jimmy was there, so it's -- on ours, when they're city, we check**

Page 18

**it, and we call city. It's up to city to come and check him out and make that decision.**

Q. Make that -- uh-huh (affirmative).

**A. And that's what I wrote in there. I called, and they came, and the only thing he said was he's coming down off something, and that is all I can tell you.**

Q. But he --

**A. Normally, we check them, take them down and tell them how he's doing, how he's breathing, how he's acting, and, you know, and then he says bring him down and watch him. That's what we was going to do with him is see what was going on, because we have so many people that fake, and we send them to the hospital. They get there, and there's nothing wrong with them, so we have to kind of look at them.**

MR. GRIFFIN: Just for clarification, you said take them down --

THE WITNESS: To booking.

MR. GRIFFIN: To booking.

**A. And if a nurse is there, we call her in to see her. If not, Jimmy will call the nurse, and he'll tell her what we told him. And then if she thinks he needs to go, she'll say, well, get him to the hospital or whatever, but, see, he was eating and everything.**

Page 19

BY MR. WALLER:

Q. You said earlier that he was coming down off of something. What made you --

**A. Well, that -- that's just what he said. I don't -- you know.**

Q. Who said that?

**A. The officer. I didn't write his name down. I don't know why, because I didn't know a lot of the PDs.**

Q. When was that said?

**A. That day. I don't know what time it was.**

Q. The 25th?

**A. Sir?**

Q. The 28th?

**A. Yes, sir.**

Q. He was arrested the early morning of the 25th.

**A. But he stayed at PD all day that day just about.**

Q. He was arrested on the 25th about 2:30 in the morning?

**A. I don't know.**

Q. 26th, 27th, this happened the afternoon of the 28th, four days later, and you're making the allegation that he was still high on something at that point?

**A. I didn't. I didn't. I'm just saying what the officer told me. I report what they tell me. I don't -- I don't make up anything. If I call somebody**

Page 20

**and talk to him and tell him what's going on, then he overrules me. It's the city's responsibility to look at him and say, well, he needs to go to the hospital or he don't. Just like it's Jimmy's call to call the Sheriff or call the nurse. We normally call the nurse. If you can't get her, then he has to get okay. It's down a chain of command.**

Q. Okay. He -- he had medical records that indicated he had injuries to his head that couldn't have occurred when he fell, so he obviously got injured when he fell, but he also got injured when he was in a altercation with y'all, according to the medical records.

MR. GRIFFIN: I'm going to object to the form.

BY MR. WALLER:

Q. Do you deny that he was injured when y'all were wrestling with him?

**A. I don't know. I mean, if you get in a tussle with somebody, you know, anybody could get hurt, because it happens so fast. You know what I'm saying? If you was pushing me backwards in a door, and I'm losing my balance, and I'm trying to hold you up, and we both hit the floor, it's going to hurt us both, especially if he lands on you.**

Q. Tell me how Officer Walker used -- administered

Page 21

the mace.

**A. He sprayed it on a piece of paper or cloth and waved it to see if it would -- you know.**

Q. Wake him up?

**A. Wake him up --**

Q. Did he use that --

**A. -- because he wasn't down. He just laid there, you know, on that next time that we started out, and then he started -- when he done that, he started back fighting.**

Q. So he was -- at one point, he was unresponsive?

**A. He was unresponsive, but I mean, he was kicking, but he wasn't saying anything or doing anything other than kicking and slinging that arm with that handcuff on it.**

Q. Was he laying on his back or on his stomach?

**A. He was on his back then.**

Q. So he put the mace over his face with a towel?

**A. No, no. He didn't put the mace over his face, he just fanned it.**

Q. So what was he trying -- what was the purpose of doing that?

**A. He didn't want to spray him, but he wanted him to, you know, calm down. If he sprayed him in the face, you know, we didn't -- if he was sick, we didn't want to**

spray him. We tell them -- we tell them if you don't settle down, we're going to spray you. We told him that three times.
Q. Did you tell him that?
A. Yes, he was told that.
Q. Was he responsive?
A. Yes, he didn't -- he just kept on fighting, and I -- he just -- I guess he just decided after we told him that, instead of spraying him, he would just spray a rag and wave it at him, you know. It got pretty strong because all the inmates went to the back.
Q. What did he do in response to the mace?
A. Not a whole -- he didn't do nothing in response of it.
Q. So it didn't have any effect on him?
A. It did not.
Q. So how did y'all get him off the floor?
A. Picked him up. This time is when we -- they came, and we put the handcuffs on him. See, we had done picked him up by -- you know, under his arms to take him out, and that's when he fought and shoved backwards. And then when he fell, and then the handcuff got hooked under him. He had his hand under him, so he was pulling that arm back and forth across his stomach like that (indicating), and then when he tried --

Q. Did he fall forward or fall backward?
A. No, we rolled him over to put the handcuffs on him, because he --
Q. He fell -- he fell backwards, and you rolled him over on his stomach?
A. Right. We rolled him over and tried to get the handcuffs - the other handcuffs on him, and he just kept fighting, and somehow or another, he got his hand up under his stomach with handcuffs.
Q. That's when Jimmy put his knee on --
A. That's when Jimmy came in and put his knee, and he had a time getting his arm out because he'd pull it back, and he'd be hitting us with the other arm.
Q. Right. Right.
A. And then it was all we could do to hold him. He was like -- like a madman.
Q. He was obviously not in his right mind?
A. I don't know the boy personally, you know, I just seen him when he was -- when he come to jail and that's it. If he came in, and it was somebody else booked him, I didn't -- you know.
Q. Did y'all ever give him a drug test at any point after this?
A. We don't do that. The city or nurse, you know, city or county, whichever one that brought him in, they

do that. You would have to talk to the city about that. Usually, if it's -- usually, if a drug test is done, it's by the PO or by the officers that pick him up, and PD picked him up, and I couldn't tell you if they did one or not, but he did just say he was coming down off something, so I don't know.
Q. But he had been in jail four days?
A. Sometimes that stuff is bad.
Q. But you never confirmed that, that was just a possibility? After the fact, you learned he had been knocked out basically by William Smith?
A. See, if we had of known he was -- we -- you know, we didn't really know what was wrong with him, you know.
Q. But had you known that, you would have handled it a little differently?
MR. GRIFFIN: Object to the form, calls for speculation.
BY MR. WALLER:
Q. Would you have handled it the same way?
MR. GRIFFIN: Object to the form.
BY MR. WALLER:
Q. You can answer it.
A. Probably not, because either way, whether he's --
THE WITNESS: Is it okay?
MR. GRIFFIN: You can answer it the best you can.

A. Okay. If -- let me get these words right, because I get my foot in my mouth sometimes. It's like this: If a person, whether he's in his right mind or not in his right mind, is fighting you --
BY MR. WALLER:
Q. You've got to protect yourself?
A. -- you've going to protect yourself, but if we know that he's hurt, you know, we try to keep them as still as we can, you know. We're there to protect those people, not to hurt them. I tell all of my people -- well, when I was there, if you give them the benefit of the doubt, you know the ones that's going to give you trouble and the ones that's not, and if we find somebody in one that don't, we move them, you know, but in this case, he was acting fine. He didn't give us no trouble. I don't know whether him and that other guy was in an argument or what. By looking at the tape, that guy was playing cards and all he was doing was walking. He just passed him and knocked him out. The rest of it, we were there just to protect him. If we hadn't have cared, we wouldn't have went up there. We wouldn't have tried to take him down --
Q. Right.
A. -- you know. I don't know where --
Q. But y'all were -- y'all were operating under

limited facts, you would agree with that, regarding what had happened prior to y'all going down there?

**A. Well, we really didn't -- like I said, we didn't know what was wrong with him. We was under -- you know, with him fighting or starting -- now, when he resisted, we talked to him a little bit, but he wouldn't -- he just kept pushing. So we decided, well, we'll just put cuffs on him, and that's when it got on him, but when we started out the door, we didn't put no handcuffs on him, you know, because we were just going to take him down and check him out and watch him and see, you know, what, and call the PD, but he started fighting, and, I mean, he fought.**

Q. He's a strong fellow, isn't he?

**A. Yeah, he was and...**

Q. Let me wrap this up. Let's see. I want to clarify something. You said the officer said he was coming down off something. Was that Dan, Captain Dan you're talking -- that said that from the Philadelphia Police Department? Who made that comment?

**A. I don't -- I don't know what his name was. I wouldn't know him if I saw him.**

Q. Was he a Philadelphia police officer?

**A. He was.**

Q. And when he said that, was that on the 28th, or

was that on the 25th?

**A. Yeah, when he came down.**

Q. But, now, he --

**A. He was on the film, but I don't know his name.**

Q. Was he the arresting officer?

**A. I don't know that, either.**

Q. All right. So --

**A. It would have been an officer.**

Q. -- you don't know that he was just saying that off the cuff or he had personal knowledge?

**A. I'm presuming he had personal knowledge.**

Q. Well, now, he was arrested in his bedroom in the bed, the way I understand it, at about 2:30 in the morning.

**A. I have no --**

Q. So I don't know how that would --

**A. -- I don't have any --**

Q. -- translate into him being high on something.

**A. -- I don't have any -- any -- any idea.**

MR. GRIFFIN: Just answer -- just answer the questions that you're asked.

**A. Okay. I don't know.**

BY MR. WALLER:

Q. Well, another thing you could have done is nothing, right?

MR. GRIFFIN: Object to the form.

BY MR. WALLER:

Q. When you said he was laying on his back on the floor, you could have walked -- exited the dayroom, right, and left him there and found out what -- what was going on?

MR. GRIFFIN: Object to the form.

BY MR. WALLER:

Q. Was that an option? You can answer, if you know.

**A. I don't know.**

Q. I mean, it seems to me like he was -- here we have an injured inmate, and all y'all did was injure him more in the process. Y'all weren't helping him, y'all were -- do you agree with that --

MR. GRIFFIN: Object to the form.

BY MR. WALLER:

Q. -- that he wasn't hurting anybody when y'all came in there, was he? He wasn't -- obviously, it wasn't a dangerous situation where it required that y'all body slam him, right?

MR. GRIFFIN: Object to the form.

BY MR. WALLER:

Q. Am I wrong? Tell me if I'm wrong. I'm just asking you a question as I perceive it.

**A. He wasn't body slammed.**

Q. He fell to the ground with Walker?

**A. That was his fault, he shoved. We were just trying to help him. If he got any kind of other injuries, he done them to hisself.**

Q. But y'all had more than one opportunity to leave the dayroom, exit the dayroom and find out what was going on and get more information. You did, didn't you?

**A. It wasn't anybody --**

Q. Why was it necessary to remove him from the dayroom?

**A. It's protocol.**

Q. Under what force?

**A. Anyway we can.**

Q. What now?

**A. Anyway we have to.**

Q. Why was he -- why was he -- why were you having to use force --

**A. He was fighting.**

Q. -- to remove him from the dayroom?

**A. He was fighting.**

Q. Why was he being removed from the dayroom?

**A. Because he was hurt or sick.**

Q. Or something?

**A. We thought sick, because we didn't know anything**

**about the fight.**
Q. So rather than rendering aid, you aggravated the situation by what y'all did. He was confused, he had been knocked out.
**A. We didn't know --**
MR. GRIFFIN: I'm going to object to the form.
BY MR. WALLER:
Q. He knew -- he didn't know who had hit him. He didn't know where he was. He was totally out of his mind, mentally ill, and y'all come in and use --
MR. GRIFFIN: I'm going to object to the form.
BY MR. WALLER:
Q. So you did have an option of doing nothing, right, and finding out what's -- getting more facts and asking questions and looking at the video and separating the inmates and finding out what happened. Y'all could have done that, right, rather that using force and trying to remove him from the dayroom?
MR. GRIFFIN: I'm going to object to the form.
BY MR. WALLER:
Q. As far as you know, he hadn't done anything illegal or wrong, right? Right?
**A. He done something or he wouldn't have been in jail.**
Q. I'm talking about in the dayroom.

**A. I couldn't tell you.**
MR. WALLER: I tender the witness.
MR. GRIFFIN: Okay. I have some follow-up questions for you.
EXAMINATION
BY MR. GRIFFIN:
Q. Mr. Guess, when you responded to the dayroom where Mr. Luke was, did y'all try to find out from Mr. Luke what was wrong with him?
**A. We asked him. We asked him what's wrong, you know.**
Q. And did he say anything? What did he tell you?
**A. Nothing.**
Q. He wouldn't respond to you?
**A. He would -- he just -- he didn't -- it's like he didn't know. He just didn't -- you know, but he was -- you know, he acted like he was sick, you know.**
Q. Okay.
**A. That's when we -- it's common to handcuff them and take them down.**
Q. Now, when you say -- you mentioned that earlier, you said handcuff them and take them down. Take them down --
**A. To booking.**
Q. -- to the booking area?

**A. Uh-huh (affirmative).**
Q. In this situation, was he taken -- the officers tried to take him to booking without even putting the cuffs on him, right?
**A. Yeah, it was -- when we put the -- these on him or this one (indicating), and he got it under him and got it -- got both of them on some kind of way, we decided to just take him without them. And then when we got to the door, he come around to elbow Walker in the face, and he had pushed with his feet, and he started backwards. And when he did, Hickman tried to catch him, but they all went down in the floor. And then he just balked. So at that point in time, hadn't nobody been rough with him, you know.**
Q. And it was during the process when y'all were trying to get handcuffs on him that he bit you on the wrist. Is that right?
**A. Yes.**
Q. Okay. And was it after that point that Officer Walker administered the mace?
**A. Yes.**
Q. Okay. And at this point in time, did y'all have any idea why Mr. Luke was acting like he was sick or something was wrong with him?
**A. We didn't know anything about it.**

Q. Okay. Whether he was hit in the head or sick for some other reason, would y'all still have taken him from the dayroom out to the booking area to check him out?
**A. Yes.**
Q. And you had mentioned that you hadn't had any problems with Mr. Luke at the jail. Prior to this incident on May 28th, had Mr. Luke reported to you or anybody else you know of any threats from any inmates at the jail while he was there?
**A. No.**
Q. Did you have any knowledge of any conflicts he had with the inmate that hit him, Willie Smith?
**A. No, because when you book them in, you ask them. There's a board there and it's got the people's name on it, and we asked him, any of those people in B, C, D or E, do you have any conflict with them, and if he says I can't see it, we read the names off to them, and they tell us, well, I've I got conflict with so and so in that block, I don't need to go in there, but he didn't say anything about anybody.**
Q. Okay. So there was no indication to you or anybody else that you know of that this incident was going to occur where he got hit by Willie Smith in the cell block?
**A. No, because if we would have known it, we would**

**have moved him.**

Q. Okay. And earlier, we were talking about the use of force in removing him from the dayroom. Was any force used other than force necessary just to restrain him?

**A. That's all.**

Q. Did you ever see any officer hit or strike Mr. Luke in the head or face area --

**A. No.**

Q. -- during this incident?

**A. No.**

Q. Did you ever strike him in the head or face --

**A. No.**

Q. -- during this incident?

**A. No.**

Q. Did you ever see an officer -- or did you ever kick Mr. Luke --

**A. No.**

Q. -- during this incident?

**A. I didn't see anything like that.**

Q. Okay. So if he's claiming that he has injuries on different parts of his head or face or back or chest or whatnot, do you have any idea how those injuries specifically came about?

**A. I don't know.**

Q. And you had said that it's possible that during the time he was being restrained or moved around, or he was fighting back, that he might have scratched himself or something like that, but that's all speculation, isn't it?

**A. Right.**

Q. You don't have any idea how he got his injuries?

**A. No, I don't.**

Q. Okay. After this incident was over, did Mr. Luke appear to be in need of emergency medical treatment?

**A. Uh-uh (negative), because he was walking around in the dayroom, because looking at the tape, you can see him looking out the window of the cell, and then you could see his shadow on it, you know, walking around. And that's why they said, well, you know, why don't, you know, let -- since he's up and moving around, give him a shower. And I said, "If he wants one, give him one." He wanted one, and he walked in there and walked out.**

Q. Were you in the shower when that was taking place?

**A. No, I was booking a lady, and when I heard the commotion, I jumped up and looked in there, and there was -- he was -- he had the water on, and I said, "What's going on?" "He don't want to shower. " I said, "If he don't want to shower," I said, "If he don't**

**want a shower, then don't give him a shower, put him back in the cell."**

Q. Okay. And if an inmate appears to be in need of emergency medical treatment, what's the procedure at that point?

**A. We call -- first of all, we give them an inmate medical sheet, and they fill it out. We take it down and put it in the door for the nurse, but if they appear bad, we call Jimmy and tell him what's going on after we check his blood pressure, and then we bring them -- if they're -- then we'll take them down and put them in isolation or detox room, whichever one's empty.**

Q. But if this is -- and that's if it's a non-emergency situation?

**A. Sometimes if they're sick, we'll bring them down just to watch them, you know.**

Q. What if an inmate is -- you know, and when I say an emergency need, I'm talking about he's passed out, he can't -- you can't wake him up, or he's got a broken leg or split his head open, things like that, what would you do in that situation?

**A. We'd call communications and tell them we need an ambulance, and then we would call Jimmy and tell him that we had to get one because he was hurt.**

Q. And that's regardless if it's a county inmate or

a city inmate?

**A. Uh-uh (negative). We had to call city. City has to okay anything that it does.**

Q. But if it's an emergency situation like we talked about, you --

**A. We tell Jimmy about it, but we call PD.**

Q. Okay. And then an ambulance would be sent?

**A. That he will call them.**

Q. The city?

**A. The city.**

Q. And this is a city inmate?

**A. Yes.**

Q. Okay. And in this situation, somebody from the city came over that afternoon?

**A. Right.**

MR. GRIFFIN: Okay. All right. I don't have anymore questions.

MR. WALLER: I want to add these documents to his testimony, and this -- this -- this would be one -- no, this would be one, two, three, four.

(EXHIBITS 1 THROUGH 4 MARKED.)

FURTHER EXAMINATION

BY MR. WALLER:

Q. Let me ask you real quick about these. You heard us talk about them at the other depositions. Have you

Page 38

seen these before today?

**A. (Witness nods head affirmatively.)**

Q. You have?

**A. I read them and signed off on them.**

Q. When did you read them?

**A. It's been years ago. I read them when his daddy was the Sheriff. That's been a long time ago.**

MR. WALLER: I would like those marked as exhibits.

(DEPOSITION CONCLUDED AT 3:08 P.M.)

************

Page 39

CERTIFICATE OF THE COURT REPORTER

I, Katherine Lusk, Court Reporter and Notary Public, and for the State of Mississippi, hereby certify that the foregoing contains a true and correct transcript in the aforementioned matter at the time and place heretofore stated, as taken by stenotype and later reduced to typewritten form under my supervision by means of computer-aided transcription.

I further certify that I placed the witness under oath to truthfully answer all questions in this matter under the authority vested in me by the State of Mississippi.

I further certify that I am not in the employ of or related to any counsel or party in this matter and have no interest, monetary or otherwise, in the final outcome of this matter.

Witness my signature and seal this the ________ day of _______________, 2015.

/s/Katherine Lusk__________
Katherine Lusk, CCR # 1731

My Commission Expires:
November 6, 2015

Page 40

CERTIFICATE OF THE DEPONENT

DEPONENT: Billy Guess
DATE: April 1st, 2015
CASE STYLE: Christopher C. Luke vs. Neshoba County, Mississippi, et al.

I, the above-named deponent in the deposition taken in the herein styled and numbered cause, certify that I have examined the deposition taken on the date above as to the correctness thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me.

Subject to those corrections listed below, if any, I find the transcript to be the correct testimony I gave at the aforestated time and place.

| Page | Line | Comments |
|---|---|---|
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |

This the ____ day of _______________, 2015.

___________________
Billy Guess

State of Mississippi
County of ______________

Subscribed and sworn to before me, this the _____ day of _____________, 2015.

My Commission Expires:
_____________________ ___________________
Notary Public