Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CHRISTOPHER C. LUKE                                PLAINTIFF

VS.                      CIVIL ACTION NO. 3:14cv240 DPJ-FKB

NESHOBA COUNTY, MISSISSIPPI, ET AL.               DEFENDANTS

_____

DEPOSITION OF TOMMY WADDELL
_____

Taken at the instance of the Plaintiff at

Wade White, PLLC

501 West Main Street

Philadelphia, Mississippi

Wednesday, April 1st, 2015

Commencing at 1:13 p.m.

\*\*\*\*\*\*\*\*

Reported by:

Katherine Lusk, CCR 1731

EMM, INC. REPORTING   (601)506-8261
EMMREPORTING@GMAIL.COM

EXHIBIT "K"

Page 2

```
 1              APPEARANCES
 2
 3   COUNSEL FOR THE PLAINTIFF:
 4    ROBERT O. WALLER, ESQUIRE
      WALLER & WALLER
 5    220 South President Street
      Jackson, Mississippi 39201
 6    Post Office Box 4
      Jackson, Mississippi 39205-0004
 7    Phone: (601) 354-5252
      Fax: (601) 354-2681
 8    bobwaller@wallerandwaller.com
 9
10   COUNSEL FOR THE DEFENDANTS:
11    STEVEN J. GRIFFIN, ESQUIRE
      DANIEL COKER HORTON & BELL
12    4400 Old Canton Road, Suite 400
      Jackson, Mississippi 39211-5982
13    4400 Old Canton Road, Suite 400
      Jackson, Mississippi 39211-5982
14    Phone: (601) 969-7607
      Fax: (601) 969-1116
15    sgriffin@danielcoker.com
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                 INDEX
 2
 3   Style..................................1
 4   Appearances............................2
 5   Index..................................3
 6   Examination by Mr. Waller..............4
 7   Examination by Mr. Griffin.............17
 8   Certificate of the Court Reporter......20
 9   Certificate of the Deponent............21
10
11               EXHIBITS
12
13   1 - Health Care Services, Policy No. F-101............7
14   2 - Staff and Inmate Movement, Policy No. C-108.......7
15   3 - Policy and Procedure Directives...................8
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                TOMMY WADDELL,
 2   having first been duly sworn, was examined and testified
 3   as follows:
 4        MR. WALLER: This deposition of Tommy Waddell is
 5   taken pursuant to notice and the Rules -- Mississippi
 6   Rules of Civil Procedure, and objections except as to
 7   form will be reserved for the trial of the matter.
 8                  EXAMINATION
 9   BY MR. WALLER:
10   Q.  Sheriff Waddell, state your name as it appears on
11   your birth certificate, please, sir.
12   A.  It's Tommy Glen Waddell.
13   Q.  G-L-E-N-N?
14   A.  No, just one N.
15   Q.  One N, okay.  What's your home address?
16   A.  It's 10201 County Road 321, Union, Mississippi
17   39365.
18   Q.  I always thought Union was in Newton County
19   but --
20   A.  Part of it is.  Part of the city is in Neshoba
21   and part of the city is in Newton.
22   Q.  That's the confusion.
23   A.  Yes, sir.
24   Q.  How long have you lived at that address?
25   A.  At that address, I'm going to say approximately
```

Page 5

```
 1   13 years.
 2   Q.  Where were you born?
 3   A.  I was born in Philadelphia.
 4   Q.  Okay.  Date of birth?
 5   A.  June the 12th of 1964.
 6   Q.  Young fellow?
 7   A.  50 years old, soon to be 51.
 8   Q.  High school?
 9   A.  Neshoba Central.
10   Q.  College?
11   A.  None.
12   Q.  Okay.  Work history?
13   A.  I started law enforcement at the age of 21.  I
14   started in 1985 with the Philadelphia Police Department
15   as a patrolman, moved up to a shift supervisor, and then
16   promoted on to chief investigator.  I served with the
17   Philadelphia Police Department for 14 years.  In 1999, I
18   left the Police Department and took a job with the
19   Mississippi Department of Wildlife, Fisheries & Parks.
20   I worked there for the next 12 years until I resigned to
21   run for public office in 2011, and I was elected Sheriff
22   and took office in January of 2012.
23   Q.  Are you married?
24   A.  I am.
25   Q.  What is your wife's first name?
```

## Page 6

1  A. Bobbie. Actually, it's Bobby Kay pretty much.
2  Q. Okay. Children's names and ages?
3  A. Okay. I have one daughter who is 21. Her name
4  is Cece, C-E-C-E, Hillman, and I have a son that is 18,
5  and his name is Drew Hillman. They're my stepchildren,
6  but they are -- they are mine.
7  Q. Right. Okay. All your -- most of your family
8  lives in Neshoba County?
9  A. They do.
10 Q. Okay. That helps when you're running for office.
11 What jail training have you received, Sheriff, since
12 you've become Sheriff?
13 A. I have not received any jail training.
14 Q. Okay. Any other -- any other training?
15 A. I graduated from the Mississippi Law Enforcement
16 Academy in 1986. Through my career, I've attended
17 numerous different classes and training exercises.
18 After being elected Sheriff, I attended just a three
19 week sheriff course that they offer. In my case, it was
20 optional because I was -- previously had law
21 enforcement, which that was in Pearl, Mississippi.
22 Q. You did that?
23 A. I did.
24 Q. Okay. Was Tom Shelton over the academy when you
25 went through, or had he retired by then?

## Page 7

1  A. I don't recall.
2  Q. Okay. That was just a side question.
3  A. Yes, sir.
4  Q. Did you know Chris Luke before the 25th of May?
5  A. I did.
6  Q. Do you know his dad, Danny?
7  A. I do.
8  Q. Have you had any -- any problems with Chris Luke,
9  confrontations or altercations?
10 A. Personally?
11 Q. Right.
12 A. No.
13 Q. Do you have -- I have three documents here in
14 front of us that were given to me as the policies and
15 procedures for the jail. The first one is the jail --
16 let's see, let me do them in order here. Number 1 is
17 the Health Care Services Procedure.
18 A. Yes.
19 Q. Have you seen that document?
20 A. Yes.
21 Q. Okay. Number 2 is the Staff and Inmate Movement
22 Policies and Procedures. Are you aware of that
23 document?
24 A. Somewhat.
25 Q. All right. And then, finally, the document --

## Page 8

1  Exhibit 3 is entitled Neshoba County Law Enforcement
2  Center Policy and Procedure Directives. Are you
3  familiar with that document?
4  A. I wish I had my glasses. (Examining.) I have
5  seen them.
6  Q. Okay. So you know they exist, but you're not --
7  you couldn't say --
8  A. I could not read them for word-for-word.
9  Q. Right. Do you know if your jailers have read
10 these documents?
11 A. I'm sure they have.
12 Q. Okay. Do you have any other jail policy and
13 procedures besides these three documents that are
14 written?
15 A. Not that I know of.
16 Q. Okay. So this -- we can say -- safely say that
17 these three exhibits here are -- are the total policies
18 and procedures involving the jail in Neshoba County?
19 A. From what I -- from what I can tell just --
20 Q. Your attorney gave me these documents, so I'm
21 not -- I don't -- I'm just assuming they are --
22 A. Yes, sir.
23 Q. -- complete documents.
24 A. Yes, sir. I'm assuming so. Without going
25 through every one, it appears to be.

## Page 9

1  Q. Yeah. Yeah. But you -- these were dated '95 --
2  '94 and '95. You've not -- you've not established any
3  additional --
4  A. No, sir.
5  Q. -- written policies or procedures?
6  A. No, sir.
7  Q. Do you have a mace policy use in the jail?
8  A. We do have mace in the jail. It's a -- it's a,
9  you know, a non-lethal means of, you know, controlling
10 something that's taking place in the jail for the
11 officers' protection and protection of other inmates.
12 Q. Yeah, in addition to --
13 A. Right, yes, sir.
14 Q. -- handcuffs and whatever else is available? Do
15 you -- are -- do you allow tasers to be used in your
16 jail?
17 A. The jail -- the jail officers are not equipped
18 with tasers.
19 Q. Okay. They're not trained on tasers?
20 A. No, sir.
21 Q. Do you recall the events of May the 28th, 2013?
22 A. Somewhat, yes.
23 Q. When did you become aware of what was -- what was
24 happening and how?
25 A. I don't know how long after the other officers or

Page 10

1  the jail officers had went into the -- the cell block,
2  but at some point, I was summoned to come to the back,
3  that there was a problem at the jail.
4      Q.  And when you arrived, what was the status of
5  the --
6      A.  There was a problem with Chris Luke.
7      Q.  Okay.  Where -- where were they?
8      A.  In the -- what we call the dayroom.
9      Q.  Okay.  They were still in the dayroom when you
10 got there?
11     A.  Correct, yes.
12     Q.  And who all was dealing with Chris at that time?
13     A.  There was a couple of jailers.  Let's see.  I
14 think when I entered, it might have been Mr. Billy
15 Guess.
16     Q.  Nick Walker?
17     A.  Nick Walker.  I want to think Jimmy Reed had
18 already -- was already present.
19     Q.  And Hickman?
20     A.  Correct.
21     Q.  Okay.  So there were four officers dealing with
22 Chris?
23     A.  Yes.
24     Q.  Did you ever get -- did you get involved in it or
25 were you just observing?

Page 11

1      A.  I just observed.
2      Q.  Okay.
3      A.  I never -- you know, I never placed my hands on
4  him.
5      Q.  At the time, you didn't know what -- what was
6  happening, did you?
7      A.  No, sir.  We did not.
8      Q.  Yeah.
9      A.  When I entered, he was acting bizarre and just
10 didn't know what was wrong with him.
11     Q.  Since then, you've found out that he'd been
12 assaulted by a fellow inmate?
13     A.  Correct.  At that time -- at that time, none of
14 us knew.  Like I said, he was fighting officers trying
15 to struggle.  We was trying to, you know, see -- they
16 were trying to see about him, and he just wasn't
17 following any commands.  I didn't know if he might have
18 been coming off of, you know, a high.  I didn't learn
19 that he had been hit until we decided to watch the video
20 to see if we could find, you know, the reason of his
21 behavior.
22     Q.  Now, Angel Crockett was -- was in the control
23 room that day.  Is that your recollection, or control
24 tower, or whatever you call it?
25     A.  Possibly.

Page 12

1      Q.  It's my understanding that she was at the -- at
2  the station.  Do you know what she was doing when this
3  was going on?
4      A.  At the station?
5      Q.  Well, at her station.
6      A.  At her station, no, sir, I --
7      Q.  She reported -- she initially reported that an
8  inmate was down in the day -- in the dayroom.
9      A.  Okay.  Yes, sir.
10     Q.  She didn't say why; she didn't say who, and so I
11 think that was what the original officers had to go on.
12     A.  Yes, sir.
13     Q.  So they didn't know what had happened?
14     A.  Correct.
15     Q.  And I think the reason they didn't know is
16 because Angel was watching the service that was going on
17 in the women's block on the screen and did not -- could
18 not see what was going on in that block.  Is that your
19 understanding of what happened?
20     A.  No.  What kind of service?
21     Q.  Well, there was a church service of some kind in
22 the women's block.
23     A.  I know we do have services.  We do have ministers
24 to come in, you know, to witness to them.
25     Q.  If you're not --

Page 13

1      A.  And that's possibly.
2      Q.  Yeah.  That's what somebody said.  I just asked
3  if you knew that or had found that out or --
4      A.  That's a possibility, yes.
5      Q.  Okay.  So it was my understanding that --
6      A.  And she would -- she would be watching -- well,
7  you know, she would be watching all, but she would be --
8  if there was somebody back there, witnesses to the
9  inmates, I'm sure she was paying close attention to them
10 because of their safety, you know --
11     Q.  Yeah.  Yeah.
12     A.  -- being -- being in there with other inmates.
13     Q.  But as far as -- as far as what's been said prior
14 to you -- your giving your deposition is that they --
15 all they knew, and all they were told by Angel was that
16 an inmate was down.
17     A.  Yes.
18     Q.  Not which inmate or not how the inmate was down,
19 so they were limited in their information.  They didn't
20 know it was Chris.  They didn't know it was -- or why he
21 was -- so he was responding.  And I -- and if you look
22 at the video, he didn't know who hit him, I think.  At
23 least that was my perception.  He got blindsided, in
24 other words, by William Smith.  So I think it would be
25 safe to say or assume that Chris didn't know who had hit

Page 14

1  him. He could assume one of the inmates, but -- and I
2  think that's why he was resisting initially, and -- but
3  the officer didn't -- didn't know that that was the
4  reason he was resisting.
5      A. No, sir. We did not know what the problem was
6  until we decided to watch the video and see if we could
7  learn what had happened.
8      Q. And I think Keith had said that he -- he knew
9  Chris, and Chris was acting out of -- what am I
10 saying -- Jimmy Reed is what I'm trying to say. Chris
11 was acting out of character when he was resisting. So
12 it was just kind of a combination of them responding to
13 Chris, who was responding to them, and it just --
14     A. Correct.
15     Q. Yeah. Do you know or have an opinion as to --
16 the main claim that Chris has is loss of hearing in his
17 left ear, and the doctors have determined it was the
18 result of battle scars, I think is what the doctor said,
19 and it was caused by nerve damage to the nerve, the
20 cochlear nerve in the -- behind the left ear. Do you
21 have any opinion, or have you been told, or have y'all
22 concluded how he might have lost his hearing?
23     A. No. I --
24        MR. GRIFFIN: I'm going to object to the form of
25 the question, but you can answer, if you know.

Page 15

1        THE WITNESS: Yes, sir.
2     A. Not that I know of.
3  BY MR. WALLER:
4     Q. Okay. So nobody -- nobody has -- I know your
5  lawyer has said that maybe he injured himself when he
6  fell, but you've not discussed that with anybody?
7     A. No, I have not.
8     Q. After -- when he fell after Smith -- after being
9  hit by the inmate, there's been no determination of that
10 by anybody in your department, or any investigator, or
11 anything like that as far as you know?
12    A. No, sir. No, sir.
13    Q. Okay. Have -- have you changed any of your
14 policies or procedures since this event occurred?
15    A. I have not.
16    Q. Did you have an occasion to see Christopher Luke
17 on the next day, Wednesday, the 29th?
18    A. I don't recall that I did.
19    Q. Okay. So you didn't know --
20    A. No.
21    Q. -- what his status was the day after or the
22 following day?
23    A. I do know that Jimmy Reed and I had talked about
24 it, and he was a city inmate, and we placed a call to
25 the Police Department to -- for them to come check on

Page 16

1  him, because he was acting strange.
2     Q. Do you recall what -- what -- how he was acting?
3     A. He just -- I mean, Chris just wouldn't -- he
4  just --
5     Q. He wasn't himself?
6     A. He wasn't hisself, you know, especially the
7  fighting part. Of course, like I said, we didn't know
8  if he was coming off of a high, because he is a known
9  drug user and crystal meth, and sometimes it's -- the
10 crystal meth will make you paranoid and do things that
11 you normally wouldn't do, and we didn't know if maybe
12 that was the reason.
13    Q. But you had no -- you have not since found that
14 out or proven that?
15    A. No, sir, I have not.
16    Q. That was just speculation?
17    A. Well, just we didn't know. We didn't know.
18    Q. Yeah. Yeah. You knew that was a possibility?
19    A. Chris -- Chris wasn't acting -- Chris wasn't
20 acting quite like Chris normally does.
21    Q. And, now, do you -- do you assume that that was
22 due to him being struck in the head by the inmate?
23       MR. GRIFFIN: I'm going to object to the form.
24    A. I'm not an expert in that field, but I -- it's a
25 possibility.

Page 17

1  BY MR. WALLER:
2     Q. Do you feel that the jail was responsible for any
3  of his injuries?
4        MR. GRIFFIN: Object to the form.
5     A. I do not.
6        MR. WALLER: I tender the witness.
7        MR. GRIFFIN: I have just a couple of follow-up
8  questions.
9             EXAMINATION
10 BY MR. GRIFFIN:
11    Q. Sheriff, you've mentioned that no determination
12 was ever made as to what caused Mr. Luke's injuries.
13 Did you ever see any of the officers at the jail strike
14 or hit Mr. Luke in the face or head area?
15    A. No, sir.
16    Q. Did you ever see any officer kick Mr. Luke during
17 this incident?
18    A. No, sir.
19    Q. You mentioned that you or Mr. Reed, or y'all had
20 talked about calling the City Police Department about
21 Mr. Luke's condition. What was the reason behind that?
22    A. Just that was he was, you know, acting -- acting
23 peculiar even -- you know, even for Chris.
24    Q. Well, let me ask you: Why would you call the
25 Police Department about that?

Page 18

1  A. Because he was a -- see, the City of Philadelphia
2  Police Department doesn't have a jail, so they use the
3  county jail, and we house their inmates, and it would be
4  normal procedure, if there was a problem with one of
5  their inmates, to notify them and let them know, and
6  that way, if they needed to come check and -- and
7  whatever needs to be done, you know, let the city come
8  in and do as they need to do.
9  Q. And if it was an emergency situation where he
10 needed to be seen immediately by the ER or something
11 like that, what would you -- would you still call the
12 city in that circumstance?
13 A. If -- if it was a matter of life -- life or
14 death, no, we would not notify. We would first notify
15 emergency personnel, you know, like maybe EMS or someone
16 could come -- to come over.
17 Q. Okay. And when you observed Mr. Luke after this
18 incident on May 28th, did he appear to be in need of --
19 having a medical emergency?
20 A. He just seemed more violent than normal for
21 Chris, because he wouldn't listen to you. He would --
22 he would try to fight back.
23 Q. Just not himself?
24 A. He just was not hisself, no.
25 Q. All right. But you didn't think he needed to be

Page 19

1  seen in the emergency room at that point?
2  A. Not at that point, no.
3  Q. Okay. And did somebody from the Police
4  Department come out and check on him?
5  A. I can't answer that. I don't know.
6  Q. Okay.
7  A. I think -- I think there was an officer, but I
8  don't know who that officer was.
9     MR. GRIFFIN: Okay. All right. No further
10 questions.
11    MR. WALLER: These are the three exhibits that we
12 want to attach to his deposition.
13    (EXHIBITS 1 THROUGH 3 MARKED.)
14    MR. WALLER: You did not have a statement, right?
15 You did not make a statement?
16    THE WITNESS: No, I did not. No, sir.
17    MR. WALLER: Thank you for your time.
18    (DEPOSITION CONCLUDED AT 1:36 P.M.)
19         ************

Page 20

1
2            CERTIFICATE OF THE COURT REPORTER
3    I, Katherine Lusk, Court Reporter and Notary Public,
4  and for the State of Mississippi, hereby certify that
5  the foregoing contains a true and correct transcript in
6  the aforementioned matter at the time and place
7  heretofore stated, as taken by stenotype and later
8  reduced to typewritten form under my supervision by
9  means of computer-aided transcription.
10   I further certify that I placed the witness under
11 oath to truthfully answer all questions in this matter
12 under the authority vested in me by the State of
13 Mississippi.
14   I further certify that I am not in the employ of or
15 related to any counsel or party in this matter and have
16 no interest, monetary or otherwise, in the final outcome
17 of this matter.
18   Witness my signature and seal this the _____ day of
19 _____, 2015.
20
21 /s/Katherine Lusk_____
   Katherine Lusk, CCR # 1731
22
   My Commission Expires:
23 November 6, 2015
24
25

Page 21

1       CERTIFICATE OF THE DEPONENT
2  DEPONENT: Tommy Waddell
   DATE: April 1st, 2015
3  CASE STYLE: Christopher C. Luke vs. Neshoba County,
   Mississippi, et al.
4
       I, the above-named deponent in the deposition
5  taken in the herein styled and numbered cause, certify
   that I have examined the deposition taken on the date
6  above as to the correctness thereof, and that after
   reading said pages, I find them to contain a full and
7  true transcript of the testimony as given by me.
       Subject to those corrections listed below, if
8  any, I find the transcript to be the correct testimony I
   gave at the aforestated time and place.
9
   Page   Line           Comments
10 ____   ____   _____
11 ____   ____   _____
12 ____   ____   _____
13 ____   ____   _____
14 ____   ____   _____
15 ____   ____   _____
16 ____   ____   _____
17
       This the ____ day of _____, 2015.
18
                   _____
19                      Tommy Waddell
   State of Mississippi
20 County of _____
21
       Subscribed and sworn to before me, this the _____
22 day of _____, 2015.
23
   My Commission Expires:
24 _____   _____
             Notary Public
25