IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CHRISTOPHER LUKE                                                        PLAINTIFF

VS.                                         CIVIL ACTION NO. 3:14-cv-240-DPJ-FKB

NESHOBA COUNTY, MISSISSIPPI, ET AL.                           DEFENDANTS

**MEMORANDUM OF AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

COME NOW Defendants Tommy Waddell, Jimmy Reid, Nick Walker, Harvey Hickman,

Billy Guess, Angel Crockett, Josh Burt, and Ken Spears, individually and in their official capacities,

and Neshoba County, Mississippi, by and through counsel, pursuant to Rule 56 of the Federal Rules

of Civil Procedure, and files this Memorandum of Authorities in support of their Motion for

Summary Judgment, as follows:

**FACTUAL BACKGROUND**

Plaintiff Christopher Luke was arrested by the Philadelphia Police Department on May 25,

2013, for possession of methamphetamine, and he was subsequently booked into the Neshoba

County Jail.[1]  *See* Incident Reports, Exh. "A."   The incident forming the basis of this lawsuit

occurred at approximately 2:30 p.m. on May 28, 2013, in the dayroom of Plaintiff's cell block.  *Id*.

Plaintiff was talking with another inmate after getting off the phone when inmate William Smith

stood up from a nearby table, approached Plaintiff, and punched him with a closed fist on the back

right side of his head while he was looking the other way, knocking him to the ground.

*See* Surveillance Video, Exh. "B." Only one punch was thrown, and no other inmates were involved.

---

[1] Plaintiff testified that he had been using crystal meth every day for the previous year or two, and he had been arrested on drug charges on two other occasions in the six months prior to his May 2013 arrest.  *See* C. Luke Dep., Exh. "C," at 24-27, 29, 66.

*Id*.  After being punched, Plaintiff laid on the ground momentarily while the other seven inmates in

the unit kept their distance and acted as if nothing had occurred.  *Id*.  Plaintiff eventually got up and

made his way to a table, though he was visibly shaken.  *Id*.  Shortly thereafter, inmates alerted jailer

Angel Crockett – who was in the "tower" monitoring each of the jail's five housing units – that

Plaintiff was sick and could not stand up.[2] *Id*.; Crockett Dep., Exh. "D," at 7, 11-12.  Crockett called

booking and asked for jailer Harvey Hickman to check on the situation, and Hickman, along with

jailers Nicholas Walker and Billy Guess responded.  *Id*., at 7-8.

   Plaintiff would not tell the officers what was wrong with him, and officers were unaware that

he had been struck in the head by another inmate.  Guess Dep., Exh. "G," at 7.  When the officers

asked the other inmates in the dayroom what had happened, they reported that he became sick and

fell but did not mention anything about Plaintiff getting hit in the head.  *See* Hickman Dep., Exh.

"E," at 19-20; Walker Dep., Exh. "F," at 17-18; Exh. "G," at 15-16.  Crockett, who was scanning

the monitors for surveillance cameras in each of the jail's housing units at the time of the subject

incident, did not see Plaintiff get hit.  *See* Exh. "D," at 12-14.  She further testified that it is common

for inmates to stretch out on the floor to sleep since cells are locked while they are out, and she did

not notice anything out of the ordinary until inmates started banging on the door to get her attention.

*Id*., at 20, 28-29.

   When Hickman attempted to check Plaintiff's blood pressure, Plaintiff was non-compliant

and became combative.  *See* Hickman Dep., Exh. "E" at 8-9; Exh. "D," at 8; Exh. "G," at 6-7.  The

---

[2] Jail policy did not require a guard to be posted inside the cell block, and an officer went by
each block approximately every 30 minutes.  *See* Reid Dep., at 32.  The tower officer monitored each
cell block through surveillance cameras, she could hear any disturbances in the cell blocks from her
post, and she communicated with inmates through an intercom system.  *See* Crockett Dep., Exh. "D,"
at 12-16; Walker Dep., Exh. "F," at 14.

officers decided to move Plaintiff from the cell block to a holding cell in the booking area where he could be further evaluated and kept separate from other inmates. *See* Exh. "E," at 8-9; Exh. "F," at 18. The officers tried to calm Plaintiff down, but he continued to struggle and fight. *See* Exh. "E," at 9. Walker eventually got Plaintiff to his feet, but Plaintiff – who was in front of Walker – began throwing his elbows at Walker from side to side and hit Walker in the face.[3] *See* Exh. "F," at 20-22; Exh. "G," at 7, 12-13. Walker and Hickman grabbed Plaintiff to restrain him, took him to the ground, and the officers gave him verbal commands to stop fighting. Exh. "F," at 21, 28. At that point, Crockett called jail administrator Jimmy Reed for additional assistance. *See* Exh. "D," at 8. Because of Plaintiff's combativeness, the officers decided they needed to restrain Plaintiff before moving him. *See* Exh. "G," at 13, 26. However, when Guess moved in to help restrain him, Plaintiff bit Guess' hand and continued to fight. *See* Exh. "G," at 32. At that point, Walker sprayed pepper spray on a rag and waved it in Plaintiff's face, but Plaintiff continued to resist. *See* Exh. "F," at 24-25, 29; Exh. "G," at 21-22. Officers managed to get handcuffs on one of Plaintiff's wrists, but in his efforts to fight the officers, he managed to latch the other part of the cuffs on the same wrist. *See* Exh. "E," at 9; Exh. "F," at 26-27; Exh. "G," at 22-23. Officers eventually were able to gain control of Plaintiff and get a second set of handcuffs applied to both of his wrists. *See* Reid Dep., Exh. "H," at 11-13.

As officers were attempting to restrain Plaintiff, Deputy Josh Burt and Sheriff Tommy Waddell entered the cell block to observe and offer any needed assistance. *See* Exh. "B." Burt's only involvement was handing Reid a second set of cuffs to use after Plaintiff managed to get the

---

[3] Plaintiff throwing his elbows at the officers at the cell block door, as well as certain other portions of Plaintiff's combative behavior, was not captured on video due to the angle of the camera. *See* Reid Dep., Exh. "H," at 13-14.

first set attached to the same wrist. See Burt Dep., Exh. "J," at 5-7. Waddell had no involvement

other than observing. Waddell Dep., Exh. "K," at 10-11. Neither Burt nor Waddell placed any

hands on Plaintiff and were not otherwise involved with restraining or moving him. Constable Ken

Spears was present in the booking area as Plaintiff was being escorted from the cell block to the

holding cell, but he also had no involvement in restraining or moving Plaintiff. *See* Spears Dep.,

Exh. "L," at 6-7.

      Once the officers had Plaintiff restrained in the cell block, he refused to walk. Thus, Walker

and Hickman had to physically carry him to the holding cell in the booking area. *See* Exh. "E," at

9; Exh. "B." After placing Plaintiff in the holding cell, officers removed the set of cuffs that had

been attached to both wrists – again making Plaintiff unrestrained – but they could not remove the

cuffs attached to the same wrist because the keyholes faced each other and were too close together

to insert the key. *See* Exh. "H," at 20.

      At that point, Walker and Hickman escorted Plaintiff to the shower to wash off any mace that

had got on Plaintiff in the cell block. *See* Hickman Dep., Exh. "E," at 9; Walker Dep., Exh. "F," at

45; Reid Dep., Exh. "H," at 15. Plaintiff initially was compliant, but when Walker turned the water

toward Plaintiff, Plaintiff swung and hit Walker with the wrist that still had the cuffs on it. *See* Exh.

"E," at 9; Exh. "F," at 46. Hickman and Walker immediately grabbed Plaintiff to restrain him, and

they escorted him back to the holding cell. *See* Exh. "F," at 46. Hickman and Walker attempted to

cut the cuffs from Plaintiff's wrist so he would not be able to use them again as a weapon, but

Plaintiff continued to swing at the officers, he bit Walker's right hand, and he defecated on himself

and slung feces at the officers. *See* Exh. "F," at 31-32; Exh. "G," at 11. Walker slapped at

Plaintiff's arm to try to get him to stop fighting. *See* Exh. "F," at 31-32. Eventually, Guess was able

to cut the cuffs off Plaintiff's wrist with bolt cutters while Hickman and Reid talked to him to calm him down.  *See* Exh. "G," at 9-10, 13-14; Exh. "H," at 20-21.

Reid instructed jail staff to keep a close eye on Plaintiff because of his odd behavior.  *See* Exh. "H," at 21.  Reid also contacted Chief Bill Cox at PPD to request that someone come and check on Plaintiff for possible medical treatment, and Captain Dan Refre arrived shortly thereafter.[4]  *See* Exh. "H," at 22.  After speaking with Plaintiff for several minutes, Captain Refre determined that Plaintiff did not need emergency medical treatment at that time and thought Plaintiff was experiencing effects of his drug use and would be alright.  *See* Exh. "G," at 14, 35; Exh. "H," at 22-23.  The jail's nurse, Sonya Rainey, had already left for the day when the subject incident occurred, but Reid scheduled Plaintiff to be seen by Rainey when she returned to the jail two days later.  Later that afternoon, Crockett observed Plaintiff banging his head on the door of the holding cell, and she ordered him to stop and helped calm him down.  *See* Crockett Dep., Exh. "D," at 8-10.  That evening, Plaintiff was returned to the shower where he cleaned himself up, and he was moved to an isolation cell for continued close monitoring.  *Id.*, at 9; Incident Reports, Exh. "A."

The following day, on May 29, Hickman fed Plaintiff breakfast, and he was responsive.  *See* Exh. "E," at 15.  Reid visited with Plaintiff later that day, and Plaintiff asked about getting a bond and about his father.  *See* Exh. "H," at 23.  Plaintiff also reported having a bad headache, and Reid gave him two Tylenol and told him that he had been scheduled to see Nurse Rainey when she returned to the jail the following morning.  *Id.*, at 23-24.  Plaintiff did not request any other medical attention that day.  *See* Exh. "C," at 41.

---

[4] Because Plaintiff was a PPD inmate being housed at the county jail, PPD was responsible for making any decisions regarding Plaintiff's non-emergency medical treatment by outside providers.  *See* Rainey Dep., Exh. "I," at 16.

When Rainey examined Plaintiff on the morning of May 30, she did not observe any physical injuries on Plaintiff and did not believe Plaintiff was in need of emergency medical treatment. *See* Rainey Dep., Exh. "I," at 12, 15. However, Rainey called Chief Cox at PPD to recommend that Plaintiff be seen by a local family physician, Dr. Soriano, due to jailers reporting that he had been sleeping more than normal and because Plaintiff told her he had a pre-existing seizure disorder. *Id.*, at 11-16. PPD ultimately decided to have EMS go by the jail to check out Plaintiff, likely due to the fact that the doctor usually only makes it to the jail once per week. *See* Incident Reports, Exh. "A,"; Exh. "I," at 12-13; Exh. "H," at 24. EMS personnel found that Plaintiff's blood sugar and blood pressure were normal, but they recommended he be taken to the local hospital for further testing and evaluation. At the hospital, it was determined that Plaintiff had bruising behind the right ear consistent with Battle's signs, and a CT scan revealed that he had right frontal and right temporal bone bruises. *See* Medical Records, Exh. "P." It was later determined that Plaintiff also had a fracture of his left temporal bone. *Id.*

Other than Plaintiff being violently struck in the right side of his head by inmate Smith and subsequently falling to the floor, the cause of Plaintiff's other injuries and when they occurred is currently unknown. Plaintiff has failed to present any evidence whatsoever regarding which, if any, of the Defendants caused any of his complained-of injuries. There is no evidence that any of the officers involved in restraining and moving Plaintiff in the subject incident (Hickman, Walker, Guess, and Reid) ever hit, kicked, or otherwise struck Plaintiff in the face or head area, and they are not aware of how or when Plaintiff sustained the aforementioned injuries – other than the injuries he sustained when he was punched and knocked to the floor by inmate Smith. *See* Hickman Dep., Exh. "E," at 14, 18; Walker Dep., Exh. "F," at 32-33; Guess Dep., Exh. "G," at 15-16, 34-35; Reid

Dep., Exh. "H," at 33-34.

After Plaintiff was taken to the hospital on the morning of May 30, Reid pulled the surveillance video from two days earlier when Plaintiff's odd behavior began. *See* Exh. "H," at 25. Reid discovered that Plaintiff had been punched in the head by inmate Smith and had fallen to the floor shortly before jail officials were summoned to the cell block. *Id*. Jail officials were not aware that Plaintiff had been in an altercation with another inmate and had no indication that he had a possible head injury until after seeing this surveillance video. *See* Exh. "E," at 14; Exh. "F," at 35; Exh. "G," at 16, 20. Smith later was charged with aggravated assault. *See* Exh. "A."

Plaintiff testified that he has no recollection of getting punched by Smith, nor does he recall anything about his confrontation with jail officers following the assault. See C. Luke Dep., Exh. "C," at 36-40. He cannot remember anything that occurred from before he was struck by Smith until he was being transported to the local hospital two days later. *Id*., at 39-40. Plaintiff testified that he has no idea how any of the officers named as Defendants were involved, and he does not know whether any of the officers used unnecessary or excessive force against him. *Id*., at 63-64.

Plaintiff has also testified that he had not had any problems or threats from inmate Smith prior to the subject incident, and he had not reported any problems with Smith to jail officials. *See* Luke Dep., at 36-37. He also had not requested to be housed in a different area of the jail. *Id*. Plaintiff testified he had no prior indication the assault was going to occur, and he does not know why Smith punched him. *Id*. Jail officials have also testified that they had no prior indication the assault on Plaintiff was going to occur. *See, e.g.*, Exh. "H," at 32-33.

Based on all of the forgoing, there are no genuine issues of material fact, and each of these Defendants are entitled to judgment as a matter of law.

-7-

## LAW AND ARGUMENT

### A.     Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure authorizes summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment.  A dispute must be genuine and the facts must be material." *Professional Managers, Inc. v. Fawer, Bryan, Hardy and Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986).  The moving party has a duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on the motion. *Union Planters Nat. Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982).

Once a properly supported motion for summary judgment is presented, the non-moving party must rebut with "significant probative evidence." *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1977).  In other words, "The non-moving litigant is required to bring forth significant probative evidence demonstrating the existence of a triable issue of fact." *In re: Municipal Bond Reporting Anti-Trust Lit.*, 672 F.2d 436, 440 (5th Cir. 1982).

To defend against a proper summary judgment motion, one may not rely on mere denial of material facts, nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda.  A non-moving party's response, by affidavit or otherwise admissible evidence, must set forth specific facts showing that as to the matter at hand there is a genuine issue of material fact for trial. *Woods*, 687 F.2d at 119.

**B.     Plaintiff Has Failed to Establish a Valid Claim Against Any of These Defendants Under Section 1983**

Section 1983 "neither provides a general remedy for the alleged torts of state officials nor opens the federal courthouse doors to relieve the complaints of all who suffer injury at the hands of the state or its officers." *White v. Thomas*, 660 F.2d 680, 683 (5th Cir. 1981). Rather, it affords a remedy only to those who suffer, as a result of state action, deprivation of "rights, privileges, or immunities secured by the Constitution and laws of the United States." *Id*. To state a cause of action under Section 1983, Plaintiff "must allege facts reflecting the defendants' participation in the alleged wrong, specifying the personal involvement of each defendant." *Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992) (emphasis added).

It is well-settled that Section 1983 does not "create supervisory or *respondeat superior* liability." *Oliver v. Scott*, 276 F.3d 736, 742 & n.6 (5th Cir. 2002); *see also Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) ("Under § 1983, supervisory officials cannot be held liable for the actions of subordinates under any theory of vicarious liability.").

**1.     Defendants are entitled to qualified immunity from Plaintiff's claims against them individually under Section 1983.**

Qualified immunity is a shield from individual liability for "government officials performing discretionary functions . . . as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Skinner v. Hinds County*, 2012 U.S. Dist. LEXIS 127264, *7 (S.D. Miss. Sept. 7, 2012) (c iting *Good v. Curtis*, 601 F.3d 393, 400 (5th Cir. 2010)). *See also Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). "Qualified immunity generally protects all but the plainly incompetent or those who knowingly violate the law." *Id*. Thus, if these Defendants reasonably could have believed under the circumstances that their conduct was not a

-9-

violation of the Plaintiff's constitutional rights, then they cannot be held liable. *Simpson v. Hines*, 903 F.2d 400, 402 (5th Cir. 1990) (citing *Anderson v. Creighton*, 483 U.S. 635 (1987)); *Dean v. Thomas*, 933 F. Supp. 600, 607 (S.D. Miss. 1996). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Austin v. Johnson*, 328 F.3d 204, 207 (5th Cir. 2003). "When a defendant asserts qualified immunity, the plaintiff has the burden to rebut the defense." *Hampton v. Oktibbeha Co. Sheriff Dept.*, 480 F.3d 358, 363 (5th Cir. 2007).

Courts use a two-step analysis to determine whether qualified immunity applies. "A court addressing a claim of qualified immunity must determine first whether the plaintiff has adduced facts sufficient to establish a constitutional or statutory violation." *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). Second, if a violation has been alleged, the court must determine "whether the officers' actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Id*. (quoting *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007)).

"The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." *Skinner*, 2011 U.S. Dist. LEXIS 112724 at 8. Whether the official acted with objective reasonableness is an issue of law reserved for the court. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999).

     **a.    Plaintiff has failed to establish a claim against any of these Defendants individually for failing to protect him from harm by other inmates.**

As a pretrial detainee, Plaintiff's constitutional claims arise under the Due Process Clause of the Fourteenth Amendment, which – like the Eighth Amendment – places a duty on the County

to protect against harm to persons in its confinement.  *See Brown v. Harris County*, 409 Fed. Appx. 728, 730 (5th Cir. Tex. 2010) (citing *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996)).  *See also Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (holding that prison officials have a duty under the Eighth Amendment to protect prisoners from violence by other inmates).  However, "[n]ot every injury by one prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety."  *Farmer*, 511 U.S. at 834.

To prevail on his failure to protect claim, Plaintiff must show that "he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection."  *Skinner v. Hinds County*, 2012 U.S. Dist. LEXIS 127264, *13 (S.D. Miss. Sept. 7, 2012) (citing *Newton v. Black*, 133 F.3d 301, 308 (5th Cir. 1998)).  Whether the risk involved was substantial "is ultimately a question of context and is susceptible to evaluations of 'contemporary standards of decency."  *Id.* (citing *Morgan v. Hubert*, 459 F. App'x 321, 326 (5th Cir. 2012).  As for deliberate indifference, the standard requires subjective culpability and "cannot be inferred from a jail official's failure to act reasonably."  *Moneer v. Harrison Cnty. Det. Ctr.*, 2008 U.S. Dist. LEXIS 83264, at *5 (S.D. Miss. Sept. 29, 2008).  Acts of negligence cannot form the basis of a section 1983 claim.  *Hoskins v. Epps*, 2013 U.S. Dist. LEXIS 126779, 10 (S.D. Miss. Sept. 5, 2013).  In other words, a jail official's negligence for failing to protect the Plaintiff is not actionable.  *Thompson v. Upshur County, TX*, 245 F.3d 447, 459 (5th Cir. 2001).  A jail official cannot be held liable for deliberate indifference unless he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  Deliberate indifference is an "extremely high standard to meet."  *Gobert v. Caldwell*,

463 F.3d 339, 346 (5th Cir. 2006).

In the present action, Plaintiff clearly has failed to establish that any of these Defendants "consciously disregarded a substantial risk of serious harm," which is necessary to state a claim cognizable under Section 1983.  *See Farmer*, 511 U.S. at 826.  Plaintiff has testified that he had no prior indication the assault was going to occur.  He had not had any prior problems or threats from inmate William Smith, nor had he reported any problems with Smith to jail officials.  He also had not requested to be moved to another housing unit.  There also is no indication he had been involved in any altercations at the jail prior to this incident.

Additionally, although a guard was not physically present with Plaintiff and the seven other inmates in his cell block at the time of the assault, Defendant Angel Crockett was posted in the "tower" of the housing unit, where she was monitoring each cell block through surveillance cameras. Her position in the tower also allowed her to hear any disturbances that occurred in each cell block, and she had communication with the inmates in each unit through an intercom system.  Although Crockett did not actually see Plaintiff get hit, the single punch by Smith was sudden, quick, and unexpected.  Crockett had no advance warning that the assault was likely to occur.  *See* Crockett Dep., Exh. "C," at 29.  Plaintiff was not assaulted again after the single blow by Smith.

There is no evidence that *any* of these Defendants knew that Plaintiff was at a substantial risk of being attacked by Smith or anyone else and consciously disregarded that risk.  As such, Plaintiff has failed to establish that the injuries inflicted upon him by Smith were the result of deliberate indifference on the part of Crockett or any of the other Defendants, in violation of Plaintiff's constitutional rights.  Further, there is no evidence that the actions of jail officials were objectively unreasonable under the circumstances at the time.

Accordingly, there are no genuine issues of material fact regarding Plaintiff's failure-to-protect claims against Defendants, individually, and Defendants are entitled to qualified immunity from Plaintiff's claims against them under Section 1983 in that regard.

      **b.**    **Plaintiff has failed to establish a claim against any of these Defendants for using excessive force against him.**

"The core inquiry in an . . . excessive use of force claim is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Skinner*, 2012 U.S. Dist. LEXIS 127264 at *9 (S.D. Miss. Sept. 7, 2012) (quoting *McClyde v. Jackson*, 405 F. App'x 891, 893 (5th Cir. 2010)).  The undisputed evidence in this case demonstrates that jail officials used only the minimum force necessary in a good faith effort to restrain Plaintiff and maintain security.

When Defendants Hickman, Walker, and Reid arrived in the dayroom, Plaintiff would not tell them what had happened or what was wrong.  When the officers asked the other inmates in Plaintiff's cell block what happened, they said Plaintiff became sick and fell.  The officers were not aware at that point that Plaintiff had been struck with a closed fist by another inmate.

Based on Plaintiff's presentation and the reports from other inmates that Plaintiff appeared to fall out, Hickman attempted to check Plaintiff's blood pressure.  However, Plaintiff started to yell and became combative.  Officers reasonably decided to move Plaintiff to a holding cell in the booking area to separate him from the other inmates and further evaluate what was wrong with him.  When Walker finally got Plaintiff to his feet to walk him out of the cell block, Plaintiff began swinging his elbows at Walker, who was behind him.  At that point, Walker and Hickman grabbed Plaintiff, took him to the ground, and gave verbal commands to stop fighting.

Due to Plaintiff's combative behavior, the officers decided they needed to restrain Plaintiff with handcuffs before moving him.  However, when Guess moved in to control his top half, Plaintiff bit Guess on the wrist.  Because of Plaintiff's continued resistance and violent behavior, Walker applied pepper spray to a towel and waved it in Plaintiff's face.  It is well established that the use of pepper spray to help subdue an unrestrained and combative inmate does not amount to constitutionally excessive force.  *See Stone v. Damons*, 252 F. App'x 581, 582 (5th Cir. 2007) (affirming summary judgment in excessive-force case where officer used pepper spray on suspect who was resisting arrest).  However, even pepper spray did not keep Plaintiff from continuing to struggle, and Plaintiff managed to get both halves of a set of handcuffs latched onto the same wrist. Officers eventually were able to hold Plaintiff down long enough for Reid to apply a second set of cuffs to both wrists.

All force used in the cell block by Hickman, Walker, Guess, and Reid was clearly done in good faith for the sole purpose of restraining Plaintiff and getting him moved to another location where he could be properly evaluated and kept safe from other inmates.  There is no evidence whatsoever that the force used by any of these four officers was constitutionally excessive, and their actions at all times were objectively reasonable under the circumstances.

Once the officers had Plaintiff restrained in the cell block, he refused to walk.  Thus, Walker and Hickman had to physically carry him to the holding cell in the booking area.  After placing Plaintiff in the holding cell, officers removed the set of cuffs that had been attached to both wrists, but they could not immediately remove the cuffs attached to the same wrist because the keyholes faced each other and were too close together to insert the key. At that point, Walker and Hickman escorted Plaintiff to the shower to wash off any mace that had got on Plaintiff in the cell block.

Plaintiff initially was compliant; however, when Walker turned the water toward him, Plaintiff started swinging at Walker with the wrist that still had the cuffs attached as if he was using it as a weapon, presenting a clear threat to security.  Due to Plaintiff's combative and aggressive behavior, Walker and Hickman grabbed Plaintiff and escorted him back to the holding cell.  Hickman and Walker attempted to cut the cuffs from Plaintiff's wrist, but Plaintiff continued to resist, bit Walker's right hand, and slung his own feces at the officers.  Eventually, Guess was able to cut the cuffs while Hickman and Reid calmed him down.  Once the cuffs were removed, Plaintiff was temporarily kept in the holding cell for further monitoring.  There were no further physical confrontations between Plaintiff and jail staff.  Again, all force used in the holding cell and shower area was done solely in response to Plaintiff's combative and aggressive behavior toward officers who were simply trying to help him.

Whether an officer's use of force is reasonable is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." *Id.*, at 396-97.

There is no evidence whatsoever that any force used by jail officials in the subject incident was done in a malicious or sadistic manner with an intent to cause harm, as required to prove constitutionally-excessive force.  *See Skinner*, 2012 U.S. Dist. LEXIS 127264 at *9 (S.D. Miss. Sept. 7, 2012).  Neither Walker, Hickman, Guess, nor Reid ever hit, kicked, or otherwise struck Plaintiff

in the head or face area while attempting to restrain or move Plaintiff, or at any other point.[5] The undisputed facts show jail officers properly attempting to restrain a combative individual, and nothing more.

Further, Plaintiff has presented no evidence to establish which Defendants, if any, actually caused any of the injuries he is claiming he sustained at the jail.  Because Plaintiff cannot demonstrate that any of the individual Defendants used excessive force against him, Plaintiff's claims in that regard fail as a matter of law.  *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986) (holding that a plaintiff in a civil rights case must articulate a set of facts that illustrate's the defendant's participation in the alleged wrong).  Any allegation as to who or what caused his injuries, other than the injuries inflicted from the assault by William Smith, are nothing more than mere speculation.  Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial and cannot defeat summary judgment.  *Skinner*, 2012 U.S. Dist. LEXIS 127264 at *4.

Accordingly, there are no genuine issues of material fact as to Plaintiff's excessive force claims against these Defendants, and these Defendants are entitled to qualified immunity from Plaintiff's claims in that regard.

      **c.**      **Plaintiff has failed to establish a claim against any of these Defendants for failing to provide him with adequate medical attention**

"Prison officials violate the constitutional proscription against cruel and unusual punishment when they are deliberately indifferent to a prisoner's serious medical needs, as doing so constitutes unnecessary and wanton infliction of pain." *Davidson v. Texas Dep't of Criminal Justice*, 91 Fed.

---

[5] There is no evidence that Defendants Tommy Waddell, Josh Burt, Ken Spears, or Angel Crockett were involved with any use of force in this incident at all.

Appx. 963, 964 (5th Cir. 2004). Deliberate indifference "is an extremely high standard to meet," and negligent conduct by prison officials does not rise to the level of a constitutional violation. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)). The test for establishing deliberate indifference is "one of subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 839 (1994). A prison official may not be held liable under this standard pursuant to Section 1983 unless the Plaintiff establishes facts which, if true, would prove that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*, at 837.

Deliberate indifference is more than mere negligence in providing or failing to provide medical treatment. *Rowell v. Jackson County*, 2010 U.S. Dist. LEXIS 47767, *24 (S.D. Miss. Mar. 9, 2010) (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993)). The law is clear that unsuccessful medical treatment, mere negligence, neglect, and medical malpractice do not give rise to a Section 1983 cause of action. *See Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). Plaintiff must show that "officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would evince a wanton disregard for any serious medical needs." *Rowell*, 2010 U.S. Dist. LEXIS 47767 at 24 (citing *Domino v. Tex. Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)).

While Plaintiff clearly was exhibiting combative and even odd behavior during the incident in question, there is no evidence that any of the Defendants in this case knew of a substantial risk to Plaintiff's health and safety and deliberately ignored that risk. Officers responded to Plaintiff's

cell block within minutes of being alerted that Plaintiff was "sick" and needed help.  Plaintiff would not tell the officers what had happened, and the other inmates simply reported that he appeared to have become sick and fallen out.  The officers were not aware that Plaintiff had been struck in the head.  Officer Hickman attempted to check Plaintiff's blood pressure, but Plaintiff refused and became combative with the officers.  The officers attempted to move Plaintiff from the cell block to the booking area for further evaluation and Plaintiff's own safety, but Plaintiff fought and initially refused to be moved.  He also refused to be restrained with handcuffs, which led to Officer Walker applying pepper spray to a towel and waving it in his face to gain his compliance.  There is no evidence that the use of pepper spray caused Plaintiff any injuries.

After finally getting Plaintiff to the holding cell and removing the set of cuffs binding both wrists, officers took Plaintiff to the shower area to clean any pepper spray that may have got on Plaintiff during the confrontation in the cell block.  However, Plaintiff again became combative and was returned to his holding cell, where he continued to struggle with officers when they attempted to remove the second set of cuffs that were attached to the same wrist.

Because Plaintiff was a city inmate, jail administrator Jimmy Reid called the police chief and had someone sent to the jail to determine if Plaintiff needed to be sent for outside medical treatment, and Captain Dan Refre from PPD arrived shortly thereafter.  After talking with Plaintiff for several minutes and noting Plaintiff's combative behavior, including hitting and biting at officers, it was determined that Plaintiff was likely experiencing the effects of withdrawal from illicit drug use and did not need immediate medical attention.  The jail's nurse had already gone home for the day when the subject incident occurred, but Plaintiff was kept under close observation by jail staff and away from other inmates.

-18-

The following day, May 29, Plaintiff was responsive to Hickman at breakfast, and Plaintiff discussed his situation with Reid that afternoon.  Plaintiff also received Tylenol from Reid after reporting that he had a bad headache.  There is no evidence that Plaintiff showed any signs of needing emergency medical treatment at that time, and there is no evidence that he requested additional treatment.

On the morning of May 30, Plaintiff was seen by Nurse Sonya Rainey, who did not observe any physical injuries but recommended to PPD that Plaintiff be scheduled to see a local family physician due to jail staff reporting that Plaintiff had been sleeping more than normal and after Plaintiff told her he had previously been diagnosed with a seizure disorder.  PPD decided to have EMS go by the jail to check on Plaintiff, and the decision was ultimately made to have Plaintiff taken to the local ER for further evaluation since he was continuing to exhibit odd behavior.

There is no evidence that any of these Defendants were aware that Plaintiff had been struck in the head or that he was in need of emergency medical care prior to him being taken to the local hospital on May 30.  There also is no evidence that any of the individual Defendants refused to provide Plaintiff with medical treatment, ignored his complaints, or engaged in any similar conduct that would evince a wanton disregard for any serious medical needs, as required for a finding of deliberate indifference.  Instead, jail officials separated Plaintiff from other inmates, made sure he was secure, kept him under close observation, and provided him with over-the-counter pain relievers as requested until he could be seen by the nurse when she returned to the facility.  Further, because Plaintiff was a city inmate, it was up to the city's discretion to provide Plaintiff with non-emergency treatment by an outside provider.

Further, it is well established that the failure to alleviate a significant risk that a jail official

-19-

should have perceived but did not is insufficient to show deliberate indifference. *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001), citing *Farmer*, 511 U.S. at 838. Also, even if Defendants were negligent in failing to discern Plaintiff's medical condition or his need for prompt medical attention, mere negligence is insufficient to establish a constitutional violation cognizable under Section 1983. It is also irrelevant to the constitutional question at issue that any of the Defendant officers may have failed to follow "best practices" in the industry or may have violated certain policies or procedures of the jail. *See Watson v. Bryant*, 532 Fed. Appx. 453 (5th Cir. 2013) (failure to follow proper procedure does not in itself amount to constitutional violation).

These Defendants' actions were objectively reasonable under the circumstances, based on the information they had at the time. *See McClyde v. Jackson*, 405 Fed. Appx. 891, 893 (5th Cir. 2010) (summary judgment proper where jail official was aware of plaintiff's nosebleed but did not believe it was a serious medical condition requiring immediate attention).

Additionally, Plaintiff cannot establish that he suffered any harm from a delay of less than 48 hours between the time he was assaulted by Smith and the time he was seen by trained medical staff. Plaintiff's ear, nose and throat (ENT) specialist, Dr. Mickey Wallace, has testified that a delay of two days in receiving medical treatment likely had no effect on the permanent hearing loss he sustained as a result of his head injuries. *See* Wallace Dep., at 22. There also is no evidence that Plaintiff sustained any injury from having a towel sprayed with pepper spray put in his face by Walker during the officers' struggle to restrain Plaintiff in the cell block. Because Plaintiff cannot establish that he suffered any harm as a result of a delay in medical treatment, his claim against Defendants for providing him with inadequate medical care must fail. *See Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (holding that a delay in medical care must cause "substantial harm"

-20-

to be a constitutional violation).

Based on all of the foregoing, there are no genuine issues of material fact, and these Defendants are entitled to qualified immunity from Plaintiff's claims against them individually regarding the failure to provide him constitutionally adequate medical treatment.

### d.   Plaintiff has failed to establish a claim against any of these Defendants for depriving him of equal protection under the Fourteenth Amendment

Plaintiff's Complaint also appears to assert a general claim against Defendants for the violation of his right to equal protection of the law under the Fourteenth Amendment. Any attempted equal protection claim must contain an allegation that a state actor intentionally discriminated against the plaintiff because of membership in a protected class or due to an irrational or arbitrary state classification unrelated to a legitimate state objective. *Washington v. Davis*, 426 U.S. 229, 247-48 (1976). A classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity and does not violate the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. *Heller v. Doe*, 509 U.S. 312 (1993).

Plaintiff has failed to identify his membership in any protected class, and he has not presented any evidence that he was intentionally discriminated against compared to similarly situated inmates at the Neshoba County Jail on the basis of his membership in any such class. Accordingly, there are no genuine issues of material fact, and Plaintiff's equal protection claim under the Fourteenth Amendment must fail as a matter of law.

### 2.   Plaintiff has failed to establish a constitutional claim against Neshoba County

Municipal liability under Section 1983 requires proof of three elements: (1) a policymaker;

-21-

(2) an official policy; (3) and a violation of constitutional rights whose "moving force" is the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001); *Monell v. Dep't of Soc. Services*, 436 U.S. 658, 694 (1978). A municipality may not be held liable under Section 1983 on the basis of *respondeat superior*. *Piotrowski*, 237 F.3d at 578. A suit against a governmental officer in his official capacity is a suit against the office that the employee holds and not the employee individually. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

Not only must the plaintiff establish that a policy or custom of the municipality was the "moving force" behind the alleged violation of a constitutional right; he must also establish that the municipality was "deliberately indifferent" to the known consequences of the policy. *Piotrowski*, 237 F.3d at 580. The Fifth Circuit has noted that the plaintiff bears an "extremely heavy burden" in establishing both the municipality's deliberate indifference and a causal link between the alleged custom and the alleged constitutional violation. *Id.*

Plaintiff testified in his deposition that he sued Neshoba County because it operates the jail and employs the officers who were involved in the subject incident. *See* Exh. "C," at 64. However, Neshoba County cannot be held vicariously liable under Section 1983 for the alleged acts or omissions of its employees. *Piotrowski*, 237 F.3d at 578.

Plaintiff's claims against Neshoba County also must fail because he has not established a deprivation of his constitutional rights. Plaintiff has failed to show that any jail officials were deliberately indifferent to his need for protection from harm by other inmates, nor has Plaintiff shown that any of these Defendants were deliberately indifferent to Plaintiff's serious medical needs. Plaintiff also has failed to show how any of these Defendants used excessive force against him during the subject incident.

-22-

Further, Plaintiff has failed to establish that any policy or custom of Neshoba County was the moving force behind any alleged constitutional deprivation.  The County had reasonable policies in place at the jail regarding protecting inmates from harm by others, use of force, and the provision of medical care, and there is no evidence that these policies were violated.  *See* Neshoba County Law Enforcement Center Policies (Use of Force and Medical Care), Exh. "N."

Additionally, to prevail on a "failure to train theory" against a municipality, a plaintiff must demonstrate: (1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question. *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009). When a plaintiff seeks to impose Section 1983 liability on a municipality for its failure to train its employees, normal tort standards are replaced with heightened standards of culpability and causation. *Williams v. City of Cleveland*, 2012 U.S. Dist. LEXIS 117559, 53-54 (N.D. Miss. Aug. 21, 2012).

Claims of inadequate training generally require that the plaintiff demonstrate a pattern of constitutional violations.  *Davis v. City of N. Richland Hills*, 406 F.3d 375, 383 n. 34 (5th Cir. 2005); *Lewis v. Pugh*, 289 F. App'x 767, 772 (5th Cir. 2008) (citing *Thompson v. Upshur County*, 245 F.3d 447, 458 (5th Cir. 2001) ("Proof of more than a single instance . . . is required before such a lack of training can constitute deliberate indifference.").  Plaintiff must "demonstrate that the municipality or supervisor had notice of a pattern of prior acts fairly similar to what ultimately transpired." *Lewis*, 289 F. App'x at 772 (internal citations omitted).

"[The Fifth Circuit] consider[s] compliance with state requirements as a factor counseling against a 'failure to train' finding." *Williams v. City of Cleveland*, 2012 U.S. Dist. LEXIS 117559,

58 (citing *Zarnow v. City of Wichita Falls Tex.*, 614 F.3d 161, 167 (5th Cir. 2010)).  Likewise, the Fifth Circuit has explained that when officers have received training as required by state law, the plaintiff must show that the legal minimum of training was inadequate. *See Benavides v. Cnty. of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992). Such evidence has not been presented in this case.

Here, there is no evidence that inadequate training caused Plaintiff to suffer a constitutional deprivation.  It is undisputed that Defendants Reid, Burt, and Waddell had been certified through the Mississippi Law Enforcement Officers Training Academy.  *See* Training Records, Exh. "O." Defendants Hickman, Guess, and Crockett have been certified by the Mississippi Board on Jail Officer Standards and Training.  *Id*.  Defendant Walker also had completed a six week Adult Detention Officers Training Course.  *Id*.  Most of these officers have also completed other law enforcement-related training courses.  *Id*.  They have also all received the County's policies and procedures manual and have completed in-service training.  *See* Exh. "H," at 7-8.

Finally, Plaintiff has failed to present any other similar instances involving constitutional violations at the Neshoba County Jail for failing to protect inmates from harm by others, for use of excessive force, or for denial of adequate medical care.

For all of the foregoing reasons, Plaintiff has failed to establish a genuine issue of material fact as to his constitutional claims against Neshoba County, and his claims against the County should be dismissed as a matter of law.

C.     **Plaintiff's State Law Claims are Barred by the Immunities and Protections of the Mississippi Tort Claims Act.**

Plaintiff's state law claims of negligence against these Defendants are subject to and barred by the protections, limitations, and immunities of the Mississippi Tort Claims Act ("MTCA"), as

codified at MISS. CODE ANN. § 11-46-1, *et seq*.  The MTCA is the exclusive route for filing suit against a governmental entity and its employees in Mississippi.  *See* MISS. CODE ANN. § 11-46-1, *et seq*.  As required by law, Plaintiff brought his Complaint pursuant to the Mississippi Tort Claims Act.  Neshoba County, Mississippi constitutes a "governmental entity" and a "political subdivision" as defined by statute. MISSISSIPPI CODE ANNOTATED § 11-46-1.

   1.   **Defendants have immunity from Plaintiff's state law claims against them individually under MISS. CODE ANN. § 11-7-6(2).**

   To the extent these Defendants were acting pursuant to and within the scope of their employment with Neshoba County, Mississippi, these Defendants are immune from individual liability, as provided by the MTCA:

> An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties.

MISS. CODE ANN. § 11-46-7(2).  Accordingly, a government employee is not subject to individual liability under state law for acts or omissions that occur while performing his job duties.

   The allegations against each of these Defendants clearly are based on alleged acts or omissions occurring during the course and scope of their employment as jail officers or other law enforcement officers of Neshoba County.  Accordingly, these Defendants are immune from any state law claims that may be asserted against them in their individual capacity herein.

   2.   **Defendants have immunity from Plaintiff's state law claims under MISS. CODE ANN. § 11-46-9(1)(m).**

   The MTCA provides that a governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:

-25-

> Of any claimant who at the time the claim arises is an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution, regardless of whether such claimant is or is not an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution when the claim is filed.

MISS. CODE ANN. 11-46-9(1)(m).

It is undisputed that Plaintiff was an inmate housed at the Neshoba County Jail at the time his claims against these Defendants arose.  Therefore, these Defendants have immunity from Plaintiff's state law claims against them in both their individual and official capacities pursuant to MISS. CODE ANN. § 11-46-9(1)(m).  *See Johnson v. Epps*, 479 Fed. Appx. 583, 592-593 (5th Cir. Miss. 2012).  As such, there are no genuine issues of material fact, and Plaintiff's state law claims against these Defendants should be dismissed as a matter of law.

## CONCLUSION

Defendants Tommy Waddell, Jimmy Reid, Harvey Hickman, Nicholas Walker, Billy Guess, Angel Crockett, Josh Burt, and Ken Spears are entitled to qualified immunity from Plaintiff's claims asserted against them in their individual capacities under Section 1983.  Further, Plaintiff has failed to set forth any evidence that would establish a *prima facie* case against Neshoba County under Section 1983.  Additionally, Plaintiff's claims under state law are barred by the immunities and protections of the Mississippi Tort Claims Act.  As such, there are no genuine issues of material fact, and each of the Defendants are entitled to judgment as a matter of law as to all of Plaintiff's claims against them.

Respectfully submitted, this 26th day of May, 2015.

TOMMY WADDELL, JIMMY REID, NICK WALKER, HARVEY HICKMAN, BILLY GUESS, ANGEL CROCKETT, JOSH BURT, KEN SPEARS,

-26-

AND NESHOBA COUNTY, MISSISSIPPI

BY: /s/ *Steven J. Griffin* _____
        OF COUNSEL

ROY A. SMITH, JR. - BAR # 7599
rsmith@danielcoker.com
STEVEN J. GRIFFIN - BAR # 103218
sgriffin@danielcoker.com
DANIEL, COKER, HORTON & BELL, P.A.
4400 OLD CANTON ROAD, SUITE 400
POST OFFICE BOX 1084
JACKSON, MISSISSIPPI  39215-1084
TELEPHONE:  (601) 969-7607
FACSIMILE:  (601) 969-1116

## CERTIFICATE OF SERVICE

       I hereby certify that on May 26, 2015, I electronically filed the foregoing with the Clerk of

the Court using the ECF system, which sent notification of such filing to the following:

       Robert O. Waller, Esq.
       bobwaller@wallerandwaller.com
           *Attorney for Plaintiff*

       /s/ *Steven J. Griffin* _____