UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


CHRISTOPHER C. LUKE                                                    PLAINTIFF

v.                                              CIVIL ACTION NO. 3:14cv240-DPJ-FKB

NESHOBA COUNTY, MISSISSIPPI, et al.                                   DEFENDANTS


ORDER

This § 1983 action relates to an unfortunate attack against a pretrial detainee by a fellow

inmate and the events that followed.  The matter is before the Court on Defendants' motion for

summary judgment [65] pursuant to Federal Rule of Civil Procedure 56.  Plaintiff Christopher

Luke has responded in opposition.  The Court, having considered the memoranda and

submissions of the parties, finds that Defendants' motion should be granted.

I.      Facts and Procedural History[1]

On May 25, 2013, officers with the Philadelphia, Mississippi, Police Department arrested

Plaintiff Christopher Luke for possession of methamphetamine and delivered him to the Neshoba

County Jail for housing.  On May 28, shortly after Luke concluded a telephone call in the

dayroom of the jail, inmate William Smith punched Luke in the head.  Luke fell to the ground

and remained motionless for several minutes.  He then began flailing on the ground and had

difficulty standing and walking, which prompted his fellow inmates to contact the jailer assigned

to monitor the video surveillance in the dayroom.

---

[1]  The Court gleaned this very general overview of the facts from Plaintiff's Complaint,
the video of the incident, and the evidentiary submissions.  More detailed facts are provided in
the analysis of Plaintiff's specific claims.

Minutes later, Defendants Harvey Hickman, Nicholas Walker, and Billy Guess, all of whom worked as jailers, responded to the call for help. Luke was unable to tell the officers what was wrong, and the other inmates simply reported that he was "sick." The officers attempted to remove Luke from the dayroom, but Luke was not cooperative—biting, elbowing, and fighting with the officers. Jail Administrator Jimmy Reed was called in to assist. The officers struggled with Luke for several minutes and ultimately employed mace and physical restraint to subdue and handcuff him.

Once they handcuffed him, Defendants carried Luke to the detox cell in the booking area. According to Defendants, Luke continued to be combative—swinging at officers, biting, banging his head against the cell door, defecating, and throwing feces. By this time, the jail nurse had left for the day, but Defendants concluded that Luke's erratic behavior was a result of his prior drug use and he did not need medical treatment.

The next day, Luke complained of having a headache, so Jail Administrator Reid gave him two Tylenol. When Nurse Sonya Rainey returned the following day, she examined Luke and voiced concern over his history of seizures and the fact that he had been sleeping more than usual. Because Luke was still within the custody of the Philadelphia Police Department, Rainey contacted Philadelphia Police Chief Cox, who dispatched Emergency Medical Services. Luke was ultimately transported to Neshoba General Hospital and released into his father's custody. The drug charges were never pursued.

At the hospital, doctors diagnosed Luke with a temporal bone fracture, right frontal and temporal contusions, and edema. Luke also had bruises and lacerations on his face, neck, and wrist. To date, he continues to suffer hearing loss as a result of head trauma—his left ear is

completely nonfunctional and his right ear has significant hearing loss. Plaintiff has no memory of the assault or the days that followed.

Luke filed this suit against Neshoba County, Neshoba County Sheriff Tommy Waddell, Neshoba County Deputy Josh Burt, Jail Administrator Jimmy Reid, Jailers Nicholas Walker, Harvey Hickman, Billy Guess, and Angel Crockett, and Constable Ken Spears. In his Complaint, Luke alleges that Defendants failed to protect him from harm at the hands of other inmates, used excessive force in subduing him in the dayroom, and failed to render appropriate medical care in the two days following the assault. Luke also contends that Neshoba County is liable for negligently hiring, training, and supervising its officers, jailers, and employees. Finally, he asserts state-law claims for negligent and intentional infliction of emotional distress and general negligence.

Defendants collectively moved for summary judgment as to all claims. The motion is fully briefed, and the Court has subject-matter jurisdiction over the claims and is prepared to rule.

II.    Standard

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

III.     Analysis

Luke generally alleges that Neshoba County and the Individual Defendants failed to protect him from harm at the hands of another inmate, subjected him to excessive force, denied him adequate medical care, and violated his due-process rights, all in violation of the Fourteenth Amendment. To state a claim under 42 U.S.C. § 1983, Luke must: (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) show that the alleged deprivation was committed by persons acting under color of state law. *James v. Tex. Collin Cnty.*, 535 F. 365, 373 (5th Cir. 2008). Here, there is no dispute the Individual Defendants were acting under color of state law; the focus is whether Luke has alleged a violation of a constitutional right. Defendants moved for dismissal of all federal claims and specifically asserted qualified immunity.

A.     Individual Defendants – Federal Claims

1.     Qualified Immunity Standard

Qualified immunity is a shield from individual liability for "'government officials performing discretionary functions . . . as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Good v. Curtis*, 601 F.3d 393, 400 (5th Cir. 2010) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). "[Q]ualified immunity generally protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When a defendant asserts qualified immunity, the plaintiff has the burden to rebut the defense. *Hamptom v. Oktibbeha Cnty. Sheriff Dep't*, 480 F.3d 358, 363 (5th Cir. 2007). In the summary-judgment posture, the Court "'looks to the evidence before it (in the light most favorable to the plaintiff).'" *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)).

Courts use a two-step analysis to determine whether qualified immunity applies. "[A] court addressing a claim of qualified immunity must determine first whether the plaintiff has adduced facts sufficient to establish a constitutional or statutory violation." *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, if a violation has been alleged, the Court must determine "'whether [the officer's] actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.'" *Id.* (alteration in original) (quoting *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007)).

"The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001) (citations omitted). Thus, "[a]n official is eligible for qualified immunity even if the official violated another's constitutional rights." *Id.* (citations omitted). Whether the official acted with objective reasonableness is an issue of law reserved for the Court. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999).

Finally, it is within the lower court's discretion to decide which prong of the qualified-immunity analysis to address first. *Collier*, 569 F.3d at 217 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). As detailed below, Luke has failed to demonstrate that Defendants violated his constitutional rights, and accordingly, they are entitled to qualified immunity.

## 2. Failure to Protect[2]

Luke alleges that the Individual Defendants failed to protect him from harm at the hands of other inmates. As a pretrial detainee, Luke's constitutional claims "arise under the Due Process Clause of the Fourteenth Amendment, which—like the Eighth Amendment—places a duty on the State to protect against harm to persons in its confinement." *Brown v. Harris Cnty.*,

---

[2]As discussed below, there is some confusion whether Luke pursues an episodic-acts claim or challenges his conditions of confinement. *See, e.g.*, *Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008). He seems to advance a conditions-of-confinement theory as to the medical-care claim, but his arguments regarding the alleged failure-to-protect more closely resemble the episodic-acts model. Accordingly, the Court will follow that approach in its analysis of the failure-to-protect claim. Regardless, the result would be the same under the conditions-of-confinement theory because Plaintiff has not shown a policy or "a pattern of acts or omissions sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice." *Shepherd v. Dall. Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) (internal quotation marks omitted).

*Tex.*, 409 F. App'x 728, 730 (5th Cir. 2010). This includes a duty to protect prisoners from violence at the hands of other inmates. *Williams v. Hampton*, 797 F.3d 276, 280 (5th Cir. 2015).

"The Supreme Court has explained that '[i]t is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Two requirements must first be met: (1) the inmate must show that he was incarcerated under conditions posing a substantial risk of serious harm; and (2) a prison official must have a "sufficiently culpable state of mind." *Id.* "[T]hat state of mind is one of deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834 (internal quotation omitted). To be deliberately indifferent, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

While Smith's attack on Luke was violent, Defendants correctly point out that Luke has neither alleged nor offered evidence showing they knew or should have known he was at risk. Both Reid and Guess testified that Luke did not inform them of any threats or conflicts with any inmates—including Smith—during intake. Guess Dep. [65-7] at 9; Reid Dep. [65-8] at 9 (CMECF pagination). Guess explained that when an inmate is booked, the officer shows him a list of all inmates in the facility and asks him if he has any conflict. Guess Dep. [65-7] at 9. Luke denied any conflict. *Id.* And Luke himself testified that he had no reason to believe the assault was going to occur and does not know why Smith punched him. Luke Dep. [65-3] at 37–38.

Instead, Luke argues that his failure-to-protect claim is based on the lack of supervision in the jail. Specifically, he claims that jail officials were "negligent" in their supervision of the dayroom and use of the telephone by inmates. Pl.'s Mem. [70] at 27. And he contends that Defendants were "negligent" in monitoring the surveillance cameras in the dayroom for an unreasonable length of time. *Id.* at 28.

First and foremost, "[m]ere negligence by officials in failing to protect a prisoner from an assault does not form the basis of a § 1983 claim." *Stout v. LeBlanc*, 599 F. App'x 170, 171 (5th Cir. 2015) (citing *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995)). Second, Defendants have produced evidence that jailers patrolled the cell blocks every thirty (30) minutes and that a jailer is always in the tower monitoring the surveillance cameras throughout the jail. Reid Dep. [65-8] at 9. On the day of the assault, Jailer Angel Crockett was manning the tower and testified that she was monitoring all cameras. Crockett Dep. [65-4] at 4.

Luke counters that Crockett failed to perform her duty to monitor the dayroom camera because she was focusing on a religious service in the women's cell block, which involved both inmates and civilians. Pl.'s Mem. [70] at 4, 29. But Luke relies on testimony from Reid and Hickman, both of whom indicated that they lacked personal knowledge of what Crockett was actually doing. *See* Reid Dep. [65-8] at 5 (testifying as to his "understanding" but stating that he did not know); Hickman Dep. [69-13] at 4 (testifying, "I imagine she [Crockett] was" monitoring the service, but stating he did not look in the control room where Crockett was stationed). Absent personal knowledge, neither Reid nor Hickman create a material dispute. And as for Crockett, she specifically stated that the religious service was "*one* of [her] priorities . . ." but not "the only thing that [she] was watching." Crockett Dep. [65-4] at 6 (emphasis added). She

testified that she was "constantly scanning each of the cameras on the zones," *id*, and repeatedly stated that she was watching "all jail cameras." *Id*.

Even assuming Crockett negligently performed her task as Luke urges, negligence is not sufficient. *Neals*, 59 F.3d at 533. And there is no evidence Crockett was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [s]he . . . [drew] the inference." *Farmer*, 511 U.S. at 837. (1994). In other words, there is no evidence she knew Luke was in danger of attack and ignored that risk.

Defendants also correctly observe the lack of causation. The surveillance video clearly confirms that the punch happened suddenly. Approximately 3 to 4 seconds transpired from the time Smith left his seat until he punched Luke one time in the head. *See generally* Video [65-2]. Smith then returned to his seat without further assault. Luke has not shown that Crockett or anyone else could have predicted and prevented the attack even if they had been watching the monitor as it happened. And, as stated before, Luke had not alerted the officers to any potential problems with Smith or anyone else. Luke Dep. [65-3] at 37–38.[3]

Finally, Luke suggests that his rights were violated by the fact that no guard was permanently posted in the dayroom. As an initial matter, Luke has not explained which Individual Defendant would face liability under that theory. Regardless, Luke has not cited any authority suggesting that the monitoring system Defendants employed violated his constitutional rights. He thus also fails to show that the Individual Defendants violated a clearly established right and are therefore unprotected by qualified immunity.

---

[3]Luke also mentions other acts of negligence related to telephone policies. But again, negligence is not enough, and the video clearly shows that Luke concluded his call and walked to the other end of the room before he was attacked.

In sum, Luke has not shown that Defendants exhibited deliberate indifference to his safety such that they are constitutionally liable under a failure-to-protect theory. *See Brown*, 409 F. App'x 730 (noting in a failure-to-protect case that deliberate indifference requires a showing that the official knows of and disregards an excessive risk to inmate health or safety). He likewise fails to show causation. Plaintiff's failure-to-protect claim is dismissed.

### 3. Excessive Force

Next, Luke claims that the Individual Defendants used excessive force in violation of his constitutional rights. A pretrial detainee's protection from excessive force flows not from the Eighth Amendment, but from the Due Process Clause of the Fourteenth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989). "[I]n the absence of an expressed intent to punish, a pretrial detainee can . . . prevail by showing that the actions are not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (citation and internal quotation marks omitted). To prevail on his excessive-force claim, Luke must show: (1) an injury, (2) which resulted from the use of force that was excessive to the need, and (3) the force used was objectively unreasonable. *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001).

As the Supreme Court recently confirmed, this is an objective test. *Kingsley*, 135 S. Ct. at 2472–73. "The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution . . . ." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001).

"A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingley*, 135 S. Ct. at 2473 (citation omitted). That is because "[o]fficers facing disturbances 'are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Id.* at 2474 (quoting *Graham*, 490 U.S. at 397). Finally, "an officer enjoys qualified immunity and is not liable for excessive force unless he has violated a 'clearly established' right, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

In this case, Luke claims that he "was body slammed to the floor by Walker and then struck in the head, face, back and neck and pepper sprayed and dragged and thrown around [sic] into and around the detox cell . . . ." Pl.'s Mem. [70] at 2; *see also id.* at 5, 20, 33, 42. And though he has no recollection of the events, he "*believes* that he was totally innocent in causing or provoking all of the violent assaults upon him and that his injuries could have been prevented." *Id.* at 6 (emphasis added). Had Luke supported this theory with record evidence, then summary judgment would be improper; he did not.[4]

---

[4] Plaintiff often offered no record citation for his descriptions of the alleged force. Rule 56(c)(1) states that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to *particular parts* of materials in the record . . . ." (Emphasis added). Rule 56(c)(3) adds that "[t]he court need consider only the cited materials, but it may consider other materials in the record." And under Rule 56(e)(2), "[i]f a party fails to properly support an assertion of fact . . . , the court may . . . consider the fact undisputed for purposes of the motion." While the Court has endeavored to consider the record as a whole, there is no "duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal–W. Packaging Corp.*, 602 F.3d 374, 379–80 (5th Cir. 2010) (citation and internal quotation marks omitted).

The Court's review of the competent record evidence fails to show objectively unreasonable use of force. To begin, Luke does not remember any relevant events, so the unsupported assertion in his memorandum that he does not "believe" he provoked the use of force is not competent evidence. *See TIG*, 276 F.3d at 759 ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial."). And he has offered no other record evidence supporting that contention.

Though Luke does mention video footage at times, it is not helpful to his case. *See generally* Video [65-2]. There were two videos with no audio. The first shows the events in the dayroom, the second shows the booking area and detox cell where Luke was taken. Much of what happened was out of view, but the Defendants' unrebutted deposition testimony completes the picture.

The first video shows the officers arriving while Luke was lying on the ground. After some time assessing the situation, Jailer Nicholas Walker props Luke up and lifts him to his feet, standing behind Luke and holding him steady around his chest. Neither Luke nor any of the officers appear confrontational as he and Walker walk off camera. But just as they leave the camera's view, something happens, and another officer who had been casually watching moves quickly toward Luke and Walker. *Id.* Luke, Walker, and a third officer then come back into view—by this time they are clearly engaged. Walker now has Luke in a full nelson, and the two, plus two other officers who had joined, fall backwards before going to the ground.

Consistent with the video, Walker explained that he tried to help Luke stand to take him out of the dayroom, but Luke "snapped, turned around [and] with his right elbow, hit [him] in the

face." Walker Dep. [65-6] at 6. Jailer Billy Guess added that when Luke and Walker reached the door to exit the dayroom, Luke "elbowed [Walker] and took his feet and pushed back" causing them to "start[] falling backwards." Guess Dep. [65-7] at 3.

What takes place next is largely out of view. Luke can be seen at times moving around on the floor resisting, and officers are on the floor trying to hold him down. Defendants described Luke as combative—swinging, fighting, biting, and kicking as they attempted to restrain him. *Id.* The officers also warned Luke three times that they would use mace, *id.* at 7, and when Luke tried to bite Guess a second time, Walker applied mace to a towel and "fanned it" in his face to subdue him. *Id.* at 6; *see also* Walker Dep. [65-6] at 7.

During this struggle, the officers attempted to handcuff Luke, but, due to the resistance, the two sides of the cuff locked on one wrist. Walker Dep. [65-6] at 7; Guess Dep. [65-7] at 3. Guess explained that Luke "just kept fighting . . . it was all we could do to hold him . . . . He was like—like a madman." Guess Dep. [65-7] at 7; *see also* Hickman Dep. [65-5] at 5 (describing Luke in the dayroom as "fighting the whole time"); Reid Dep. [65-8] at 4 (stating that officers were trying to handcuff Luke and "he was fighting and scratching or biting at them or whatever"). A second set of handcuffs was obtained, and Reid put his knee on Luke's shoulder to keep him still. Reid Dep. [65-8] at 3.[5]

The first video is consistent with these accounts and shows no punches or kicks. For the most part, the officers are merely trying to hold Luke in place to apply the handcuffs. In all, it

---

[5] According to Luke, Defendant "Reid admitted in his statement and in his deposition that he put his knee in Christopher Luke's neck, in the right corner of his head." Pl.'s Mem. [70] at 20. But in Reid's deposition, he denied putting his knee on Luke's neck, stating, "It was right around his shoulders." Reid Dep. [69-15] at 3.

took several officers almost four minutes and the use of mace to finally place the handcuffs on Luke.

Once Luke was handcuffed in the dayroom, officers moved him to the detox cell, where the second video picks up. Guess Dep. [65-7] at 3. The officers removed the second set of cuffs (attached to both wrists), leaving Luke unrestrained. They could not, however, remove the first set of cuffs (attached to one wrist). Guess Dep. [65-7] at 4. After a couple of minutes in the cell, Walker escorted Luke to the shower to remove any traces of mace. Walker Dep. [65-6] at 9. The video shows Walker steadying Luke by his forearm. It is obvious that no force is being used and Walker is handling him gently as the two leave the camera's view.

Guess and Walker explain that once at the shower, Luke resumed resisting, striking Walker with the remaining cuffs, and biting him. *Id.*; *see also* Guess Dep. [65-7] at 4. Luke had also defecated on himself and was "slinging" feces on the officers. Guess Dep. [65-7] at 4. Though the shower is out of view, those in view clearly react to something in the direction Walker took Luke, and after Luke is returned to the cell, the officers can be seen cleaning themselves.

When Luke returned to the detox cell, the second video shows that he was still unrestrained with the initial handcuffs on a single wrist. Several officers made efforts to remove those cuffs with bolt cutters, but another altercation began, and Luke can be seen kicking and otherwise resisting the officers. Walker admits punching Luke "in his arm" during this episode in an effort to "to deaden his arm" as they continued to try removing the original handcuffs. Walker Dep. [65-6] at 9. The officers then leave the cell, and one officer seems to examine an

injury to his arm.  Eventually, Luke settled down and officers used bolt cutters to remove the first set of cuffs.  Guess Dep. [65-7] at 4.

In the end, there is no genuine dispute of material fact.  The officers' testimony and the video paint a picture of what occurred, and Luke has no memory or other evidence to rebut it.  Once the relevant set of facts are determined with all inferences in favor of the nonmoving party, the reasonableness of a defendant's actions "is a pure question of law."  *Scott v. Harris*, 550 U.S. 372, 381, n.8 (2007); *see also Thompson v. Mercer*, 762 F.3d 433, 441 (5th Cir. 2014).

That question is answered with review of the nonexclusive factors the Court reiterated in *Kingsley*:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

135 S. Ct. at 2473.

Luke specifically addresses one of the *Kingsley* factors, arguing the severity of his injuries demonstrates the force was excessive.  Pl.'s Mem. [70] at 34.  He states, "Clearly, the Plaintiff's permanent injuries were caused by the Defendants and these injuries resulted directly from the excessive force used by Defendants."  *Id.*  But Luke must speculate that his "permanent" injuries were caused by the officers and not when he banged his head against the cell wall or when Smith punched him in the head causing Luke to fall flat to the ground.[6]  Such conclusory and unsupported statements are not sufficient under Rule 56.  *See TIG*, 276 F.3d at

---

[6]Luke was not able to break his fall, but the view of his head is obstructed by the time he hits to the ground.  It is not possible to tell if his head struck the floor.  *See* Video [65-2].

759. And even assuming he suffered injuries during his altercations with the officers, officers may use force, even deadly force, as long as it is reasonable and not excessive. *See, e.g.*, *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009) (affirming summary judgment in favor of officer and holding that fatal shooting of suspect was reasonable under the circumstances). Given the amount of resistance, it is not surprising some injuries would occur, but Luke has not shown that Defendants caused the more severe injuries or that the force was unreasonable.

As for the remaining relevant factors, they include whether the plaintiff resisted, *Kingsley*, 135 S. Ct. at 2473, which is clearly present to a significant degree in this case. Also, there were efforts to temper or limit the force. *Id.* The force used was mostly in an effort to hold Luke still while applying and removing the handcuffs, all of which began after Luke became combative and thus created the need for restraint. No one attempted to restrain Luke or use any force until he hit Walker and began resisting. Similarly, he was warned that mace would be used, and when it was, it was applied to a cloth and fanned rather than sprayed. This also shows a measured "relationship between the need for the use of force and the amount of force used." *Id.* Luke also presented a "security problem," as clearly shown on the videos. *Id.*

The one instance an officer appears to do more than hold Luke still is when Walker admittedly punched him in the arm. But Luke was not restrained at that point, and there was an obvious need to remove the cuffs that remained on his one wrist—he had already hit Walker with them and was still resisting. It should also be noted that this exchange occurred only after other attempts to remove the cuffs had failed due to Luke's resistance and fighting. There is no evidence of excessive force while Luke was restrained and actually subdued.

Luke's behavior was no doubt influenced by his injuries from Smith's attack, but there is no evidence the officers knew what had happened or the extent of any injuries when Luke began fighting them. The reasonableness of their response may not be viewed "with the 20/20 vision of hindsight." *Id.* Luke has not shown excessive force or that the officers violated clearly established law. *See Kitchen*, 759 F.3d at 479 (holding that it is clearly established that "kicking, stomping, and choking *a subdued inmate* would violate the inmate's constitutional rights under certain circumstances" (emphasis added)); *Dawson v. Anderson Cnty., Tex.*, 566 F. App'x 369, 370 (5th Cir. 2014) (affirming summary judgment on excessive-force claim where plaintiff did not comply with officers' instructions and holding that "[l]aw enforcement officers are within their rights to use objectively reasonable force to obtain compliance from prisoners") (citing *Tillis v. Garcia*, 99 F.3d 1135 (5th Cir. 1996) (affirming judgment as matter of law where officers applied physical force to restrain plaintiff after he "engaged in provocative conduct toward the officers")); *see also Stone v. Damons*, 252 F. App'x 581, 582 (5th Cir. 2007) (agreeing with the district court that use of pepper spray by officer where plaintiff resisted and refused to obey order did not amount to excessive force under the circumstances).[7] Summary judgment on the excessive-force claim is appropriate.

---

[7]The Court is likewise not persuaded by Luke's other arguments for this claim. First, Luke claims Defendants were negligent, but "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). Second, he contends that the officers violated internal policies and procedures, but it is well recognized that such violations do not establish § 1983 liability. *See Pasco v. Knoblauch*, 566 F.3d 572, 579 (5th Cir. 2009) ("Violations of non-federal laws cannot form a basis for liability under § 1983, and qualified immunity is not lost because an officer violates department protocol.") (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 119 (1992)); *McCarthy v. Waddell*, No. 3:13-CV-924-DPJ-FKB, 2014 WL 1571678, at *3 (S.D. Miss. Apr. 17, 2014) (noting that even if an officer violated county policy, that does not establish a violation of federal law as required by § 1983).

4.      Delayed Medical Care

As a threshold issue, the Court must determine the type of medical-care claim Luke

presents.  Such claims under § 1983 fall within two well-recognized categories—claims related

to conditions of confinement and those related to episodic acts.  "A challenge to a condition of

confinement is a challenge to 'general conditions, practices, rules, or restrictions of pretrial

confinement.'"  *Estate of Henson v. Wichita Cnty., Tex.*, 795 F.3d 456, 463 (5th Cir. 2015)

(quoting *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644 (5th Cir. 1996)).  "An

episodic-acts-or-omissions claim, by contrast, 'faults specific jail officials for their acts or

omissions.'"  *Id.* (quoting *Shepherd v. Dall. Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009)).  "In such

a case, an actor is 'interposed between the detainee and the municipality, such that the detainee

complains first of a particular act of, or omission by, the actor and then points derivatively to a

policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or

omission.'"  *Id.* (quoting *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc)).

Although the facts and arguments against the Individual Defendants track an episodic-act

theory, Luke seems to disavow it with respect to the medical-care claim, stating:  "This is a

general condition of confinement case not an episodic act or omissions case as alleged by

Defendants."  Pl.'s Mem. [70] at 31.  It is not entirely clear, however, which claim Luke was

addressing when he made that statement.  This argument is technically found in a section

otherwise addressing the alleged failure to protect, but Luke had clearly turned to the medical-

care claim when he stated that this is "not an episodic act or omission case."  *Id.*  Indeed, the

preceding paragraph obviously shifts from the protection claim to the medical-care claim, stating

that he was "effectively denied medical care." *Id.* at 30; *see also id.* ("He was denied medical care."). And the paragraph containing this argument discusses his post-assault condition. *Id.*

To further complicate things, Luke references the law for both theories in the section entitled: "There are Disputed Genuine Issues of Material Fact as to whether the Individual Defendants Delayed or Improperly Denied Medical Care for the Decedent's [sic] Serious Medical Needs, Health and Safety." *Compare id.* at 24 ("Additionally, the Fourteenth Amendment requires prison officials to provide humane conditions of confinement, including adequate medical care." (citing *Farmer*, 511 U.S. at 832)), *with id.* at 25 ("The Fifth Circuit has held that a 'state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm . . . but responded with deliberate indifference to that risk.'" (quoting *Hare*, 74 F.3d at 650)).

Given Luke's plain statement that he pursues a conditions-of-confinement claim, the Court will begin with that theory. But because the arguments Luke offers sound more like an episodic-act theory, the Court will examine that theory as well.

a. Conditions of Confinement

"[A] true jail condition case starts with the assumption that the [defendant] intended to cause the pretrial detainee's alleged constitutional deprivation." *Hare*, 74 F.3d at 644–45. Thus, "isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate. . . . Rather, a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights." *Shepherd*, 591 F.3d at 454.

"A condition is usually the manifestation of an explicit policy or restriction: the number of bunks per cell, mail privileges, disciplinary segregation, etc." *Shepherd*, 591 F.3d at 452. Or, "[i]n some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice." *Id.* (alteration in original) (citation and internal quotation marks omitted). "Proving a pattern is a heavy burden, one that has rarely been met in our caselaw." *Id.* (finding that detainee met this burden by presenting "extensive" evidence of the jail's handling of prisoners with similar illnesses). "In order to prove that in practice [the county's] medical system was constitutionally deficient, Plaintiffs needed to show, or at the summary judgment stage at least present evidence of, more than an isolated incident; they must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs." *Estate of Henson v. Wichita Cnty., Tex.*, 795 F.3d 456, 469 (5th Cir. 2015) (citation and internal quotation marks omitted).

Here, Luke never directly addresses these more specific elements. He does mention two health-care related policies, Policy Numbers D-109 and F-101. *See* Pl.'s Mem. [70] at 18, 23. But he argues only that Defendants violated both by delaying care. *Id.* Accordingly, he has not shown the type of "explicit policy" *Shephard* contemplates. Likewise, he makes no showing of a "pattern" of other incidents. *Id.* at 454. Accordingly, Luke has not demonstrated Neshoba County intended to deprive necessary medical care to its prisoners. *Hare*, 74 F.3d at 644–45.[8]

---

[8] Nor has Luke met the requirements for single-incident liability. *See Walker v. Upshaw*, 555 F. App'x 334, 341 (5th Cir. 2013) (reversing district court and rendering judgment for defendant).

b. Episodic Act

As a pretrial detainee, Luke had a clearly established Fourteenth Amendment right not to be denied medical care as a result of deliberate indifference. *Hare*, 74 F.3d at 650. Here, Luke did receive treatment, but he contends that it was delayed. According to the Fifth Circuit, "[a] delay in medical treatment is not actionable unless the defendants were deliberately indifferent to a serious medical need *and* their indifference resulted in substantial harm." *Uzomba v. Univ. Health Sys., B.C.A.D.C.*, 558 F. App'x 474, 474 (5th Cir. 2014) (per curiam) (emphasis added) (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)).

Defendants address both prongs, but the lack of substantial harm is more quickly addressed. "A delay in providing medical care is not a violation of this constitutional right unless it results in substantial harm." *Lacy v. Shaw*, 357 F. App'x 607, 609 (5th Cir. 2009) (holding that "[e]ven if this lapse were [defendant's] fault, Lacy has not alleged any substantial harm from this moderate delay . . ."); *see also Uzomba*, 558 F. App'x at 474 (holding that pretrial detainee failed to demonstrate alleged delay in care caused substantial harm); *Treece v. Andrews*, 188 F. App'x 230, 231 (5th Cir. 2006) (holding that pretrial detainee failed to show "prison officials intentionally delayed the recommended treatment, much less that any such delay resulted in substantial harm").

Luke contends that he suffered a 48-hour delay in receiving care, but Defendants argue that he fails to show the delay caused substantial harm. They support the argument with the deposition testimony of Luke's treating physician, Dr. Mickey Wallace. Defs.' Mem. [66] at 20–21. Dr. Wallace was asked whether the delay caused Luke's permanent injury—hearing loss—and he responded: "Once it was done, it was probably done. . . . If he tore the hearing

21

nerve, it's torn."  Wallace Dep. [65-13] at 22; *see also id.* at 22–23 (confirming "his hearing loss in both ears was nerve related").

Luke never directly addresses this argument or Defendants' authority, but he does include the following sentence in his brief:  "It is not necessary to establish actual harm to demonstrate violation or [sic] the Constitution."  Pl.'s Mem. [70] at 22.  Luke cites *Farmer* for this contention, but *Farmer* addresses claims for injunctive relief where the defendant is "knowingly and unreasonably disregarding an objectively intolerable risk of harm, and . . . they will continue to do so."  511 U.S. at 845.  In such circumstances, an injunction can issue before an injury occurs.  *Id.*  By contrast, claims for money damages from delayed medical care require proof of "substantial harm."  Luke has not addressed that authority or Defendants' record evidence.  Because Defendants' argument is legally correct and supported by competent record evidence, the Court finds that Luke has not established an episodic-act claim for delayed medical care, assuming he intended one.[9]

B.      Neshoba County—Federal Claims

Municipalities are subject to § 1983 liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

_____

[9] The other essential element is deliberate indifference.  To prove a Defendant acted with deliberate indifference, Luke must show that the officer:  (1) knew Luke faced a substantial risk of serious bodily harm; and (2) disregarded that risk by "failing to take reasonable measures to abate it."  *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).  These inquires must be made on an individual basis in the qualified immunity context.  *See Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007) ("[W]e have consistently examined the actions of defendants individually in the qualified immunity context.").  But such a review is difficult on this record because Luke tends to make his arguments with respect to the Defendants as a whole.  Regardless, he has not shown substantial harm from the delay.

represent official policy, inflicts the injury . . . ." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "Municipal liability cannot be sustained under a theory of respondeat superior. [Rather,] the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (internal citations and quotations omitted).

A claim of municipal liability requires proof of 1) a policymaker; 2) an official policy; and 3) a violation of constitutional rights whose "moving force" is the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694). Without an underlying constitutional violation, "an essential element of municipal liability is missing." *Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997). In other words, even if an ineffective policy was the moving force behind a plaintiff's injury, there can be no § 1983 liability unless the plaintiff suffered a constitution violation. *Doe ex rel. Magee v Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 867 (5th Cir. 2012). Because the Court has found that Luke's constitutional rights were not violated, there can be no § 1983 municipal liability. His claims against Neshoba County are dismissed.

C.      Other Federal Claims

In their motion for summary judgment, Defendants anticipated a claim by Luke for a violation of his right to equal protection of the law under the Fourteenth Amendment. Defs.' Mem. [66] at 21. They argued that he has failed to identify his membership in a protected class or present evidence that he was intentionally discriminated against on account of his membership in said class. *Id.* Plaintiff did not respond to this argument. So, to the extent such a claim is

contained in his Complaint, it has been abandoned.  *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (noting that a plaintiff's failure to pursue a claim beyond the complaint constitutes abandonment).

Plaintiff does, however, mention in his Response that Defendants violated his Fourth Amendment search-and-seizure rights and his Fourteenth Amendment due-process rights to a timely initial appearance.  Pl.'s Mem. [70] at 36.  For the most part, Plaintiff's due-process arguments are derived from the medical-care and excessive-force claims, which have been addressed.  To the extent Plaintiff is asserting these additional claims, they are not apparent from the Second Amended Complaint [30].[10]  Moreover, he does not explain in his argument which Defendant would be responsible for the alleged violations.  In fact, those claims would be directed toward Philadelphia Police Department, the arresting agency, which is not a defendant in this action.  *See* Reid Dep. [65-8] at 7 ("I was told that the police department refused or decided against taking Luke to court because he wasn't acting right.").  In the end, summary judgment is appropriate as to all federal claims.

D.       State-Law Claims[11]

In his Complaint, Luke also asserts state-law claims for negligent and intentional infliction of emotional distress and general negligence against all Defendants.  These state-law claims fall under the Mississippi Tort Claims Act (MTCA), which "provides the exclusive civil

---

[10]   The circumstances of the arrest by the Philadelphia Police Department are mentioned in the Complaint's factual background, but no claims are stated against these Defendants related to the arrest.  *See generally* Second Am. Compl. [30].

[11]  Given the nature of the state-law claims and the stage of this litigation, the Court will exercise supplemental jurisdiction.

remedy against a governmental entity or its employees for acts or omissions which give rise to a suit." *Simpson v. City of Pickens*, 761 So. 2d 855, 858 (Miss. 2000).

Defendants submit that they are immune from liability because it is undisputed that Luke was an inmate at the time of the events giving rise to his claims. *See* Miss. Code § 11-46-9(1)(m) (providing that "[a] governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim: . . . [o]f any claimant who at the time the claim arises is an inmate of an detention center, jail, workhouse, penal farm, penitentiary or other such institution . . . .").

Luke counters that the Individual Defendants do not enjoy personal immunity because they were acting outside the course and scope of their employment when they "assaulted" him. He relies on section 11-46-7(2), which states:

> An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties. For the purposes of this chapter an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense.

In other words, Luke is attempting to argue that the Individual Defendants do not have immunity from state-law claims because they engaged in criminal conduct. Luke cited no cases supporting his argument.

As an initial point, Luke's argument that the Individual Defendants acted outside the course and scope of employment means that all state claims against Neshoba County must be dismissed. Miss. Code Ann. § 11-46-7(2). Next, the general negligence and negligent infliction

of emotional distress claims must be dismissed. These claims contemplate unintentional conduct and do not involve malice or criminal conduct. *See Harris v. Jackson Cnty., Miss.*, No. 1:14CV00435 LG-JCG, 2015 WL 5918196, at *5 (S.D. Miss. Oct. 9, 2015) ("The Court further notes that the negligent infliction of emotional distress claim is one of negligence, and therefore it does not fall within the definition of conduct that would expose an officer to personal liability pursuant to § 11-46-7(2)."); *Lee v. Yazoo Cnty., Miss.*, No. 5:11CV165 DCB-JMR, 2012 WL 5287868, at *1 (S.D. Miss. Oct. 24, 2012) ("[S]ince the plaintiffs are asserting only state law claims for negligence, the defendants are immune from individual liability pursuant to Miss. Code. Ann. § 11-46-7(2)."); *McBroom v. Payne*, No. 1:06CV1222 LG-JMR, 2010 WL 3942010, at *9 (S.D. Miss. Oct. 6, 2010) (considering § 11-46-7(2) and dismissing negligent infliction of emotional distress claim).

As for the remaining intentional-infliction-of-emotional-distress claim, the Court's research reveals that those cases denying immunity to a law-enforcement officer based on § 11-46-7(2) are factually dissimilar. Generally speaking, those cases involve the use of excessive force. For example, in *McBroom v. Payne*, Judge Guirola found a jury question whether the officer used excessive force where he shot at the plaintiff eleven times after she failed to yield to a traffic stop and was driving away. 2010 WL 3942010, at *9. The court then concluded that the officer was not immune from liability. *Id.* Likewise, in *City of Jackson v. Powell*, the court found that the officers acted with malice, and beyond the scope of their employment under § 11-46-7(2), when they used excessive force by beating and kicking the plaintiff who was on the ground and handcuffed, knocking out three teeth. 917 So. 2d 59, 73 (Miss. 2005); *see also Tyson v. Jones County, Miss.*, 2008 WL 4602788, at *7–8 (S.D. Miss. Oct. 15, 2008) (finding

plaintiff's allegations that officers struck and kicked him in head while he was handcuffed on ground, if true, would constitute excessive force and criminal assault, thereby taking conduct outside course and scope of employment).

By contrast, in this case, the Court has examined the conduct of the officers and concluded that they used reasonable force in subduing Luke while he was combative. The Individual Defendants were permitted under the Constitution to use necessary force. *See, e.g., Webb v. Jackson*, 583 So. 2d 946, 951 (Miss. 1991) ("A defense to the charge of an assault or battery is that the person was acting in self-defense. In such a situation, he 'is privileged to use reasonable force, not intended or likely to cause death or serious bodily harm, to defend himself against unprivileged harmful or offensive contact or other bodily harm which he reasonably believes that another is about to inflict intentionally upon him.'") (quoting Restatement (Second) of Torts § 63 (1965)); *see also Manus v. City of Eupora, Miss.*, No. 1:11-CV-00149–SA–DAS, 2015 WL 1505836, at 12 (N.D. Miss. Mar. 31, 2015) (holding that use of reasonable force is within course and scope of employment).

Ultimately, there is a rebuttable presumption under the MTCA that "any act or omission of an employee within the time and at a place of his employment is *within* the course and scope of his employment." Miss. Code § 11-46-5(3) (emphasis added) Plaintiff has not rebutted that presumption, and therefore, the officers do not lose the immunity provided to them by the MTCA. All state-law claims under the MTCA are dismissed.

IV.     Conclusion

The Court has considered all the arguments raised by the parties. Those not addressed in this Order would not have changed the outcome. For the reasons given, the Court finds that

Defendants' motion for summary judgment should be granted.  All claims are dismissed with prejudice.[12]

A separate judgment will be entered in accordance with Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED** this the 22nd day of March, 2016.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE

---

[12] In light of the dismissal, Defendants' motion in limine [72] to exclude the opinions of Plaintiff's expert is considered moot.